IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LINDA BENAVIDEZ,

       Plaintiff,

vs.                                       No. CIV 15-0922 JB/LF

SANDIA NATIONAL LABARATORIES,
VARICK TUCKER, Personally, and
TIMOTHY GARDNER, Personally,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss, filed October 21, 2015 (Doc. 7)(the "Motion"). The Court held a hearing on January 20, 2016. The primary issues are: (i) whether § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("LMRA"), preempts Plaintiff Linda Benavidez' claims for gender and age discrimination under the New Mexico Human Rights Act, N.M. Stat. Ann. §§ 28-1-1 to -14 ("NMHRA"), and for intentional infliction of emotional distress; (ii) if federal law does not preempt Benavidez' gender and age discrimination claims under the NMHRA, whether the Court should nonetheless dismiss her claims for failure to state a claim; (iii) whether Benavidez failed to exhaust her administrative remedies with respect to her claims against Defendants Timothy Gardner and Varick Tucker, and with respect to some of the conduct alleged in support of her discrimination claims that occurred after she filed her charge of discrimination; (iv) whether Benavidez' intentional-infliction-of-emotional-distress claim fails as a matter of law; and (v) whether the Court should remand the case to state court because it lacks subject-matter jurisdiction. The Court will grant the Motion. First, the Court concludes that the LMRA's § 301 does not preempt

Benavidez' age and sex discrimination claims brought pursuant to the NMHRA.  Second, the Court concludes that the LMRA's § 301 partially preempts Benavidez' intentional-infliction-of-emotional-distress claim.  The Court concludes that, to the extent that Benavidez bases her intentional infliction of emotional distress claim on Gardener's "belittl[ing] and berat[ing]" her "for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree," § 301 does not foreclose Benavidez from asserting an intentional infliction of emotional distress claim.  The Court concludes, however, that § 301 preempts Benavidez' intentional-infliction-of-emotional-distress claim to the extent that it is based on: (i) the Defendants' downgrading of Benavidez and putting her in a position for which she was not qualified, either by experience or physical abilities, rather than allowing her to move into another Grade 8 position; and (ii) the Defendants doing nothing to help her find another, more appropriate position after she complained to management multiple times and asked for help in her new position, and their ultimate termination of Benavidez for being unable to perform the new position.  The Court nonetheless dismisses the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 preempts, because Benavidez has not demonstrated that she exhausted her remedies under the CBA.  See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220-21 (1962)(concluding that complaint should have been dismissed for failure to make use of the grievance procedure established in a collective-bargaining agreement or dismissed as preempted by § 301).  Third, the Court concludes that Benavidez states a claim for sex and age discrimination under the NMHRA.  Fourth, the Court will dismiss the claims against the individual defendants -- Gardner and Tucker -- because Benavidez has not exhausted her administrative remedies against them.  The Court concludes, however, that Benavidez has

exhausted her administrative remedies for the conduct alleged in support of her NMHRA discrimination claims that took place after she filed her Charge of Discrimination on September 9, 2014.  Fifth, with respect to the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 does not preempt, the Court concludes that Benavidez does not state a claim upon which relief can be granted.  In sum, the Court is left with two state-law discrimination claims brought under the NMHRA.  While the Court concludes that it retains federal enclave jurisdiction over this action, and therefore denies Benavides' request that the Court remand this case to state court, it must dismiss Benavidez' three claims -- including those brought under the NMHRA -- pursuant to the federal enclave doctrine.

## FACTUAL BACKGROUND

The Court takes its facts from the First Amended Complaint for Damages for Violation of the New Mexico Human Rights Act, and for Intentional Infliction of Emotional Distress, filed October 15, 2015 (Doc. 1-2)("Complaint"),[1] as it must at the motion-to-dismiss stage, see Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

1.      **The Parties.**

Benavidez is a United States citizen and a resident of Albuquerque, New Mexico.  See Complaint ¶ 8, at 6.  At all times relevant to the Complaint, Defendant Sandia National

---

[1]To cite the Complaint, the Court will use the CM/ECF's pagination -- i.e., the blue number in the top right-hand corner of each page -- because the Complaint does not contain internal pagination.

Laboratories employed Benavidez.  See Complaint ¶ 8, at 6.  Sandia Labs is a New Mexico corporation that at all times relevant to the Complaint employed more than fifteen employees. See Complaint ¶¶ 9-10, at 6.  Tucker was Benavidez' Human Resource manager and Gardener was Benavidez' manager.  See Complaint ¶¶ 11-12, at 6.

> **2.      The Events Giving Rise to the Litigation.**

Sandia Labs hired Benavidez as a Neutron Generator Production Specialist on June 1, 2001, and assigned her to work at Sandia Labs in Albuquerque.  See Complaint ¶ 14, at 7.  At all relevant times relevant to the Complaint, Benavidez was a woman and over the age of forty.  See Complaint ¶ 40, at 10-11; id. ¶ 51, at 12.  While working as a Neutron Generator Production Specialist, Benavidez was trained and successfully learned all of her job functions, and she was cross-trained on many other jobs within her department.  See Complaint ¶ 15, at 7.  While working at Sandia Labs, Benavidez "developed some serious medical conditions which resulted in Plaintiff's life activities being affected."  Complaint ¶ 16, at 7.  At some time in 2011, the requirements of Benavidez' position changed to include the need for a Trades Degree, although the essential functions of her position never changed.  See Complaint ¶ 17, at 7; id. ¶ 52, at 12.

"Defendant Timothy Gardener implemented the requirement for a Trades Degree in attempt to get rid of all Grade 8's in the Neutron Generator location."  Complaint ¶ 18, at 7.  To obtain a Trades Degree, Benavidez would have had to return to school for college-level courses such as physics, trigonometry, and chemistry, which would have required her to take years of preparatory classes in order to even qualify to take the required classes.  See Complaint ¶ 19, at 7; id. ¶ 42, at 11; id. ¶ 53, at 12.  "Plaintiff had not attended school since graduating from high school in the 1970s."  Complaint ¶ 19, at 7.  These classes had no bearing on the work that the

Neutron Generator Productions Specialist position required.   See Complaint ¶ 20, at 7. Benavidez attempted to take a class, but could not keep up with the course work.  See Complaint ¶ 20, at 7.  Benavidez "was offered tutoring for her class work but that never occurred." Complaint ¶ 20, at 7.  Gardener "belittled and berated Plaintiff for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree."  Complaint ¶ 64, at 13.  Throughout her employment at Sandia Labs, Benavidez consistently received positive ratings on her performance reviews.  See Complaint ¶ 21, at 7-8; id. ¶ 41, at 11; id. ¶ 52, at 12. She also received comprehensive training for her position's functions until Sandia Labs required her to obtain a Trades Degree.  See Complaint ¶ 21, at 8; id. ¶ 41, at 11; id. ¶ 52, at 12.

Benavidez was told that, if she was unable to obtain the Trades Degree, she would be "bumped" into another similar position at Sandia Labs with the same grade level and pay. Complaint ¶ 22, at 8.  See id. ¶ 42, at 11; id. ¶ 53, at 12.  On June 23, 2014, Gardner informed her "that she would no longer be working as a Neutron Generator Production Specialist due to a workforce reduction."  Complaint ¶ 23, at 8.  "However, there was no reduction in the work force in Plaintiff's department, as younger individuals with Trades Degrees, whom Plaintiff had trained, are currently working in her old position."  Complaint ¶ 23, at 8.  Gardener took away Benavidez' "work access for the Neutron Generator Production department and placed her at a desk with nothing to do for two weeks."  Complaint ¶ 23, at 8.  "Instead of being 'bumped' into a similar position at SNL, Plaintiff was placed in a position described as a Maintenance Support Technician," which "included 'duties requiring working strenuous positions with exertions of physical effort up to 60 pounds.'"  Complaint ¶ 24, at 8.  See id. ¶ 43, at 11; id. ¶ 54, at 12.  In her new position, Benavidez was required to, among other things, obtain a Commercial Driver's

License, obtain a Hazmat Tanker endorsement for fueling, pass the Occupational Safety and Health Administration tire and rim safety training, and obtain a forklift certificate.  See Complaint ¶ 25, at 8.  "She and her co-workers that were put in this position, essentially as tractor/trailer drivers, were the only females working this job."  Complaint ¶ 25, at 8.  See id. ¶ 43, at 11; id. ¶ 54, at 12.  "The only other employees in this position were men, with the exception of one other woman over the age of 40 who was also being 'absorbed' into this new position, and who was ultimately terminated."  Complaint ¶ 54, at 12.

Gardner and Tucker "knew or should have known that Plaintiff was not qualified physically to perform her new job, and was physically unable to perform the job duties." Complaint ¶ 26, at 8.  The Defendants placed Benavides in a position where she was guaranteed not to be able to succeed because of her age and sex.  Complaint ¶ 44, at 11; id. ¶ 56, at 12.  In her new position, Benavidez was demoted from a Pay Grade 8 to a Pay Grade 7.  See Complaint ¶ 27, at 8-9.  "Defendant SNL absorbed the male employees into grade 8 positions which meant that they were not downgraded."  Complaint ¶ 55, at 12.  "After her Union contested this issue, Defendant SNL gave back Plaintiff's Grade 8 pay but froze her scale so that she could no longer receive any raises."  Complaint ¶ 27, at 8-9.  "Throughout July 11, 2014, and continuing to April 16, 2015, Plaintiff attempted to perform her new job."  Complaint ¶ 28, at 9.  Benavidez, however, "had absolutely no qualifications to meet the new job functions."  Complaint ¶ 28, at 9. Classes and training were provided, and Benavidez accomplished all requirements with the exception of getting her CDL.  See Complaint ¶ 28, at 9.  "When Plaintiff was placed on indefinite restrictions is when she had 120 days to find a new job."  Complaint ¶ 29, at 9. Because of the new job's strenuous nature, Sandia Labs sent Benavidez to Bear Canyon Therapy

to be evaluated to determine whether she could physically meet the new job requirements.  See Complaint ¶ 30, at 9.  "On September 9, 2014, Ms. Benavides filed a formal charge of discrimination on the basis of sex, age, and equal pay in violation of the New Mexico Human Rights Act, NMSA § 28-1-7 (1978), et seq."  Complaint ¶ 3, at 5-6.  "On September 30, 2014, Dr. Saurman with Defendant SNL advised Plaintiff that she was incapable of performing the job duties due to her permanent medical restrictions."  Complaint ¶ 31, at 9.  See id. ¶ 45, at 11; id. ¶ 57, at 13.  Accordingly, Benavidez "was placed on a realignment process and was not given any reasonable accommodation."  Complaint ¶ 32, at 9.  See id. ¶ 57, at 13.

> The first sixty (60) day time period is to conduct a division/labs-wide search for suitable work for which Plaintiff is qualified and that can accommodate her indefinite medical restrictions.  If another positon [sic] cannot be obtained within the first sixty (60) day period, the case will be reviewed by the Disability Accommodation Committee for recommendation on whether or not to proceed through the second 60 day period [] of [the] Essential Functions Realignment Process.  Suitable work which Plaintiff was qualified for and could accommodate her indefinite medical restrictions was not found with the first sixty (60) day period.  After the first sixty (60) days the Disability Accommodation Committee met to review Plaintiff's process and voted to continue through the second sixty (60) day period of the Essential Functions Realignment Process.  During the second sixty (60) day period Plaintiff was required to make a good faith effort to find suitable work for which she was qualified for and that could accommodate her indefinite medical restrictions.  If suitable work cannot be found during the second sixty (60) day time period her employment with Sandia would be terminated.

Complaint ¶ 32, at 9-10.

Benavidez made multiple complaints to Sandia Labs management and to Sandia Labs' Human Resources, including complaints to Tucker, "but instead of being offered help, Plaintiff was humiliated and degraded."  Complaint ¶ 33, at 10.  "Plaintiff was advised to bid/apply for other positions offered through Defendant SNL."  Complaint ¶ 34, at 10.  See id. ¶ 45, at 11; id. ¶ 57, at 13.  Benavidez "bid and applied for several positions for which she was capable of

performing, but she was never called back or interviewed."  Complaint ¶ 34, at 10.  See id. ¶ 57, at 13.  Sandia Labs did not offer Benavidez any accommodations even though it provided accommodations to similarly situated employees.  See Complaint ¶ 35, at 10.  "The New Mexico Human Rights Bureau issued an Order of Non-Determination on April 8, 2015, and has closed Plaintiff's complaint administratively, with prejudice."  Complaint ¶ 4, at 6.  After Benavides complained to management multiple times and asked for help in her new position, the Defendants did nothing to help her find another, more appropriate position and did not offer her any other position.  See Complaint ¶ 58, at 13.  On April 16, 2015, Sandia Labs terminated Benavidez' employment for her being unable to perform the new position.  See Complaint ¶ 36, at 10; id. ¶ 66, at 13-14.  "Defendant SNL did nothing to prevent or rectify Defendant Timothy Gardener's or Defendant Varick Tucker's extreme and outrageous behavior, and therefore acquiesced to it."  Complaint ¶ 71, at 14.

## PROCEDURAL BACKGROUND

On August 27, 2015, Benavidez filed suit in the Second Judicial District Court, County of Bernalillo, New Mexico.  See Complaint at 1.  About a month and a half later, on October 15, 2015, the Defendants removed the case to federal court, asserting federal-question jurisdiction.  See Notice of Removal, filed October 15, 2015 (Doc. 1).  Benavidez asserts three causes of action against all of the Defendants: (i) discrimination on the basis of age in violation of the NMHRA, see Complaint ¶¶ 38-48, at 10-12 (Count I); (ii) discrimination on the basis of sex in violation of the NMHRA, see Complaint ¶¶ 49-62, at 12-13 (Count II); and (iii) intentional infliction of emotional distress, see Complaint ¶¶ 63-73, at 13-14 (Count III).  Benavidez asks the Court for judgment against the Defendants "for all actual, compensatory, nominal, and

emotional damages she has suffered . . . [,] punitive damages for Defendants' willful, wanton, and reckless conduct . . . [,] attorneys' and other fees, costs, and pre-and post-judgment interest accrued; and for such other relief as the Court finds just and proper."  Complaint at 14-15.

### 1.    **The Motion.**

The Defendants filed the Motion on October 21, 2015.  In the Motion, the Defendants ask the Court to dismiss this lawsuit for failure to state a claim upon which relief can be granted.  See Motion at 1.  The Defendants first argue that the LMRA's § 301 preempts all of Benavidez' claims.  See Motion at 1.  The Defendants assert that, although Benavidez frames her claims in terms of state law theories, the Court should look beyond the allegations in the Complaint to determine whether the wrongs of which she complains arose from a breach of obligations under the collective bargaining agreement.  See Motion at 1-2.  Here, the Defendants contend, the Complaint states claims arising under New Mexico law: age and sex discrimination in violation of the NMHRA and intentional infliction of emotional distress.  See Motion at 2.  The Defendants maintain that Benavidez "carefully (though not completely) omitted references to the collective bargaining agreement and associated negotiations between her union and employer that directly impacted all of the actions Plaintiff describes."  Motion at 2.

Moreover, the Defendants argue that all three of Benavidez' claims relate to a common set of alleged actions by the Defendants.  See Motion at 2.  First, according to the Defendants, Benavidez alleges that, in 2011, the Defendants implemented a requirement for "college-level classes" or a "Trades Degree" on her position.  Motion at 2.  The Defendants argue that this requirement was negotiated between Sandia Labs and the labor organization representing Benavidez, the Metal Trades Council.  See Motion at 2.  They state that "[t]his allegation is not

- 9 -

based on any independent right or obligation created by state law -- it is instead entirely reliant

on the rights and obligations created by this labor agreement." Motion at 2. Second, according

to the Defendants, Benavidez alleges that the Defendants downgraded her from a Grade 8

position to a "Maintenance Support Technician" instead of "bumping" her into a similar position.

Motion at 4. The Defendants argue, however, that the 2011 Collective Bargaining Agreement

("2011 CBA") contains provisions for direct placement into a position, downgrading, and

"bumping." Motion at 4. The Defendants state:

> By implicitly arguing that Defendants should have utilized one of these
> contractual provisions *instead of* another, Plaintiff grounds her claims in rights
> and obligations created by the collective bargaining agreement. Notably, Plaintiff
> acknowledges that at least one aspect of this alleged action -- her resulting
> compensation after the downgrade -- was resolved between her union and
> employer.

Motion at 4 (emphasis in Motion).

Third, the Defendants state that Benavidez alleges that the Defendants determined that

she could not physically perform the new position, but did not interview her for, or place her in,

another position. See Motion at 4. The Defendants argue that Article 38, Section 7 of the 2014

Collective Bargaining Agreement ("2014 CBA"), however, governs priority placement for

bargaining unit employees "[u]nable to perform [their] job because of physical disability

developed while employed by the Laboratories." Motion at 4. Accordingly, the Defendants

contend that evaluating Benavidez' claims that Defendants did not interview or place her in a

new position would require the Court to interpret the 2014 CBA to identify and apply the rights

and obligations that the agreement creates. See Motion at 4. Finally, the Defendants state that,

"in support of her claims for sex discrimination and intentional infliction of emotional distress,

Plaintiff alleges that her employment was terminated because she was unable to perform her new

position."  Motion at 4.  The Defendants argue that Article 13 of the 2014 CBA establishes the rights and benefits of bargaining unit employees separated because of their inability to perform any available job's essential functions.  See Motion at 4.

The Defendants next argue that, even if § 301 does not preempt Benavidez' NMHRA discrimination claims, the Court must dismiss them for failure to state a claim.  See Motion at 5. The Defendants state that Benavidez must "plead sufficient background facts to make plausible that the [Defendants] took an adverse employment action against [Benavidez], and that [Benavidez' protected] status was a determinative factor in the decision to take that action." Motion at 5-6 (citing Hunt v. Cent. Consol. Sch. Dist., 951 F. Supp. 2d 1136, 1205 (D.N.M. 2013)(Browning, J.)).  The Defendants assert that Benavidez does not allege any background facts supporting her allegation that her age or sex motivated any of the Defendants to undertake the alleged actions.  See Motion at 6.  Further, the Defendants maintain that Benavidez does not allege that younger employees or male employees were treated more favorably, nor does she allege that any of the Defendants harbored any animus towards women or employees over the age of forty.  See Motion at 6.  The Defendants state that Benavidez "does not allege that her age or sex was referenced by Defendants in connection with any of the actions she alleges."  Motion at 6.

The Defendants then catalogue and purport to undermine each of Benavidez' allegations regarding her discrimination claim.  See Motion at 6.  According to the Defendants, Benavidez alleges that Gardner's intent to "get rid of all Grade 8s in the Neutron Generator location" motivated the requirement to take college-level classes.  Motion at 6.  The Defendants assert that, "as alleged, the requirement was non-discriminatory."  Motion at 6.  The Defendants state that

Benavidez' second allegation supporting her discrimination claim is that she was placed in a "Maintenance Support Technician" position.   Motion at 6.   According to the Defendants, Benavidez alleges that the "Defendants placed Plaintiff in a position where she was guaranteed not to be able to succeed because of her age" and "because of her sex."   Motion at 6.   Regarding this allegation, the Defendants assert:

> Although this ambiguous allegation is subject to two interpretations, neither is favorable to Plaintiff's claims.   The most natural reading -- that she could not succeed in her new position because she was a woman or because she was over the age of forty -- is clearly inconsistent with the NMHRA's prohibition on discrimination.     Plaintiff is effectively claiming that Defendants failed to discriminate, by placing her in a job regardless of the fact that she was a woman over the age of forty.   The alternative possible reading of these assertions -- that Defendants, motivated by Plaintiff's age or sex, placed her in a position she was guaranteed not to be able to succeed -- is simply a conclusion, unsupported by any background facts, and therefore is "not entitled to the assumption of truth."

Motion at 6-7 (citations omitted).

Regarding Benavidez' allegation that she was not interviewed for any other positions after it was determined that she was not physically capable of performing her new position, the Defendants contend that Benavidez does not allege that the Defendants failed to conduct any interviews because of Benavidez' age or sex, or that younger or male employees were treated differently.   See Motion at 7.   The Defendants further state that Benavidez "alleges that she was terminated, but she does not allege that this was because of her age or sex, and in fact admits that she was terminated 'for being unable to perform the new position into which Defendants had placed her.'"   Motion at 7 (quoting Complaint ¶ 66, at 13-14).   Finally, the Defendants assert that Benavidez' "broad assertions that '[t]hrough these actions, Defendants discriminated against Plaintiff because of her age [or sex] in violation of the New Mexico Human Rights Act . . .'" are again "mere conclusions . . . not entitled to the assumption of truth."   Motion at 7.   In conclusion,

the Defendants contend that "[t]he deferential requirements of Rule 12(b)(6) do not allow the court to assume that a plaintiff can prove facts that she has not alleged or that the defendant has violated the laws in ways that have not been alleged."  Motion at 7 (citing Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983)).

The Defendants argue that Benavidez has failed to exhaust her administrative remedies with respect to her claims against Gardner and Tucker, and with respect to some of the conduct alleged in support of her discrimination claims that occurred after her charge of discrimination was filed.  See Motion at 8-9.  Finally, the Defendants assert that Benavidez' intentional-infliction-of-emotional-distress claim fails as a matter of law.  See Motion at 9-10.  The Defendants contend that Benavidez must establish "extreme and outrageous" conduct to succeed on her intentional infliction of emotional distress claim.  Motion at 9-10.  The Defendants argue that Benavidez' allegations that she was "belittled and berated," "downgraded," and "terminated" do not amount to extreme and outrageous conduct.  Motion at 10.

**2.      The Response.**

Benavidez responded on November 20, 2015.  See Plaintiff's Response to Defendants' Motion to Dismiss (Doc. 7), Request for Remand, and Memorandum in Support, filed November 20, 2015 (Doc. 16)("Response").  Benavidez first stresses that she does not allege that the Defendants breached the collective bargaining agreement between Sandia Labs and the Metal Workers Union to which she belonged, nor does she allege that the Metal Workers Union failed to fulfill its duty of representation.  See Response at 1-2.  Benavidez then re-alleges all of the facts that she sets forth in her Complaint.  See Response at 2-4.  Benavidez next disputes the

Defendants' assertion that the LMRA's § 301 preempts her claims.   See Response at 5. Benavidez contends that "not every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law."   Response at 5 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. at 209). She argues that preemption is present only if a state claim is "inextricably intertwined with the consideration of the terms of the labor contract," Response at 5 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. at 213), that the state law claims here are not inextricably intertwined with the CBA negotiated between Sandia Labs and the Metal Workers Union, and that the claims can be resolved without interpreting the agreement itself, see Response at 6.   Moreover, Benavidez maintains that her NMHRA discrimination claims and her intentional infliction of emotional distress claim are not dependent on any interpretation of the CBA.   See Response at 6.

Benavidez argues that her claims under the NMHRA are neither founded on rights that the CBA creates, nor dependent on an interpretation of the CBA.   See Response at 6.   She maintains that -- unrelated to the CBA's terms -- she suffered discrimination on the basis of her age, gender, and medical condition, contrary to state law under the NMHRA.   See Response at 6. Benavidez contends that her claims can be resolved without reference to the CBA and that, if she can "meet all the elements to sustain her state claims, she can prevail under the NMHRA irrespective of the terms of the CBA."   Response at 6 (citing Milton v. Scrivner, 53 F.3d 1118, 1121 (10th Cir. 1995)).   Benavidez quotes Milton v. Scrivner for the proposition that state law claims are not preempted even if "the state law analysis might well involve attention to the same factual considerations 'that might be involved in determining the federal issues.'"   Response at 6-7 (quoting Milton v. Scrivner, 53 F.3d at 1121).   According to Benavidez, under Milton v.

Scrivner, "claims made pursuant to state law anti-discrimination statutes are not dependent upon collective bargaining agreements, and are not preempted under § 301."  Response at 7.  She asserts that § 301 does not require preemption where, as is the case here, a plaintiff's claims present purely factual questions that do not require reference to the CBA for resolution, the meaning of the CBA's terms is not in dispute, and the state law remedy is independent of the CBA.  See Response at 7.

Benavidez maintains that, in the retaliation claim context, "[s]o long as the state law cause of action is concerned not with the employer's contractual right to discharge the employee, but rather with its motives in exercising that right, the CBA is not relevant and preemption does not apply."  Response at 7.  She further contends that the Defendants' decision to raise the CBA as a defense to her NMHRA claim does not change the analysis.  See Response at 8.  According to Benavidez, "[e]ven if the Court is required to construe the CBA in considering the defense, 'the presence of a federal question, even a § 301 question, in a defensive argument' does not require preemption."  Response at 8.  Finally, she asserts that § 301 does not preempt her intentional infliction of emotional distress claim, because New Mexico law creates an independent method of measure without recourse to the CBA.  See Response at 8.

Benavidez next argues that her Complaint contains sufficient factual allegations which plausibly support her discrimination claims.  See Response at 9.  She states that her Complaint alleges more than sufficient facts to plausibly allege that the Defendants intentionally discriminated against her and took adverse employment actions against her, because of her age, gender, and medical conditions, which are protected statuses under the NMHRA.  See Response at 9.  Benavidez then spends several pages re-stating the facts that she alleges in her Complaint,

and arguing that they sufficiently support a plausible inference that the Defendants discriminated against her on the basis of age, gender, and medical condition, in violation of the NMHRA.  See Response at 9-12.  Benavidez concedes that she did not exhaust her administrative remedies with respect to claims against Garner and Tucker, and therefore, withdraws her claims as to them.  See Response at 12-13.  She next asserts that her intentional infliction of emotional distress claim has legal and factual support.  See Response at 13.  She argues:

> Defendants attempt to downplay their outrageous actions toward Plaintiff by focusing only on her allegations that she was "belittled and berated," "downgraded," and "terminated."  However, taking all her allegations into account, it is apparent that Defendants' actions began at the point they required her to take college-level physics and chemistry classes, with no help or tutoring, at which they had to know she could not succeed given that she had only a high school degree.  From there, they proceeded to tell her she was being RIF'd, when all could see she was simply replaced with younger employees.  They then proceeded to outrageous actions by putting her in a physically difficult position for which she had no background or qualifications, a recipe for failure, at which she did fail.  They capped this with giving her 120 days to find another position at SNL, but gave her no help and no interviews.  All these actions toward a long-time employee who, up to 2011, had given the company good work product amounted to behavior that was "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Response at 14-15.

Last, Benavidez asks the Court to remand the case to state court.  See Response at 15-16.  She states that the Court is required to remand "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction."  Response at 15 (quoting 28 U.S.C. § 1447(c)).  According to Benavidez, because federal courts are courts of limited jurisdiction, the law imposes a presumption against federal jurisdiction.  See Response at 15-16 (citing Frederick & Warinner v. Lundgren, 962 F. Supp. 1580, 1582 (D. Kan. 1997)(O'Connor, J.).  She argues

that, because there is no federal-question jurisdiction, the Court should remand the case.  See Response at 16.

    **3.**       **The Reply**.

    The Defendants replied on November 25, 2015.  See Defendants' Reply in Support of their Motion to Dismiss, filed November 25, 2015 (Doc. 17)("Reply").   In their Reply, the Defendants make four primary arguments: (i) although Benavidez asserts that she does not allege any violation of a CBA, she fails to address the supporting evidence set forth in the Motion that demonstrates that Benavidez' claims are inextricably intertwined with the interpretation of the CBA between Sandia Labs and the Metal Workers Union; (ii) Benavidez does not demonstrate how the facts alleged support plausible claims for age or gender discrimination; (iii) on her intentional infliction of emotional distress claim, Benavidez does not establish that the conduct alleged is extreme and outrageous; and (iv) the Court should not remand Benavidez' lawsuit to state court because she does not establish that the Court lacks subject-matter jurisdiction.  See Reply at 1.

    On point one, the Defendants attempt to distinguish the facts of this case from the United States Court of Appeals for the Tenth Circuit's decision in Milton v. Scrivner, Inc., and the Supreme Court of the United States' decision in Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988).  See Reply at 2-3.  The Defendants contend that those cases, in particular Lingle v. Norge Division of Magic Chef, Inc., do not foreclose the possibility of preemption altogether where state law anti-discrimination statutes exist.  See Reply at 2-3.  According to the Defendants, "an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-

bargaining agreement."   Reply at 3.   The Defendants maintain that this case presents "the atypical situation where a state law discrimination claim, as applied to the facts alleged in the artfully pleaded complaint and the evidence supporting Defendants' Notice of Removal, cannot be resolved without interpreting the underling collective bargaining agreement."   Reply at 3. The Defendants concede that the NMHRA creates rights independent of the CBA, but assert that they are not arguing, like the employer in Lingle v. Norge Division of Magic Chef, Inc., that Benavidez' claims are preempted because an arbitration under the CBA would address the same facts and conduct.   See Reply at 3.   Rather, the Defendants contend that "a close reading of Plaintiff's Amended Complaint, with the appropriate context, demonstrates that the fundamental concerns at issue in Plaintiff's claims are not Defendants' actions or motivations, but the application of the CBA."   Reply at 3-4.   After examining the allegations set forth in the Complaint, the Defendants conclude: "Defendants have presented excerpts from the CBAs applicable to Plaintiff's employment to demonstrate that the rights and obligations underlying Plaintiff's allegations are founded in those CBAs, and therefore Plaintiff's claims cannot independently be resolved by reference to state law."   Reply at 4-5.

The Defendants next argue that § 301 similarly preempts Benavidez' intentional-infliction-of-emotional-distress claim.   See Reply at 5.   They contend:

> Plaintiff acknowledges that New Mexico state law "requires proof of extreme and outrageous conduct *under the circumstances*" but nevertheless claims that there is an "independent method of measure without recourse to the CBA."   Plaintiff's Response at page 8 (emphasis added).   This cannot be true where, as here, the circumstances at issue involve employment actions governed by a CBA.   *See also Mowry v. United Parcel Service*, 415 F.3d 1149, 1157 (10th Cir. 2005)("Any argument that § 301 does not preempt this [intentional infliction of emotional distress] claim is foreclosed by circuit precedent.").

Reply at 5.  The Defendants then re-assert their arguments from the Motion that, even if § 301 does not preempt Benavidez' discrimination claims, she does not allege sufficient facts to support her claims.  See Reply at 5-6.  Regarding Benavidez' contention that she sufficiently alleges facts to support an intentional infliction of emotional distress claim, the Defendants state that, in her Response, Benavidez  goes beyond the specific allegations asserted in support of Count III.  See Reply at 6.  According to the Defendants, "[e]ven assuming Plaintiff has adequately incorporated the additional allegations she cites, she still has not described any actions that meet the 'very highest' threshold of outrageous conduct necessary to state a claim for IIED."  Reply at 6 (citing Padwa v. Hadley, 1999-NMCA-067, ¶ 11, 981 P.2d 1234, 1238).  They argue that none of these alleged actions "are unusual in the employment context, much less 'extreme and outrageous.'"  Reply at 6-7.

Finally, the Defendants argue that the Court retains subject-matter jurisdiction over this lawsuit.  See Reply at 7.  The Defendants state that Benavidez' argument that her Complaint does not state any federal claims on its face fails to account for the complete preemption doctrine, which, according to the Defendants, acts as an exception to the well-pleaded-complaint rule.  See Reply at 7.  The Defendants contend that the Court retains jurisdiction, because the LMRA's § 301 completely preempts Benavidez' claims.  See Reply at 7.  The Defendants further assert that the Court retains jurisdiction over this lawsuit regardless how it rules on preemption.  See Reply at 7.  The Defendants explain:

> As demonstrated in Defendants' Notice of Removal [Doc. 1], the events in this case occurred within a federal enclave.  In footnote 1 of Plaintiff's Response, she questions why Defendants did not assert "federal enclave jurisdiction in their Motion to Dismiss as an alternative basis for federal jurisdiction."  The answer is that the purpose of the Motion to Dismiss is to seek dismissal of Plaintiff's claims, not to establish federal jurisdiction.  That was accomplished in the Notice

of Removal. Plaintiff also suggests that removal was premature.  This is clearly wrong.  *See* 28 U.S.C. § 1446(b)(1) & (3) (requiring a notice of removal within 30 days from service or the point at which it is apparent the case is removable). Because Plaintiff's Response does not establish that this court lacks subject matter jurisdiction, the case cannot be remanded.  *See* 28 U.S.C. § 1447(c).

Reply at 7-8.

### 4.      **The January 20, 2016, Hearing.**

The Court held a hearing on January 20, 2016.  <u>See</u> Transcript of Hearing (taken January 20, 2015)("Tr.").[2]   At the hearing, the parties largely stuck to their briefing.   After the Defendants briefly set forth their argument that federal law preempts Benavidez' claims, the Court asked the Defendants whether they agree that all of Benavidez' claims are state claims and that there are no federal claims.  <u>See</u> Tr. at 2:12-3:25 (Court, Poore).  The Defendants responded that there are only state law claims in the Complaint.  <u>See</u> Tr. at 4:1-2 (Poore).  They further stated, however, that Benavidez had sent them a proposed second amended complaint, in which Benavidez asserts claims on behalf of herself and three additional former Sandia employees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 to 634 ("ADEA"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12201 to 12213 ("ADA").  <u>See</u> Tr. at 4:3-15 (Court, Poore).  The Court stated that, under the preemption doctrine, one of the bases for federal court jurisdiction is that, even though the face of the complaint does not raise any federal claims, if there is a preemption defense, that is enough for a defendant to remove a case to federal court.  <u>See</u> Tr. at 4:19-24 (Court).  The Defendants agreed and argued that, under the artful pleading doctrine, a plaintiff cannot fail to include factual allegations to avoid federal jurisdiction.  <u>See</u> Tr. at 4:25-5:3 (Poore).   They

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

contended that, in this case, Benavidez failed to plead allegations to avoid federal jurisdiction by omitting the references to the CBAs. See Tr. at 5:3-5 (Poore). The Defendants added that, with respect to Benavidez' request for remand, "there is an alternative basis for federal jurisdiction, which is that the actions took place on a federal enclave, and so remand would be inappropriate regardless of how far the Court rules on the preemption claim." Tr. at 5:11-16 (Poore). The Defendants also confirmed that they cited that basis of jurisdiction in their notice of removal. See Tr. at 5:17-19 (Court, Poore).

Benavidez then took up argument on the Motion. See Tr. 6:21-23 (Court, Higgins, Poore). Benavidez began by emphasizing that "preemption is only required if the state claim is inextricably intertwined with the consideration of the terms of the labor contract." Tr. 6:23-7:1 (Higgins). According to Benavidez, her claims for sex and age discrimination are not inextricably intertwined with the contract's terms and there is nothing in the CBA that would have anything to do with discrimination. See Tr. 7:5-13 (Higgins). She maintained, therefore, that § 301 preemption does not apply. See Tr. 7:9-20 (Higgins). Benavidez then largely re-stated her arguments from her briefing. See Tr. 9:3-10:4 (Higgins). The Court expressed concern that the conduct alleged here does not appear to meet the standard of being outrageous. See Tr. 10:5-20 (Court). Benavidez responded that it was premature to dismiss the claim and that she would like an opportunity to do some discovery. See Tr. 10:5-11:3 (Higgins). Benavidez also agreed that the Court can likely decide whether there is § 301 preemption in this case. See Tr. 12:11-13:5 (Court, Higgins).

The Court then asked Benavidez where she is going with the case by adding additional people and bringing federal claims. See Tr. 13:6-8 (Court). Benavidez stated that attorney

Rachel Berenson was present and could better address that question.  See Tr. 13:9-11 (Higgins).  Ms. Berenson then took up argument before the Court.  See Tr. 13:12-17 (Berenson, Court, Higgins).  She agreed that the Defendants will likely prevail on the issue of federal enclave jurisdiction.  See Tr. 13:17-15:17 (Berenson, Court).  Ms. Berenson further stated that they have received additional right to sue letters from the Equal Employment Opportunity Commission regarding the three other plaintiffs and that they have been trying to draft a complaint to include federal claims for discrimination both for the three additional plaintiffs and for the additional charge that pertains to Benavidez.  See Tr. 14:3-12 (Berenson).  Ms. Berenson explained that they could go about it in two separate ways: (i) file a separate lawsuit for the additional plaintiffs; or (ii) file a motion for leave to amend Benavidez' Complaint to include the federal claims and incorporate the additional plaintiffs.  See Tr. 14:7-19 (Berenson).  The Court asked whether, given that the Defendants have not filed an answer, Benavidez has the ability to file an amended complaint as of right.  See Tr. 15:18-22 (Court).  Ms. Berenson responded that she believed that Benavidez would need permission from the Court, because the time frame had already lapsed even though the Defendants had not yet filed an answer.  See Tr. 15:23-16:3 (Berenson).

The Court then asked the Defendants whether, given that the plaintiffs have indicated that the Defendants likely will prevail on the remand issue, they might allow the plaintiffs to bring their suit here in one case.  See Tr. 16:9-15 (Court).  The Defendants responded that they would prefer that all of the plaintiffs and claims be in one case, but that all of the parties would benefit from the Court ruling on the § 301 preemption question.  See Tr. 16:16-17:2 (Poore).  The Defendants also clarified that they are arguing that, as with the intentional infliction of emotional

distress claim, Benavidez' sex and age discrimination claims do not state a claim upon which relief can be granted.  See Tr. 18:23-19:19 (Poore).  The Defendants made the final point that, although Benavidez did not quite concede federal enclave jurisdiction, she suggested that the intentional infliction of emotional distress claim might survive anyway.  See Tr. 20:7-11 (Poore). According to the Defendants, however, New Mexico first recognized the tort of intentional infliction of emotional distress in 1972, well after the New Mexico legislature passed the NMHRA in 1969.  See Tr. 20:7-11 (Poore).  They therefore contended that they believe that "all of the state law claims will ultimately be disposed of under federal enclave jurisdiction."  Tr. 20:7-19 (Poore).

Benavidez responded that they were relying on a 1937 case, which they contended allowed for damages and recognized a claim for emotional distress.  See Tr. 21:2-10 (Higgins). Benavidez also clarified that the question of sex and age discrimination does not rely on the contract.  See Tr. 20:25-22:4 (Higgins).  The Court responded:

> Does that require any construction of the contract?  I mean [what I] understand the plaintiffs are saying.  It's kind of irrelevant whether the contract required bumping or didn't require bumping, they don't care, they're just saying is the manager came in and said this is what occurred on the basis of what the manager said, that's where the sexual or age discrimination occurred.  Does it really require the Court to construe in any way the CBA.

Tr. 22:5-14 (Court).  The Defendants responded that they read the Complaint as arguing that Benavidez should have bumped or displaced another employee.  See Tr. 22:15-17 (Poore).  They further explained: "I don't believe an argument that her supervisor told her one thing and something different ended up happening has anything to do with [age] or sex discrimination, and so if you actually look at that, it's at best, a contract claim.  At worst it's not a claim at all."  Tr. 22:17-22 (Poore).

The Court then stated:

Let me take a look at this.  I still have a recollection I thought it was maybe that [T]ru[] [Solutions], that [Westinghouse] case out of the [WIPP] site[,] maybe it wasn't.  I thought I had a [§] 301 preemption and I thought I'd construed it narrowly but let me give that some thought.  It sounds like I'm going to [have] federal jurisdiction one way or another here so I'm inclined to dismiss the intentional infliction of distress[;] I think I've had enough of these in the employment context.  I'll have to look at the allegation to see whether they satisfy Iqbal an[d] Twombly.  That's really [what I] understand Sandia to be raising [about] the state law claims on the substance, but the only one I really have a feel for is maybe the intentional infliction of emotional distress.  So I'll have to give that some consideration.  It sounds like the plaintiffs are not contesting or at least indicating that this federal enclave which I have had no experience with, so I'll have to take a look at it for the first time, it sounds like that's sufficient to confer jurisdiction, so it doesn't look like it's a remand situation and the case will remain here in Federal Court.  I understand that the intentional infliction might survive or be around before the federal enclave but I'm not sure that would save it even under state law.

I'll hear the plaintiff[']s motion to stay.  I'll give you my thoughts.  I guess I was inclined to think that the defendant was right, at some point I've got to decide this 301 issue.  It may not be exactly what you[r] next complaint is.  But it sound[s] like I'm going to have to get into it at some point, and I know you may be amending your complaint and things like that, but . . . those [sort] of things I've got to decide[;] it's just delaying things for me not to go ahead and decide it.  So I was inclined to deny it.  [I will g]o ahead and have Ms. Wild send out an [initial scheduling conference] and try to have the opinion out to you by the time I see you at the initial scheduling conference, so we can keep the case moving for all sides and hopefully I'll have [that] opinion out to you.  It will give you some guidance on whether we're going to have these state claims in or out and maybe by that point the plaintiffs will know what they're going to do with their complaint and be ready to go on that.

Tr. 22:23-24:20 (Court).

Ms. Berenson then pointed out that the Defendants could also raise this § 301 preemption argument as to the additional claims that Benavidez and the three additional plaintiffs will bring.  See Tr. 25:4-10 (Berenson).  She asserted that the Court would then have to revisit this preemption issue again with all of the additional plaintiffs.  See Tr. 25:10-12 (Berenson).  The

Court responded, that even if it might need to decide these § 301 preemption issues as to each plaintiff, it might make sense to go ahead and deal with it as to Benavidez.  See Tr. 25:13-21 (Court).  The parties would then have its thoughts on preemption under § 301, and they could then move onto the three additional plaintiffs.  See Tr. 25:21-13 (Court).  Ms. Berenson stated that she understood that rationale, but explained that they had not yet received right-to-sue letters from the Human Rights Division, which would require additional time before they could bring forth all of the other plaintiffs.  See Tr. 25:24-26:5 (Berenson).  The Defendants expressed concern about having to re-file the Motion.  See Tr. 26:6-17 (Court, Poore).  The Court concluded by stating:

> Well, I think that it will probably be helpful to the Court and really to the parties for me to go ahead and get this 301 issue resolved.  So I'm going to deny the motion to stay.  Usually if the plaintiffs want to put theirs on [ice], I'm pretty sympathetic to that, let them kind of control the case, but I think in this situation where we've had a hearing, we've had all the briefing, go ahead and get this issue decided, and I think it will give guidance to us down the road.  I think once I figure it out it will probably help us more expeditiously decide 301 issues for the other three plaintiffs.

Tr. 26:19-27:16 (Court).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the

plaintiff's favor.   See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

 A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

    To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is

insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions. First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss. See Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)); Robbins v. Oklahoma, 519 F.3d 1242. Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the face of the complaint. See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The defense of limitations is the affirmative defense that the complaint's uncontroverted facts is most likely to establish. See 5 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004). If

the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute.  The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense).  It appears that, from case law in several Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates.  See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.).  Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this practice.  See Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, at *17, *37-39 (D.N.M. May 16, 2014)(Browning, J.).

## LAW REGARDING LMRA PREEMPTION

In Caterpillar Inc. v. Williams, 482 U.S. 386 (1987), the Supreme Court articulated the doctrine of complete preemption:

> On occasion, the Court has concluded that the pre-emptive force of a statute is so "extraordinary" that it "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." Metropolitan Life Ins. Co. [v. Taylor, 481 U.S. 58, 65 (1987)]. Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law. See Franchise Tax Bd. [of State of Cal. v. Construction Laborers Vacation Trust for S. Cal., 463 U.S. 1, 24 (1983)]("If a federal cause of action completely pre-empts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law").

482 U.S. at 393. The Supreme Court has held that the LMRA's § 301 has complete preemptive force. See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 23. "Section 301 of the LMRA governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement, although it does not contain an explicit preemption provision." Felix v. Lucent Techs., Inc., 387 F.3d 1146, 1163-64 (10th Cir. 2004)(footnote omitted)(citation omitted)(internal quotation marks omitted).

### 1.   **General Preemption Principles Under the LMRA.**

The LMRA's § 301 provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Tenth Circuit has explained that § 301 "preempts questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, . . . whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." Cisneros v. ABC Rail Corp., F.3d 1299,

1302 (10th Cir. 2000)(citations omitted)(internal quotation marks omitted).  Accord Carroll v. City of Albuquerque, 749 F. Supp. 1216, 1223-24 (D.N.M. 2010)(Browning, J.).

In Allis-Chalmers Corp. v. Lueck, the Supreme Court set forth the standard for determining when § 301 completely preempts a state law claim: "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." 471 U.S. at 220 (citation omitted).  In Allis-Chalmers Corp. v. Lueck, the plaintiff brought a state tort claim against his employer for the bad-faith processing of an insurance claim.  See 471 U.S. at 206.  The Supreme Court concluded that § 301 completely preempted the cause of action, because "the duties imposed and rights established through the state tort . . . derive from the rights and obligations established by the [collective-bargaining] contract," and resolution of the dispute would therefore "inevitably . . . involve contract interpretation." 471 U.S. at 217-18.  The Supreme Court noted, however, that "it would be inconsistent with congressional intent under [§ 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." 471 U.S. at 212.

Subsequently, in Caterpillar Inc. v. Williams, the Supreme Court considered whether § 301 permits employees, whom a CBA covers, to bring state law contract claims for breach of individual contracts between each employee and their employer.  See 482 U.S. at 388.  After reiterating that § 301 "governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective bargaining agreement," the Supreme Court concluded that federal law does not preempt the employees'

state claims for breach of their individual employment contracts. 482 U.S. at 394 (internal

quotation marks omitted). The Supreme Court reasoned:

> Section 301 says nothing about the content or validity of individual employment
> contracts. It is true that respondents, bargaining unit members at the time of the
> plant closing, possessed substantial rights under the collective agreement, and
> could have brought suit under § 301. As masters of the complaint, however, they
> chose not to do so.
>
> Moreover, . . . respondents' complaint is not substantially dependent upon
> interpretation of the collective-bargaining agreement. It does not rely upon the
> collective agreement indirectly, nor does it address the relationship between the
> individual contracts and the collective agreement.

482 U.S. at 394-95. Accord Voilas v. Gen. Motors Corp., 170 F.3d 367, 373-74 (3d Cir.

1999)(stating that, "under Caterpillar, employees have the option of vindicating their interests by

means of either a section 301 action or an action brought under state law, as long as the state-law

action as pleaded does not require interpretation of the collective bargaining contract").

### 2. Determining Whether Claims Are Inextricably Intertwined with Existing CBA Provisions.

"Preemption arises only when an 'evaluation of the . . . claim is *inextricably intertwined*

with consideration of the terms of the labor contract.'" Mowry v. United Parcel Service, 415

F.3d 1149, 1152 (10th Cir. 2005)(emphasis in original)(quoting Allis-Chalmers Corp. v. Lueck,

471 U.S. at 213). "As long as the state-law claim can be resolved without interpreting the

agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."

Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. at 399.

In Lingle v. Norge Division of Magic Chef, Inc., the Supreme Court considered whether

§ 301 completely preempted an employee's state law retaliatory discharge claim against her

employer. See 486 U.S. at 401. The Supreme Court's analysis focused first upon the elements

necessary to make a prima facie retaliatory discharge claim under the relevant state law: (i) discharge or a threat of discharge; and (ii) a motive to deter the employee from exercising her rights.  See 486 U.S. at 407.  These elements, the Supreme Court noted, constituted "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer," neither of which "require[d] a court to interpret any term of a collective-bargaining agreement."  486 U.S. at 407.  Accordingly, the Supreme Court concluded that the employee's state claim was "independent" of the relevant CBA for purposes of § 301, because "resolution of the state-law claim did not require construing the collective-bargaining agreement."  486 U.S. at 407.  Moreover, the Supreme Court found it irrelevant that "the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether [the employee] was fired for just cause [under her CBA]."  486 U.S. at 408.  "[S]uch parallelism," according to the Supreme Court, would not "render [ ] the state-law analysis dependent upon the contractual analysis."  486 U.S. at 408.  The Supreme Court opined that the reason for this principle was that

> [Section] 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements.  In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

486 U.S. at 409-10.

In Mowry v. United Parcel Service, the Tenth Circuit evaluated each of the plaintiff's claims "to determine whether they [were] 'inextricably intertwined' with existing provisions of

his collective-bargaining agreement and, as a result, preempted by § 301 of the LMRA." 415 F.3d at 1152. The plaintiff's first claim -- retaliatory discharge in violation of public policy -- was based on his allegation that United Parcel Service terminated him for refusing to drive when weather and road conditions posed a risk of injury, in violation of statutory regulations stating that commercial drivers must discontinue operation of vehicles in dangerous conditions. See 415 F.3d at 1152-53. The plaintiff argued that, based on the statutory and regulatory provisions, his retaliatory discharge claim was subject to evaluation independent of any interpretation of the CBA and, as a result, § 301 did not preempt the retaliatory discharge claim. See 415 F.3d at 1153. The defendant countered that federal law preempted the claim, because: (i) each of the statutory and regulatory provisions on which the plaintiff relied were expressly incorporated into the CBA, and thus resolution of his retaliation claim necessarily would involve an interpretation of the CBA; and (ii) each element of the retaliation claim required or was substantially dependent on interpretation of the CBA, and thus the claim and the CBA were inextricably intertwined. See 415 F.3d at 1153. The Tenth Circuit did not find persuasive the defendant's assertion that resolution of the plaintiff's retaliatory discharge claim involved interpretation of the CBA solely because it expressly incorporated the statutory provisions upon which the plaintiff relied. See 415 F.3d at 1153. "To the contrary, it actually makes the [CBA] dependent on interpretations of federal and state safety regulations." 415 F.3d at 1153. The Tenth Circuit concluded that federal law did not preempt the plaintiff's state law retaliation claim solely because the CBA incorporated the safety regulations upon which he based his claim. See 415 F.3d at 1153. The Tenth Circuit, nevertheless, found that the LMRA's § 301 preempted the

plaintiff's second claim -- that the defendant "shorted his [pay]checks and he was discharged," because he complained about inadequate pay.  415 F.3d at 1153.  The Tenth Circuit explained:

> In order to resolve the claim, a court would have to determine what work [the plaintiff] performed, when he worked, whether delays occurred and, if so, whether he was entitled to be paid for those delays.  The court would also have to determine what wages he should have been paid, what wages he actually was paid, whether he was underpaid, and, if so, the amount of the shortfall.  All of these issues are regulated by the [CBA] and, thus, require consideration of the collective bargaining agreement.  Article 17 of the [CBA] expressly assures full payment for all hours worked and specifically addresses rates of pay, computation of time worked, credit for certain delays that occur through no fault of the employee, and procedures for obtaining full payment of wages. In sum, because [the plaintiff's] wage and compensation claim is substantially dependent on analysis of the wage and compensation provisions of the collective bargaining agreement, that claim is preempted by federal labor law.

415 F.3d at 1157.  The Tenth Circuit also found that § 301 preempted the plaintiff's third claim -- that the termination constituted intentional infliction of emotional distress.  See 415 F.3d at 1157.   The Tenth Circuit found that "determining whether [the defendant's] conduct in terminating [the plaintiff] was 'outrageous' requires construction of [the defendant's] rights and obligations under the [CBA], as that is the reference point against which [the defendant's] action must be scrutinized."  415 F.3d at 1158 (internal citation and quotation omitted).

In Garley v. Sandia Corp., 236 F.3d 1200 (10th Cir. 2001), the plaintiff, alleged, among other claims, a claim of breach of implied contract.  See 236 F.3d at 1206.  The plaintiff alleged that the defendant's code of ethics, personnel policies, and director's memorandum formed an express and implied contract, which the defendant breached when it failed to follow the criteria stated for progressive disciplinary policy.  See 236 F.3d at 1205.  The plaintiff argued that his claim was not founded on the collective-bargaining agreement, but rather was based exclusively on implied contracts that the defendant's personnel policy, code of ethics, and director's

memorandum created.   See 236 F.3d at 1210.   Consequently, the plaintiff argued that the collective-bargaining agreement was irrelevant to his claim and that a court had no need to interpret the collective-bargaining agreement.   See 236 F.3d at 1210.   The district court found that the breach-of-implied-contract claim revolved around the manner in which the defendant conducted its investigation of suspected employee misconduct and the way in which the plaintiff was terminated.   See 236 F.3d at 1206.   The district court cited the articles of the collective-bargaining agreement governing management of the business and treatment of employees performing council duties, and found that an analysis whether the defendant acted properly would inevitably require an analysis of the collective-bargaining agreement and what it permitted, and thus found section 301 preemption.   See 236 F.3d at 1206.   The Tenth Circuit affirmed the district court's finding of preemption with regards to the breach-of-implied-contract claim.   See 236 F.3d at 1211.

In Cumpston v. Dyncorp Technical Service, Inc., 76 F. App'x 861 (10th Cir. 2003), the plaintiff brought, among other claims, an implied-contract claim based on the defendant's business ethics standards, which forbade harassment of any nature.   See 76 F. App'x at 862.   He argued that the individual defendants' actions constituted proscribed harassment and that, by allowing such conduct, the defendant breached the duty it assumed -- separate from the collective-bargaining agreement -- by issuing the business ethics standards.   See 76 F. App'x at 863.   The district court disagreed, holding that, despite its separate origin, the implied-contract claim was inextricably intertwined with consideration of the terms of the collective-bargaining agreement, and that, the LMRA, thus, preempted the claim.   See 76 F. App'x at 863.   The Tenth Circuit stated:

It is difficult to say in the abstract whether [the defendant's] standards were intended to be read in conjunction with the [collective-bargaining agreement], but we need not resolve that question to decide the preemption issue in this case. Even if there is no general intrinsic connection between the [collective-bargaining agreement] and the standards, consideration of the [collective-bargaining agreement] would still be necessary to assess the merit of plaintiff's allegations regarding breach of the implied contract for two particularized and interrelated reasons. Because the prohibition on "harassment" set out in the standards is devoid of descriptive content, and the actions plaintiff complains of are not on their face so inherently or plainly wrongful as to make application of such a label ineluctable, there would be no way of telling whether the standards were violated here without consulting the [collective-bargaining agreement] to assess the opposing rights and privileges of the parties. Thus, the [collective-bargaining agreement] would be indispensable to a proper resolution of the implied-contract claim, which is, therefore, preempted under the LMRA.

76 F. App'x at 864 (footnote omitted).

In Carroll v. City of Albuquerque, the plaintiff, among other claims, asserted a claim of breach of implied contract. See 749 F. Supp. at 1220. The plaintiff alleged that the defendant's Interoffice Memorandum, Personnel Rules and Regulations, Merit System Ordinance, and Procedures Manual formed an implied employment contract, which the defendant breached when it hired another employee for the position of Traffic Program Specialist over the plaintiff. See 749 F. Supp. at 1220, 1231. The plaintiff argued that it was not necessary to look to the CBA to determine whether the defendant's policies gave rise to an implied employment contract and contended that the defendant's personnel rules were completely independent of the CBA. See 749 F. Supp. at 1221. The Court concluded that the documents upon which the plaintiff relied to support his implied contract claim were inextricably intertwined with the CBA, and that the Court could not ignore the CBA in its analysis whether the policies and ordinances created an implied employment contract. See 749 F. Supp. at 1234. The Court explained that assessing the defendant's actions would also require the Court to construe the CBA's terms to see how they

overlapped with the policies that the plaintiff alleged were breached.  See 749 F. Supp. at 1234.

The Court therefore concluded that § 301 preempted the plaintiff's implied contract claims,

denied the plaintiff's motion to remand, and provided the plaintiff with ten days to amend his

breach-of-implied-contract claims to state a § 301 claim.  See 749 F. Supp. at 1234.

        In Perez v. Qwest Corp., 883 F. Supp. 2d 1095 (D.N.M. 2012)(Browning, J.), the plaintiff

alleged an assault and battery claim.  See 883 F. Supp. 2d at 1101.  The plaintiff alleged that the

CBA preempted his assault and battery claim.  See 883 F. Supp. 2d at 1125-26.  The Court

concluded that the CBA did not contain a provision addressing physical altercations between

employees such that a court might have to consult the CBA to result such a claim.  See 883 F.

Supp. 2d at 1125.  The Court explained that "people face common-law liability for assaulting

and battering one another, independent of any collective bargaining provision to that effect" and

noted that the employee had not pled that the CBA had any provision that related to assault or

battery.  See 883 F. Supp. 2d at 1125.  The Court also rejected the plaintiff's contention that the

Court would need to consult the CBA's provisions relating to injured/ill employees to determine

whether an assault or battery occurred.  See 883 F. Supp. 2d at 1126.  The Court therefore held

that § 301 did not preempt the employee's assault and battery claim.  See 883 F. Supp. 2d at

1126.

### 3.    Distinction Between Interpretation of the CBA and Consultation of the CBA.

        "The Supreme Court has outlined a key distinction between a claim that involves

interpretation of [CBA] terms and one that involves mere reference to those terms, with only the

former requiring complete preemption under § 301 of the LMRA."  Felix v. Lucent Techs., Inc.,

387 F.3d at 1164.  "The mere need to 'look to' the collective-bargaining agreement for damages

computation is no reason to hold the state-law claim defeated by § 301." Livadas v. Bradshaw, 512 U.S. 107, 125 (1994)(citing Lingle v. Norge Div. of Magic Chef, 486 U.S. at 413 n.12). "Especially when the [CBA] terms are undisputed, the court's limited reference to the collective-bargaining agreement to confirm damages is not sufficient to remove a state law claim on the ground that it is completely preempted by § 301 of the LMRA." Felix v. Lucent Techs., Inc., 387 F.3d at 1165.   See Foy v. Pratt & Whitney Grp., 127 F.3d 229, 233 (2d Cir. 1997)(emphasizing difference between interpretation of a CBA and consultation of a CBA).

## LAW REGARDING THE NMHRA

The NMHRA, which is administered by the Human Rights Division and the Human Rights Commission, makes it an unlawful discriminatory practice for

> an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation; provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age; or, if the employer has fifteen or more employees, to discriminate against an employee based upon the employee's sexual orientation or gender identity[.]

N.M. Stat. Ann. § 28-1-7A.   The NMHRA allows individuals to bring a lawsuit in the appropriate district court after exhausting their administrative remedies.   See Luboyeski v. Hill, 117-NMSC-380, 872 P.2d 353, 355 (1994).   The NMHRA sets out the same standard for establishing wrongful discrimination as Title VII.   See Orr v. City of Albuquerque, 417 F.3d 1144, 1149 n.5 (10th Cir. 2005)("Plaintiffs' burden under the NMHRA is identical to their burden under Title VII."); Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1296-97 (10th Cir. 2013)(holding that, "because we conclude that Lobato has no Title VII claim, we also conclude

he has no NMHRA claim").   The NMHRA requires an individual to first exhaust his or her administrative remedies before bringing a lawsuit.  See Luboyeski v. Hill, 117-NMSC-380, 872 P.2d at 355; Bates v. N.M. Corr. Dep't, No. CIV 08-1013, 2010 WL 4339367, at *7 (D.N.M. Sept. 30, 2010)(Browning, J.)("NMHRA claims must be administratively exhausted before being brought in federal court.").  The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days from the date of service of the [New Mexico Human Rights] commission's order.

N.M. Stat. Ann. § 28-1-13A.

The Supreme Court of New Mexico applies the framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "[w]hen considering a violation of the NMHRA."   Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d 548, 551.  The Supreme Court of New Mexico has stated that, "when considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA.  Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own."  Ocana v. Am. Furniture Co., 2004-NMSC-018,  ¶  23,  91  P.3d  58,  68  (internal  quotation  marks omitted)(citations omitted).   "[C]laims of age, race, national origin, gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green."  Gamez v. Country Cottage Care and Rehab., 377 F. Supp. 2d 1103, 1119 (D.N.M. 2005)(citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-804). Under the McDonnell Douglas Corp. v. Green framework, a plaintiff must set forth a prima-facie case of discrimination.  See Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210 (D.N.M.

2004)(Browning, J.).  If the plaintiff establishes a prima-facie case for any of his discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision."  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802.  "Upon the employer's articulation of a legitimate, nondiscriminatory reason . . . the presumption of discrimination established by the prima facie case simply drops out of the picture."  <u>Kelley v. City of Albuquerque</u>, 375 F. Supp. 2d at 1210 (internal quotations omitted). The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual.  <u>See</u> <u>Kelley v. City of Albuquerque</u>, 375 F. Supp. 2d at 1210 (citing <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000)). The Supreme Court of New Mexico has stated that the framework it applies to discrimination claims under the NMHRA is as follows: "[A]n employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action.  The employee then has the opportunity to rebut the employer's proffered reason as pretextual or otherwise inadequate."  <u>Juneau v. Intel Corp.</u>, 2006-NMSC-002, ¶ 9, 127 P.3d at 551 (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802-805).  This approach is the same as the <u>McDonnell Douglas Corp. v. Green</u> framework.

While New Mexico uses federal law to interpret the NMHRA, there may be two ways in which the NMHRA is broader than federal law.  First, as this Court has previously acknowledged, the Supreme Court of New Mexico allows for personal liability under the NMHRA.  <u>See</u> <u>Duprey v. Twelfth Judicial Dist. Court</u>, No. 08-0756 JB, 2009 WL 2482170, at *7 (D.N.M. July 28, 2009)(Browning, J.).  The NMHRA defines "employer" as "any person

employing four or more persons and any person acting for an employer."  N.M. Stat. Ann. § 28-1-2B.  While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has "reject[ed] the proposition that there can exist no individual liability under the NMHRA."  Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d 1188, 1193.  In Sonntag v. Shaw, a defendant relied on Title VII case law to argue that employees cannot sue a corporation's owner in the owner's individual capacity under the NMHRA.  See 2001-NMSC-015, ¶ 13, 22 P.3d at 1193.  Although it held that the defendant could not be held personally liable, given that the plaintiff had failed to exhaust administrative remedies, the Supreme Court of New Mexico declined to close the door on individual liability under the NMHRA.  See 2001-NMSC-015, ¶ 13, 22 P.3d at 1193.  The Supreme Court of New Mexico noted:

> [T]his Court has acknowledged the possibility of individual liability for discrimination claims.  Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994)(affirming the dismissal of individual defendants because the plaintiff failed to exhaust administrative remedies against them); Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski).  As Plaintiff suggests, the potential for individual liability for discrimination claims is rooted in the language of the NMHRA itself, which forbids "any person" from supporting a discriminatory practice.  Section 28-1-7(i); see N.M.S.A. 1978, § 28-1-2(A) (1993)(including within its definition of "person" for purposes of the NMHRA, "one or more individuals").

2001-NMSC-015, ¶ 12, 22 P.3d at 1193.  Second, the NMHRA's definition of "serious medical condition," N.M. Stat. Ann. § 28-1-7, may be broader in scope than the ADA's definition of disability.  See Clayton v. Pioneer Bank, No. 07-0680, 2008 WL 5787472, at *17-18 (D.N.M. Dec. 31, 2008)(Browning, J.)(recognizing that, although "the terms 'medical condition' under the NMHRA, and 'disability,' under the ADA, may be interchangeable in some cases[,]" they may not be the same in others).

## LAW REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

Both Title VII and NMHRA claims must be administratively exhausted before being brought in federal court.  Title VII creates a work-sharing deferral system between the EEOC and the states that have their own employment discrimination legislation.  See 42 U.S.C. § 2000e-5(c), (d).  In the states that possess their own employment discrimination legislation, the EEOC must generally "defer" to state or local remedies.  EEOC v. Superior Temp. Servs., Inc., 56 F.3d 441, 447 (2d Cir. 1995)(quoting 42 U.S.C. § 2000e-5(c), (d)).  The NMHRA places New Mexico among those states that have their own employment discrimination legislation and contact agencies.  See 29 C.F.R. § 1601.74 (2005).  In New Mexico, a complainant can, upon meeting filing requirements, proceed with his or her grievance either through the EEOC or through the New Mexico Human Rights Division.  See Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶¶ 10-19, 980 P.2d at 69-70.  "In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002).  Once a person elects to proceed with his or her complaint under state law, the NMHRA controls the grievance procedures for resolving the complaint.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 109.

Whether complainants decide to pursue their grievances with the EEOC or with the NMHRD, they must exhaust their respective regimes' administrative remedies before seeking judicial review.  See Jones v. Runyon, 91 F.3d 1298, 1399 (10th Cir. 1996)("Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII."); Mitchell-Carr v.

McLendon, 1999-NMSC-025, ¶ 20, 980 P.2d at 71 ("[E]xhaustion of administrative remedies is a prerequisite to suit under the NMHRA, and a failure to exhaust administrative remedies may mean that the court lacks subject-matter jurisdiction.")(citing Luboyeski v. Hill, 117-NMSC-380, 872 P.2d at 355). Exhaustion of administrative remedies is central to Title VII's statutory scheme, because it provides the EEOC and state deferral agencies with the first opportunity to investigate discriminatory practices, and enables them to perform their roles of obtaining voluntary compliance and of promoting conciliatory efforts. See Patterson v. McLean Credit Union, 491 U.S. 164, 180-81 (1989); Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994).

## NEW MEXICO LAW REGARDING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Supreme Court of New Mexico has adopted the Restatement (Second) of Torts' approach for intentional infliction of emotional distress. See Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 26, 176 P.3d 277, 283. The Restatement (Second) provides that intentional infliction of emotional distress exists when:

> [(i)] One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> [(ii)] Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>
> (b) to any other person who is present at the time, if such distress results in bodily harm.

Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 26, 176 P.3d at 283 (quoting Restatement (Second) of Torts § 46).  The elements of intentional infliction of emotional distress are: "[(i)] the conduct in question was extreme and outrageous; [(ii)] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [(iii)] the plaintiffs mental distress was extreme and severe; [and (iv)] there is a causal connection between the defendant's conduct and the claimant's mental distress."  Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 27, 176 P.3d at 283 (internal quotations omitted).  The Supreme Court of New Mexico interprets these elements as "merely restat[ing] the first prong of the *Restatement* test."  Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 27, 176 P.3d at 283.  Most intentional infliction of emotional distress claims arise from a preexisting relationship between the plaintiff and the defendant -- such as employer/employee.  See Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 27, 176 P.3d at 283.

        "Extreme and outrageous conduct is described as conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Silverman v. Progressive Broad., Inc., 1998-NMCA-107, ¶ 32, 964 P.2d 61, 70 (internal quotations omitted).  Severe emotional distress means "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances."  Silverman v. Progressive Broad., Inc., 1998-NMCA-107, ¶ 33, 964 P.2d at 71 (internal quotations omitted).  "Improper treatment does not constitute severe emotional distress as contemplated under the tort."  Silverman v. Progressive Broad., Inc., 1998-NMCA-107, ¶ 33, 964 P.2d at 71.

In <u>E.E.O.C. v. University of Phoenix, Inc.</u>, 505 F. Supp. 2d 1045 (D.N.M. 2007)(Browning, J.), Loretta Grado, an employee working as a Program Specialist at the University of Phoenix, intervened in a lawsuit filed by the EEOC against the University, asserting claims for, among other things, intentional infliction of emotional distress.  <u>See</u> 505 F. Supp. 2d at 1049-53.  The University moved for summary judgment, asking the Court to grant judgment in its favor on all of her claims.  <u>See</u> 505 F. Supp. 2d at 1049-53. The Court granted summary judgment in the University's favor on Grado's intentional infliction of emotional distress claim.  <u>See</u> 505 F. Supp. 2d at 1062-63.   The Court concluded that Grado had not presented evidence of extreme and severe emotional distress where she had alleged that the campus director's behavior towards her

> made her feel like vomiting, caused her to have between five and ten nightmares, caused her to lose sleep, led her to seek medical assistance, led her to take some sample medications her physician provided, and prevented her from caring for her children for a month, because she was too tired and emotionally distracted to do so.

<u>E.E.O.C. v. University of Phoenix, Inc.</u>, 505 F. Supp. 2d at 1062.  The Court explained that Grado presented evidence that she had suffered emotional distress similar to that of which the plaintiff complained in <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.</u>, 41 P.3d 333 (N.M. 2001).  <u>See</u> 505 F. Supp. 2d at 1063.  The Court explained that in <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.</u>, the plaintiff presented evidence that he felt "lousy," was depressed, was prescribed Prozac, slept long hours, and displayed erratic eating habits.  505 F. Supp. 2d at 1062-63 (citing <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.</u>, 41 2002-NMSC-004, ¶ 28, 41 P.3d at 333).  The Court concluded:

> The New Mexico Supreme Court held that such evidence was insufficient to satisfy the extreme and severe emotional distress element of an intentional infliction of emotional distress claim. . . .  Applying New Mexico precedent to this case, the Court finds that the evidence of distress Grado presents is similarly

insufficient to meet the tort claim's extreme and severe element.  As such, the
Court concludes that the University is entitled to summary judgment on Grado's
intentional infliction of emotional distress claim.

E.E.O.C. v. University of Phoenix, Inc., 505 F. Supp. 2d at 1063.

## ANALYSIS

The Court will grant the Motion.  First, the Court concludes that the LMRA's § 301 does

not preempt Benavidez' age and sex discrimination claims brought pursuant to the NMHRA.

Second, the Court concludes that the LMRA's § 301 partially preempts Benavidez' intentional-

infliction-of-emotional-distress claim.  The Court concludes that, to the extent that Benavidez

bases her intentional infliction of emotional distress claim on Gardener's "belittl[ing] and

berat[ing]" her "for not being able to complete the course work she took in preparation for

attempting to obtain a Trades Degree," § 301 does not foreclose Benavidez from asserting an

intentional infliction of emotional distress claim.  See Complaint ¶ 64, at 13.  The Court

concludes, however, that § 301 preempts Benavidez' intentional-infliction-of-emotional-distress

claim to the extent that it is based on: (i) the Defendants' downgrading of Benavidez and putting

her in a position for which she was not qualified, either by experience or physical abilities, rather

than allowing her to move into another Grade 8 position, see Complaint ¶ 64, at 13; and (ii) the

Defendants doing nothing to help her find another, more appropriate position after she

complained to management multiple times and asked for help in her new position, and their

ultimate termination of Benavidez for being unable to perform the new position, see Complaint ¶

65, at 13.  The Court nonetheless dismisses the portion of Benavidez' intentional-infliction-of-

emotional-distress claim that § 301 preempts, because Benavidez has not demonstrated that she

exhausted her remedies under the CBA.  See Allis-Chalmers Corp. v. Lueck, 471 U.S. at 220-21

(concluding that complaint should have been dismissed for failure to make use of the grievance procedure established in a collective-bargaining agreement or dismissed as pre-empted by § 301).  Third, the Court concludes that Benavidez states a claim for sex and age discrimination under the NMHRA.  Fourth, the Court will dismiss the claims against the individual defendants -- Gardner and Tucker -- because Benavidez has not exhausted her administrative remedies against them.  The Court concludes, however, that Benavidez has exhausted her administrative remedies for the conduct alleged in support of her NMHRA discrimination claims that took place after she filed her Charge of Discrimination on September 9, 2014.  Fifth, with respect to the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 does not preempt, the Court concludes that Benavidez does not state a claim upon which relief can be granted.  In sum, the Court is left with two state-law discrimination claims brought under the NMHRA.  While the Court concludes that it retains federal enclave jurisdiction over this action, and therefore denies Benavides' request that the Court remand this case to state court, it must dismiss Benavidez' three claims -- including those brought under the NMHRA -- pursuant to the federal enclave doctrine.

I.     **THE LMRA's § 301 DOES NOT PREEMPT BENAVIDEZ' AGE AND SEX DISCRIMINATION CLAIMS BROUGHT UNDER THE NMHRA, BUT PARTIALLY PREEMPTS HER INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.**

The Court concludes that the LMRA's § 301 does not preempt Benavidez' age and sex discrimination claims brought under the NMHRA, because they are not inextricably intertwined with consideration of the CBA's terms.  Under binding Tenth Circuit precedent, however, the LMRA's § 301 partially preempts Benavidez' intentional-infliction-of-emotional-distress claim.  The Court concludes that, to the extent that Benavidez bases her intentional infliction of

emotional distress claim on Gardener's "belittl[ing] and berat[ing]" her "for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree," § 301 does not foreclose Benavidez from asserting an intentional infliction of emotional distress claim.  See Complaint ¶ 64, at 13.  The Court concludes, however, that Benavidez' intentional-infliction-of-emotional-distress claim is preempted to the extent that she bases her claim on: (i) the Defendants' downgrading of Benavidez and putting her in a position for which she was not qualified, either by experience or physical abilities, rather than allowing her to move into another Grade 8 position, see Complaint ¶ 64, at 13; and (ii) the Defendants doing nothing to help her find another, more appropriate position after she complained to management multiple times and asked for help in her new position, and their ultimate termination of Benavidez for being unable to perform the new position, see Complaint ¶ 65, at 13.  While the Court can dismiss the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 preempts or treat it as arising under § 301, see McCrary v. Aurora Pub. Schs., 57 F. App'x 362, 374 (10th 2003), will dismiss it because Benavidez has not demonstrated that she exhausted her remedies under the CBA, see Allis-Chalmers Corp. v. Lueck, 471 U.S. at 220-21 (concluding that complaint should have been dismissed for failure to make use of the grievance procedure established in a collective-bargaining agreement or dismissed as pre-empted by § 301).[3]

_____

[3]Benavidez did not intent to bring her intentional-infliction-of-emotional-distress claim under § 301 and she has not demonstrated that she exhausted her remedies under the CBA.  See Allis-Chalmers Corp. v. Lueck, 471 U.S. at 220-21 (concluding that complaint should have been dismissed for failure to make use of the grievance procedure established in a collective-bargaining agreement or dismissed as pre-empted by § 301).  Under controlling Tenth Circuit case law, when § 301 preempts a state law claim, the Court can choose to either dismiss the claim or treat it as arising under § 301.  See McCrary v. Aurora Pub. Schs., 57 F. App'x at 374.  Here, as described in this Memorandum Opinion and Order's Section II(B), the Court elects to dismiss the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301

**A.     THE LMRA'S § 301 DOES NOT PREEMPT BENAVIDEZ' AGE AND SEX DISCRIMINATION CLAIMS BROUGHT UNDER THE NMHRA.**

A claim of federal preemption is a defense to the complaint's allegations, and therefore, under the well-pleaded complaint rule, a defendant's assertion that federal law preempts a plaintiff's claims ordinarily is not a proper basis to remove an action to federal court.  See Carroll v. City of Albuquerque, 749 F. Supp. at 1228-30.   "The exception is the complete preemption corollary to the well-pleaded complaint rule."  Carroll v. City of Albuquerque, 749 F. Supp. at 1230.  The LMRA's § 301 is one of the statutes that the Supreme Court has found may completely preempt a plaintiff's state claims.  See Carroll v. City of Albuquerque, 749 F. Supp. at 1230.  The Supreme Court has held that the "preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization."  Avco Corp. v. Machinists, 390 U.S. 557, 558 (1968).  "Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301."  Avco Corp. v. Machinists, 390 U.S. at 558.

Under the LMRA's § 301, a district court may possess subject-matter jurisdiction over a removed complaint even where the federal question arises only in the context of a preempted defense.  See Carroll v. City of Albuquerque, 749 F. Supp. at 1230.  When presented with a removed complaint involving a defense that a federal statute completely preempts state law, the court must decide whether federal law preempts any of the plaintiff's state law claims.  See Carroll v. City of Albuquerque, 749 F. Supp. at 1230.  "When a party's state law claims are

---

preempts, but nothing in this Memorandum Opinion and Order should be construed as precluding the possibility that Benavidez could at a future time ask the Court for leave to amend her Complaint to assert a § 301 claim based on the facts that she advances in support of the portion of her intentional infliction of emotional distress claim that § 301 preempts.

preempted under § 301, the court must either dismiss the claims as preempted or treat them as arising under § 301." McCrary v. Aurora Pub. Schs., 57 F. App'x at 374. See Allis-Chalmers Corp. v. Lueck, 471 U.S. at 220-21 ("[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law.").  "An employee can bring suit under § 301[, however,] only if he or she has exhausted the contractual remedies provided in the collective bargaining agreements." McCrary v. Aurora Pub. Schs., 57 F. App'x at 374. See Allis-Chalmers Corp. v. Lueck, 471 U.S. at 220-21 (concluding that complaint should have been dismissed for failure to make use of the grievance procedure established in a collective-bargaining agreement or dismissed as pre-empted by § 301).  If federal law does not preempt any of the plaintiff's state-law claims, however, the plaintiff's complaint does not present a federal question, and the court must remand, because it lacks subject-matter jurisdiction.[4] See Carroll v. City of Albuquerque, 749 F. Supp. at 1230.

_____

[4]It is important to note that, when a federal court initially performs its analysis with respect to whether a plaintiff's state-law claim is preempted under a completely preemptive federal statute, it does so for jurisdictional purposes.  In other words, if the district court determines that at least one of the plaintiff's state-law claims is preempted, then the court has subject-matter jurisdiction and has at the same time adjudicated the merits of the defendant's preemption defense.  By contrast, if the court determines that the federal statute does not preempt any of the plaintiff's state-law claims, and the court therefore remands the action to state court, then the federal court's conclusion that the plaintiff's state-law claims are not preempted -- an assessment which was made purely for jurisdictional purposes -- is not binding on the state court. See Lyons v. Alaska Teamsters Employer Serv. Corp., 188 F.3d 1170, 1172 n.1 (9th Cir. 1999)("However, the preemption determination made for purposes of determining jurisdiction has no bearing on whether the defendant can actually establish a substantive preemption defense.").

The Supreme Court has stated that § 301 will completely preempt a state law claim when resolution of the state law claim is substantially dependent upon analysis of the terms of the CBA between the parties.  See Caterpillar Inc. v. Williams, 482 U.S. at 395; Allis-Chalmers Corp. v. Lueck, 471 U.S. at 213 (stating that preemption analysis turns on whether the action confers rights on employers or employees "independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract"); Cisneros v. ABC Rail Corp., 217 F.3d at 1302 (explaining that § 301 "preempts questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, . . . whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort"). "Preemption arises only when an 'evaluation of the . . . claim is *inextricably intertwined* with consideration of the terms of the labor contract.'" Mowry v. United Parcel Service, 415 F.3d at 1152 (emphasis in original).  "As long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. at 410.

In Allis-Chalmers Corp. v. Lueck, the Supreme Court set forth the standard for determining when § 301 completely preempts a state law claim: "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." 471 U.S. at 220 (citation omitted).  The Supreme Court of New Mexico applies the framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green "[w]hen considering a violation of the

NMHRA."  Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d at 551.  Under the McDonnell Douglas Corp. v. Green burden-shifting framework, "an employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action."  Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d at 551 (citing Gonzales v. New Mexico Dep't. of Health, 2000-NMSC-029, ¶ 21, 11 P.3d 550, 557).  "The employee then has the opportunity to rebut the employer's proffered reason as pretextual or otherwise inadequate."  Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d at 551-52.

The Court concludes that Lingle v. Norge Division of Magic Chef, Inc. saves Benavidez' age and sex discrimination claims from preemption.  There, the Supreme Court concluded that the LMRA's § 301 did not preempt the particular state law claim at issue where the plaintiff alleged that she had been discharged in retaliation for filing a workers' compensation claim, in violation of applicable state workers compensation laws.  See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. at 401.  Her employer argued that she had been discharged for "just cause" under the CBA.  486 U.S. at 401-02.  The Supreme Court held that the plaintiff's state-law retaliatory discharge claim was "independent" of the CBA and could thus be resolved without reference to the CBA.  486 U.S. at 407.  According to the Supreme Court, it involved "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer."  486 U.S. at 407.  The Supreme Court articulated that the resolution of such a claim "does not require construing the collective-bargaining agreement," 486 U.S. at 407, even if "the state-law analysis might well involve attention to the same factual considerations as the contractual determination of whether Lingle was fired for just cause," 486 U.S. at 408.

The Tenth Circuit reached the same conclusion in  TRW, Inc., Reda Pump Division, 900 F.2d 1517 (10th Cir. 1990), where it held that the LMRA's § 301 did not preempt a state-law retaliatory discharge claim.  See 900 F.2d 1521-22.  See also Davies v. American Airlines, Inc., 971 F.2d 463, 465 (10th Cir. 1992)("[I]nterpretation of the 'just cause' provision of a CBA is not necessary to resolve a retaliatory discharge suit.").  Without looking at the CBA, the Court can apply the McDonnell Douglas Corp. v. Green burden-shifting framework under which Benavidez "bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action."  Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d at 551 (citing Gonzales v. New Mexico Dep't. of Health, 2000-NMSC-029, ¶ 21, 11 P.3d at 557).  Benavidez will "then ha[ve] the opportunity to rebut [Sandia Labs]' proffered reason as pretextual or otherwise inadequate."  Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d at 551-52.  In other words, the right not to suffer discrimination in employment decisions based on age or sex is independent of the question whether the Defendants violated the CBA.  Benavidez in this case will try to show that that the Defendants discriminated against her by forcing her from her position as a Neutron Generator Productions Specialist and placing her in a new job as a Maintenance Support Technician, where she was unlikely to succeed because of her age and sex.  Benavidez will attempt to demonstrate that, after the Defendants placed her in this new position, they determined that she was not physically capable of doing the job, advised her to apply for other Sandia Labs positions, and eventually terminated her.  The Defendants could then defend by arguing that they had the right to transfer employees to improve operations, just as the defendants in Lingle v. Norge Division of Magic Chef, Inc. maintained that they had good cause

to fire their employees.  The point is that New Mexico employees have the right not to suffer

discrimination on the basis of age or sex independent of the CBA's language about an

employee's rights.  The LMRA's § 301 does not preempt Benavidez' age and sex discrimination

claims brought under the NMHRA.

> **B.    THE LMRA's § 301 PARTIALLY PREEMPTS BENAVIDEZ' INTENTIONAL-INFLICTION-OF-EMOTIONAL-DISTRESS CLAIM, BUT THE COURT WILL DISMISS ANY § 301 CLAIM.**

Benavidez contends that the LMRA's § 301 does not preempt her state-law intentional-

infliction-of-emotional-distress claim.  See Response at 13-15.  Unlike the discrimination claims,

the Court concludes that the LMRA's § 301 partially preempts Benavidez' intentional-infliction-

of-emotional-distress claim.  Despite the varying results that other Courts of Appeals have

reached on this issue,[5] the Tenth Circuit has considered LMRA preemption with respect to

---

[5]In Johnson v. Beatrice Foods Co., 921 F.2d 1015 (10th Cir. 1990), the Tenth Circuit acknowledged:

> We note that other circuits have reached varying results when applying the *Allis-Chalmers* and *Lingle* holdings to state tort claims for intentional infliction of emotional distress.  *Compare Brown v. Southwestern Bell Telephone Co.*, 901 F.2d 1250, 1256 (5th Cir. 1990)(emotional distress claim pre-empted because claim actually based on whether employer could discharge employee under terms of contract); *Harris v. Alumax Mill Products, Inc.*, 897 F.2d 400, 403 (9th Cir. [1990]), *cert denied*, 498 U.S. 835 (1990)(emotional distress claim arising out of application of attendance policy pre-empted because "determination of both the scope of Alumax's control over the attendance policy and any consequences flowing from a violation of the policy are dependent upon an analysis of the [CBA]"); *Douglas v. American Information Technologies Corp.*, 877 F.2d 565, 573 (7th Cir. 1989)(emotional distress claim pre-empted where employee complains that employer unfairly applied terms and conditions of CBA); *Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620, 624 (8th Cir. 1989)(claim pre-empted where claim arises out of employee's discharge and investigation leading up to discharge because determination of merits requires review of whether discharge was warranted under CBA), *with Hanks v. General Motors Corp.*, 906 F.2d 341 (8th Cir. 1990)(emotional distress claim based on employee's re-assignment to

intentional infliction of emotional distress claims against employers on numerous occasions.  In Johnson v. Beatrice Foods Co., 921 F.2d 1015 (10th Cir. 1990), an employee alleged a single theory of recovery for intentional infliction of emotional distress under Oklahoma common law. See 921 F.2d at 1017.   The employee alleged that his supervisor, out of personal hostility, "instituted a campaign of intentional discrimination and harassment with the express purpose of inflicting emotional distress upon [him]" -- including verbal abuse, name calling, discipline that the supervisor knew was unwarranted, and changes to the employee's working conditions.  921 F.2d 1017-18.  The Tenth Circuit held that § 301 preempted the employee's intentional infliction of emotional distress claim, because the outrageousness of the supervisor's conduct could not be evaluated without resort to the CBA, and because the state law tort did not create an independent method of measuring when an employer's work-related conduct is outrageous.  See 921 F.2d at 1020.  See Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 530 (10th Cir. 1992)(citing Johnson v. Beatrice Foods Co., 921 F.2d at 1020 (stating that the Tenth Circuit "has specifically held that

---

work with supervisor accused of molesting employee's daughter is not pre-empted because claim does not depend on interpretation of CBA terms); *Krashna v. Oliver Realty, Inc.*, 895 F.2d 111, 114 (3d Cir. 1990)(emotional distress claim based on harassment and discharge is "clearly outside the scope of the [CBA] and § 301"); *O'Shea v. Detroit News*, 887 F.2d 683, 687 (6th Cir. 1989)(claim based on employee's assignment to work undesirable night shift not pre-empted because CBA is irrelevant.  Employer could have tortiously caused employee emotional distress without violating the contract); *Keehr v. Consolidated Freightways of Delaware, Inc.*, 825 F.2d 133, 138 n.6 (7th Cir. 1987)(emotional distress claim based on supervisor's baiting of employee in order to provoke employee into throwing a punch and giving supervisor reason to discharge employee is not pre-empted because claim "revolved around conduct by . . . employer that is not even arguably sanctioned by the labor contract.").

921 F.2d at 1021.

claims for intentional infliction of emotional distress are preempted by section 301")).   The

Tenth Circuit explained:

> We hold that Johnson's claim for intentional infliction of emotional distress
> closely parallels the bad faith claim in *Allis-Chalmers,* and is thus pre-empted by
> [§] 301.   Each of Johnson's allegations directly relates to either explicit or implied
> rights derived from the CBA, just as the bad faith tort claim in *Allis-Chalmers* did.
> Johnson's complaint pertains to the <u>manner in which discipline was carried out</u>,
> just as the employee in *Allis-Chalmers* complained about the manner in which his
> insurance claim was handled.   Furthermore, Johnson could have used the CBA
> grievance procedure for any of the allegations in his complaint since all the
> allegations involved either a suspension, discharge or work-related dispute.

<u>Johnson v. Beatrice Foods Co.</u>, 921 F.2d at 1020 (emphasis added).   The Tenth Circuit

> distinguished *Lingle* and *Marshall* on the basis that "[t]he Illinois Worker's
> Compensation Act creates an independent cause of action because it creates an
> independent method of review" whereas "Oklahoma's tort for intentional
> infliction of emotional distress does not create an independent method of
> measuring when an employer's work-related conduct is outrageous."

<u>Johnson v. Beatrice Foods Co.</u>, 921 F.2d at 1021.   The Tenth Circuit concluded:

> Moreover, Oklahoma has held that a claim for intentional infliction of emotional
> distress "should not be considered in a sterile setting, detached from the milieu in
> which it took place."   <u>Eddy v. Brown</u>, 715 P.2d 74, 77 (Oka. 1986)(footnote
> omitted).   We interpret the Oklahoma law to mean that all aspects of Johnson's
> employment, including the terms of the CBA, must be considered when
> evaluating whether Beatrice's conduct was outrageous.   We therefore agree with
> the district court that it cannot be determined whether Beatrice's conduct was
> outrageous without determining whether the conduct was allowed under the CBA.
> Indeed, "[a]ctions that the [CBA] permits might be deemed reasonable in virtue of
> the fact that the CBA permits them."   <u>Miller v. AT&T Network Systems</u>, 850
> F.2d 543, 550 (9th Cir. 1988).

<u>Johnson v. Beatrice Foods Co.</u>, 921 F.2d at 1020.

The Tenth Circuit revisited the issue in <u>Albertson's, Inc. v. Carrigan</u>, 982 F.2d 1478 (10th

Cir. 1993), where it held that § 301 did not preempt an employee's outrageous conduct claim.

<u>See</u> 982 F.2d 1482-83.   In that case, a union employee covered by a CBA was suspended from

her employment after she was accused of shoplifting.  See 982 F.2d 1479.  She filed suit alleging that Albertson's and various individual defendants "unlawfully suspended [her] from employment and conspired to accuse her falsely of shoplifting from her employer, Albertson's." 982 F.2d 1479.  The employee asserted a single claim for "extreme and outrageous conduct," inflicting upon her "severe emotional distress."  982 F.2d 1479.  The defendants removed the action to federal court based upon preemption pursuant to the LMRA's § 301.  See 982 F.2d 1479.  They then moved to dismiss the suit, alleging that § 301 preempted it and the plaintiff filed a motion to remand to state court.  See 982 F.2d 1479.  The district court concluded that the plaintiff's claim for outrageous conduct consisted of two claims: (i) one based on suspension; and (ii) one based on conspiracy to charge the plaintiff with shoplifting.  See 982 F.2d 1479.  It then dismissed the suspension claim on preemption grounds, but concluded that federal law did not preempt the conspiracy claim, because it did not require interpretation of the CBA.  See 982 F.2d 1479.  Because diversity jurisdiction no longer existed, however, the district court exercised its discretion and remanded that claim to state court.  See 982 F.2d 1479.

The question before the Tenth Circuit was whether federal law completely preempted the plaintiff's claim of outrageous conduct, in which case, the district court should have dismissed the action in its entirety without the conspiracy claim being remanded to the state court.  See 982 F.2d 1479.  The Tenth Circuit first concluded that it did not matter whether it construed the complaint as stating one claim or two.  See 982 F.2d 1481.  It then noted that it

> has held three times that a cause of action for intentional infliction of emotional distress or outrageous conduct in a discharge context is preempted by § 301. *Mock*, 971 F.2d 522 (intentional infliction of emotional distress, defamation, and false light portrayal); *Viestenz v. Fleming Cos., Inc.*, 681 F.2d 699, 702-04 (10th Cir. 1982)(outrageous conduct); *Johnson v. Beatrice Foods Co.*, 921 F.2d [at] 1020[])(intentional infliction of emotional distress).

Albertson's, Inc. v. Carrigan, 982 F.2d 1482.  The Tenth Circuit explained "[t]wo of these cases,

*Mock* and *Viesenz*, involved accusations of theft of the employer's property."  982 F.2d 1482.

The Tenth Circuit then concluded that "[d]espite some broad language in these cases all three are

distinguishable from the situation before us," 982 F.2d 1482, explaining:

> In *Viestenz* the alleged outrageous conduct consisted of threats or comments made
> during an internal investigation of employee thefts, in what could be considered
> the grievance procedure itself ("Viestenz was aware that he was entitled to have a
> union representative present" at the interview in which the threats or comments
> were made). 681 F.2d at 700.  In *Viestenz* we also concluded that the conduct was
> not sufficiently outrageous to be separated from the fact of the employee's
> discharge.  *Id.* at 703-04.  In *Johnson* the acts that formed the basis of the
> outrageous conduct claim were alleged acts of harassment on the job by Johnson's
> superior, many of which were in the form of grievances filed against Johnson
> invoking procedures set out in the CBA.  We held that it could not be determined
> whether the conduct was outrageous "without determining whether the conduct
> was allowed under the CBA."  921 F.2d at 1020.  *Mock* also involved alleged
> wrongful interrogation, abuse and coercion in investigating employees for thefts
> of the employer's assets with the alleged intent of depriving the plaintiff-
> employees of their jobs. 971 F.2d at 524.  Noting that all of the state law claims
> "arose out of conduct alleged to have occurred during the course of an
> investigation by [the employer]," and would "inevitably require an analysis of
> what the CBA permitted," we found § 301 preemption.  *Id.* at 530.
>
> In the case before us, there is no doubt that many, if not all, of the same factual
> issues and disputes will have to be resolved in arbitrating the discharge under the
> CBA as in determining the conspiracy or outrageous conduct claim.  But, it is also
> true that if plaintiffs can show defendants conspired to have Mrs. Aguirre arrested
> by fabricating her theft of groceries from her employer, proving their outrageous
> conduct need not require interpretation of or reference to the CBA.  We believe
> the case before us is akin to the facts in *Lingle v. Norge Div. of Magic Chef, Inc.*,
> 486 U.S. 399 (1988).  There, the plaintiff was allegedly discharged for filing a
> false workers' compensation claim.  Her union, as in the instant case, filed a
> grievance pursuant to the CBA.  That plaintiff subsequently filed an action in state
> court alleging that she had been discharged for exercising her rights under the
> state workers' compensation laws.  After the case was removed to federal court
> the district court granted the defendant's motion for dismissal of the motion,
> concluding that the claim was "'inextricably intertwined' with the collective
> bargaining provision prohibiting wrongful discharge or discharge without just
> cause." *Lingle v. Norge Div. of Magic Chef, Inc.*, 618 F. Supp. 1448, 1449 (S.D.

Ill. 1985).   The Seventh Circuit agreed.   In reversing, the Supreme Court reiterated the *Allis-Chalmers* rule, but concluded that even though the state law claim analysis might involve the same factual consideration as the contractual determination, dismissal was not required.   The Court reasoned that so long as the state law claim could be resolved without resort to the agreement itself, the claim was independent for § 301 preemption purposes; therefore, § 301 preemption occurs "only if . . . application [of state law] requires the interpretation of a collective-bargaining agreement."   *Lingle*, 486 U.S. at 413.   Although in the case before us we are not dealing with workers' compensation, we believe the principle to be the same.

If we were to hold § 301 preempts plaintiff's state law claim that defendants conspired to set her up for arrest and imprisonment just because the same factual disputes would be present in arbitration under the CBA, it would seem to be virtually impossible for a plaintiff to set out a state claim when the complaint also states a federal § 301 claim or a grievance procedure is commenced under the CBA.   We cannot reconcile such a conclusion with *Lingle.   See also Farmer v. United Brotherhood of Carpenters & Joiners*, 430 U.S. 290, 305 (1977)(union member's suit against union officials for intentional infliction of emotional distress not preempted if unrelated to employment discrimination or particularly abusive).

Albertson's, Inc. v. Carrigan, 982 F.2d 1482-83 (emphasis added).

In Garley v. Sandia Corp., a union employee alleged that his supervisor, out of personal hostility, conspired with others to falsely accuse him of timecard fraud.  See 236 F.3d 1203.  He alleged that his supervisor, knowing that he was authorized to attend to union business during work hours under the CBA, initiated an investigation into his alleged timecard fraud, had the employee followed, and caused his termination.  See 236 F.3d 1203-04.  The employee alleged, among other things, that "Sandia committed the tort of intentional infliction of emotional distress because it knew or should have known that the actions of Rose, Fraser, O'Neil, and Harty were maliciously motivated and designed to punish and humiliate [him] and would cause him emotional harm."  236 F.3d 1206.  On appeal, Sandia Corp. argued that, as in Johnson v. Beatrice Foods Co. and Mock v. T.G. & Y. Stores Co., resolving the employee's intentional

infliction of emotional distress claim depended on interpreting what investigatory and disciplinary actions Sandia Corp. was authorized or required to take under the CBA and, therefore, § 301 preempted the claim.  See 236 F.3d 1210.

The Tenth Circuit held that federal law partially preempted the employee's intentional infliction of emotional distress claim.  See 236 F.3d 1210.  It explained that the employee presented two factual predicates for the claim: (i) Sandia Corp.'s actions leading to his dismissal; and (ii) Sandia Corp.'s "continued retaliatory acts."  236 F.3d 1214.  First, it affirmed the district court's decision to the extent that the employee based his claim on Sandia Corp.'s conduct during the investigation -- the first factual predicate for the claim -- and held that § 301 foreclosed the employee from successfully asserting an intentional infliction of emotional distress claim based on Sandia Corp.'s disciplinary procedures.  See 236 F.3d 1214.  The Tenth Circuit explained, however, that this holding did not require it to arrive at the same conclusion with respect to the employee's second factual predicate for his claim -- Sandia Corp.'s alleged retaliatory actions taken following the arbitrator's ruling.  See 236 F.3d 1214.  It explained:

> We are not required to find preemption in "every conceivable claim for intentional infliction of emotional distress which arises from conduct in the work place."  *Jackson v. Kimel*, 922 F.2d 1318, 1326 (4th Cir. 1993).  For the reasons we set out above when discussing Garley's claim for retaliation, we find that to the extent Garley's claim of intentional infliction of emotional distress is based on Sandia's retaliatory acts, we conclude that the claim is not preempted and reverse.  As with Garley's independent cause of action for retaliation, determining whether Sandia's allegedly retaliatory acts are "outrageous" would not require resort to the CBA.  Consequently, to the extent that Garley's cause of action for intentional infliction of emotional distress is based on Sandia's conduct after the completion of the binding arbitration, his claim is not preempted by § 301.

Garley v. Sandia Corp., 236 F.3d at 1214.

In Mowry v. United Parcel Service, the Tenth Circuit again held that § 301 preempted an employee's intentional infliction of emotional distress claim. See 415 F.3d at 1157-58. There, the employee alleged that the United Parcel Service's act of terminating him constituted intentional infliction of emotional distress. See 415 F.3d at 1157. The Tenth Circuit rejected this argument, explaining that "[a]ny argument that § 301 does not preempt this claim is foreclosed by circuit precedent." 415 F.3d at 1157. The Tenth Circuit stated:

> We have repeatedly held that an employee's outrageous conduct claim is "preempted by § 301 because the outrageousness of his supervisor's conduct could not be evaluated without resort to the collective bargaining agreement, and because the state tort did not create an independent method of measure when an employer's work-related conduct is outrageous." *Steinbach* [*v. Dillon Companies, Inc.*], 253 F.3d [538,] 541 [(10th Cir. 2001)]; *see also Beatrice Foods*, 921 F.2d at 1020 ("We hold that [the employee's] claim for intentional infliction of emotional distress closely parallels the bad faith claim in *Allis-Chalmers,* and is thus pre-empted by § 301."). Recently, we held that an employee's civil conspiracy claim based on a fabricated charge of timecard fraud was not preempted but the employee's outrageous conduct claim based on the same factual allegations was, because determining whether the supervisor's conduct was outrageous required resort to the collective bargaining agreement. *Garley*, 236 at 1213-14. Mr. Mowry's outrageous conduct claim is preempted by § 301 for the very same reason-determining whether UPS's conduct in terminating Mr. Mowry was "outrageous" requires construction of UPS's rights and obligations under the CBA, "as that is the reference point against which [UPS's] action must be scrutinized." *Id.* at 1214.

Mowry v. United Parcel Service, 415 F.3d at 1157-58.

The Court concludes that, in this case, as in Garley v. Sandia Corp., § 301 partially preempts Benavides' intentional-infliction-of-emotional-distress claim. With respect to her intentional-infliction-of-emotional-distress-claim, Benavidez alleges the following:

> 64. Defendant Timothy Gardener belittled and berated Plaintiff for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree.

65.   Instead of allowing Plaintiff to move into another Grade 8 position, Defendants downgraded her and put her in a position for which she was not qualified, either by experience or physical abilities.

66.  After Plaintiff complained to management multiple times and asked for help in her new position, Defendants did nothing to help her find another, more appropriate position and ultimately terminated her for being unable to perform the new position into which Defendants had placed her.

67.   Such conduct was extreme and outrageous under the circumstances, was completely unwarranted, and was intended to cause Plaintiff humiliation and emotional harm.

68.   In the alternative, such conduct was in reckless disregard of Plaintiff's physical abilities.

69.   As a result of the Defendants' extreme and outrageous conduct, Plaintiff suffered severe mental illness.

70.   Defendants are liable for the acts of their agents and those who supervise their employees when such act is perpetrated during the course and scope of that agent's or supervisor's employment.

71.   Defendant SNL did nothing to rectify or prevent Defendant Timothy Gardener or Defendant Varick Tucker's extreme and outrageous behavior, and therefore acquiesced to it.

72.  Defendant Timothy Gardener's and Defendant Varick Tucker's extreme and outrageous conduct, and Defendant SNL's acquiescence to Defendant Timothy Gardener's and Defendant Varick Tucker's extreme and outrageous conduct, was willful, wanton, and in reckless disregard for Plaintiff.

Complaint ¶¶ 64-72, at 13-14.

The Court concludes that § 301 partially preempts Benavidez' intentional-infliction-of-emotional-distress claim.  Similar to the plaintiff in Garley v. Sandia Corp., Benavidez presents two factually distinguishable bases for her claim.   The first factual basis is Gardener's "belittl[ing] and berat[ing] of Plaintiff for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree."   Complaint ¶ 64, at 13.  The second

factually distinguishable basis consists of: (i) the Defendants' downgrading of Benavidez and putting her in a position for which she was not qualified, either by experience or physical abilities, rather than allowing her to move into another Grade 8 position, see Complaint ¶ 64, at 13; and (ii) the Defendants doing nothing to help her find another, more appropriate position after she complained to management multiple times and asked for help in her new position, and their ultimate termination of Benavidez for being unable to perform the new position, see Complaint ¶ 65, at 13.

The Court concludes that to the extent that Benavidez bases her claim on Gardener's "belittl[ing] and berat[ing]" her "for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree" -- the first factually distinguishable basis for her claim -- § 301 does not foreclose Benavidez from successfully asserting an intentional-infliction-of-emotional-distress claim.  Complaint ¶ 64, at 13.  The Court is "not required to find preemption in 'every conceivable claim for intentional infliction of emotional distress which arises from conduct in the work place.'"  Garley v. Sandia Corp., 236 F.3d at 1214 (quoting Jackson v. Kimel, 922 F.2d at 1326).  Determining whether Gardener's belittling and berating of Benavidez for not being able to complete the course work that she took in preparation for attempting to obtain a Trades Degree is "outrageous" would not require resort to the CBA. Consequently, to the extent that Garley's cause of action for intentional infliction of emotional distress is based on Gardener's belittling and berating of Benavidez, § 301 does not preempt her claim.

This holding, however, does not require the Court to arrive at the same conclusion with respect to Benavidez' second factual basis for her claim.  Unlike the Court's evaluation of

Gardener's belittling and berating of Benavidez, the Court must examine the CBA to determine whether Sandia Labs' conduct was "outrageous" when it: (i) downgraded her, instead of putting her into another Grade 8 position; (ii) did nothing to help her find another more appropriate position following her complaints; and (iii) ultimately terminated her for being unable to perform the new position.  See Garley v. Sandia Corp., 236 F.3d at 1214 (citing Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 27 (1st Cir. 1997)("[The defendant's] rights and obligations under the collective bargaining agreement are obviously central not only to an inquiry into [its] intentions, but also to an inquiry into whether [it] conducted itself in a sufficiently outrageous manner to give rise to liability under state tort law."); Douglas v. American Information Techs. Corp., 877 F.2d 565, 573 (7th Cir. 1989)("Because [plaintiff's] intentional infliction of emotional distress claim consists of allegedly wrongful acts directly related to the terms and conditions of her employment, resolution of her claim will be substantially dependent on an analysis of the terms of the collective bargaining agreement under which she is employed.")).

In sum, the Court holds that, under controlling Tenth Circuit law, § 301 forecloses Benavidez from successfully asserting an intentional-infliction-of-emotional-distress claim based on the Defendants' downgrading of Benavidez, their failure to help her find a more appropriate position, and their ultimate termination of Benavidez for being unable to perform her new position.  Under controlling Tenth Circuit law, § 301 does not preempt Benavidez' claim of intentional infliction of emotional distress, however, to the extent that it is based on Gardener's "belittl[ing] and berat[ing]" her "for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree."  Complaint ¶ 64, at 13.  With respect to the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 preempts,

the Court can dismiss it or treat it as arising under § 301.  See McCrary v. Aurora Pub. Schs., 57 F. App'x at  374.  The Court concludes, however, that it must be dismissed because Benavidez has not demonstrated that she exhausted her remedies under the CBA.  See Allis-Chalmers Corp. v. Lueck, 471 U.S. at 220-21 (concluding that complaint should have been dismissed for failure to make use of the grievance procedure established in a collective-bargaining agreement or dismissed as pre-empted by § 301).  As explained in this Memorandum Opinion and Order's footnote 3, nothing in this Memorandum Opinion and Order should be construed as precluding the possibility that Benavidez could at a future time ask the Court for leave to amend her Complaint to assert a § 301 claim based on the facts that she advances in support of the portion of her intentional infliction of emotional distress claim that § 301 preempts.

## II.   BENAVIDEZ STATES A CLAIM FOR SEX AND AGE DISCRIMINATION UNDER THE NMHRA.

The Defendants contend that, even if § 301 does not preempt Benavidez' discrimination claims, the Court must dismiss them for failure to state a claim.  See Motion at 5.  Benavidez counters that her Complaint contains sufficient factual allegations which plausibly support her assertion that she suffered discrimination because of her age and sex.  See Response at 9-12. "[T]he 12(b)(6) standard does not require that a plaintiff establish a prima facie case in her complaint."  Khalik v. United Airlines, 671 F.3d 1188, 1192 (10th Cir. 2012).  Rather a plaintiff must "plead sufficient background facts to make plausible that the [Defendants] took an adverse employment action against [the Plaintiff], and that [the Plaintiff's protected] status was a determinative factor in the decision to take that action."  Hunt v. Cent. Consol. Sch. Dist., 951 F. Supp. 2d at 1205.  See Rico v. Xcel Energy Inc., 893 F. Supp. 2d 1165, 1170-71 (D.N.M. 2012)(Vazquez, J.)(explaining that, at the motion to dismiss stage, the Court need not address the

sufficiency of the evidence based on a fully developed factual record, but must rather, determine whether the allegations set forth in the four corners of the Complaint are sufficient to state a plausible claim under the NMHRA). While not required, the elements of a cause of action can help in determining whether a plaintiff has made a plausible claim. See Khalik v. United Airlines, 671 F.3d at 1190. The elements of a prima facie case of discrimination are: "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." Orr v. City of Albuquerque, 417 F.3d at 1149.

The Court concludes that Benavidez' Complaint sufficiently alleges that she suffered discrimination on the basis of her age and sex. First, she sufficiently pleads membership in protected classes -- age and sex -- under the NMHRA. See Complaint ¶¶ 40, 51, at 10-12. Under Count I, Benavidez pleads that "at all relevant times she was over the age of 40," Complaint ¶ 40, at 10, and, under Count II, she pleads that "at all relevant times she is a woman," Complaint ¶ 51, at 12. Second, Benavidez "plead[s] sufficient background facts to make it plausible that the [Defendants] took an adverse employment action against [her]." Hunt v. Cent. Consol. Sch. Dist., 951 F. Supp. 2d at 1205. Adverse employment actions "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Orr v. City of Albuquerque, 417 F.3d at 1150. Benavidez alleges that "[o]n June 23, 2014, Plaintiff was informed by Defendant Timothy Gardner that she would no longer be working as a Neutron Generator Production Specialist due to a workforce reduction." Complaint ¶ 23, at 8. She alleges that "there was no reduction in the work force in Plaintiff's department[, however,] as younger individuals with Trades Degrees, whom Plaintiff had trained, are currently

working in her old position." Complaint ¶ 23, at 8.  Benavidez further alleges that Gardener then

"took away [her] work access for the Neutron Generator Production Department and placed her

at a desk with nothing to do for two weeks."  Complaint ¶ 23, at 8.  She was then "placed in a

position described as a Maintenance Support Technician," which included "duties requiring

working in strenuous positions with exertions of physical effort up to 60 pounds."  Complaint ¶

24, at 8. Benavidez then alleges:

> 25.  As part of her new job, Plaintiff was required to, among other things, obtain a Commercial Driver's License, obtain a Hazmat Tanker endorsement for fueling, pass the OSHA tire and rim safety training, and obtain a forklift certificate. She and her other co-workers that were put in this position, essentially as tractor/trailer drivers, were the only females working this job.
>
> . . . .
>
> 27.  Moreover, in her new position, Plaintiff was demoted from a Pay Grade 8 to a Pay Grade 7.  After her Union contested this issue, Defendant SNL gave back Plaintiff's Grade 8 pay but froze her scale so that she could no longer receive any raises.
>
> 28.   Throughout July 11, 2014, and continuing to April 16, 2015, Plaintiff attempted to perform her new job.  However, she had absolutely no qualifications to meet the new job functions.  Classes and training were provided and Plaintiff accomplished all with the exception of getting her CDL.
>
> 29.  When Plaintiff was placed on indefinite restrictions is when she had 120 days to find a new job.
>
> 30.  Due to the strenuous nature of the new job, Defendant SNL sent Plaintiff to Bear Canyon Therapy to be evaluated to determine whether she could physically meet the new job requirements.
>
> 31.  On September 30, 2014, Dr. Saurman with Defendant SNL advised Plaintiff that she was incapable of performing the job duties due to her permanent medical restrictions.
>
> 32.  As a result, Plaintiff was placed on a realignment process and was not given any reasonable accommodations.  Plaintiff made multiple complaints to SNL management and SNL Human Resources, including complaints to Defendant

Varick Tucker, but instead of being offered help Plaintiff was humiliated and degraded.

34.   Plaintiff was advised to bid/apply for other positions offered through Defendant SNL.  Plaintiff bid and applied for several positions for which she was capable of performing but was never called back or interviewed.

35.  Defendant SNL did not offer Plaintiff any accommodations even though there were similarly-situated employees given accommodations.

36.  On April 16, 2015 Plaintiff's employment was terminated by Defendant SNL.

Complaint ¶¶ 25-36, at 8-10.[6]   Under Count I (age discrimination), Benavidez specifically

alleges:

41.   Plaintiff received consistently positive performance reviews and thorough training for her position at SNL until she was informed that she needed to obtain a Trades Degree to continue in her position as a Neutron Generator Productions Specialist.

42.   Defendants forced Plaintiff either to leave her position as a Neutron Generator Production Specialist, or take college-level classes which would have required Plaintiff to take years of preparatory classes in order even to qualify to take the required classes.

43.   Defendants, instead of "bumping" Plaintiff into a position similar to or like her original position, placed her in a position described as a Maintenance Support Technician, which in essence required her to be a trailer tractor driver.

44.  Defendants placed Plaintiff in a position where she was guaranteed not to be able to succeed because of her age.

45.  After Defendants moved her to the new position, a position Defendants knew Plaintiff was not physically capable of performing successfully, Defendants thereafter determined that Plaintiff was not physically eligible for the position. Defendants advised Plaintiff to apply for other positions through SNL, but Plaintiff was not interviewed for any of the positions for which she applied.

---

[6]As explained in Section IV of this Memorandum Opinion and Order's Analysis Section, the Court concludes that Benavidez has exhausted her administrative remedies for the conduct alleged in support of her NMHRA discrimination claims that took place after she filed her Charge of Discrimination on September 9, 2014, including her ultimate termination.

Complaint ¶¶ 41-45, at 11.  Finally, under Count 2 (sex discrimination), Benavidez specifically alleges:

> 52.  Plaintiff received consistently positive performance reviews and thorough training for her position at SNL until she was informed that she needed to obtain a Trades Degree to continue in her position as a Neutron Generator Productions Specialist.
>
> 53.  Defendants forced Plaintiff either to leave her position as a Neutron Generator Production Specialist, or take college-level classes which would have required Plaintiff to take years of preparatory classes in order even to qualify to take the required classes.
>
> 54.  Defendants, instead of "bumping" Plaintiff into a position similar to or like her original position, placed her in a position described as a Maintenance Support Technician, which in essence required her to be a trailer tractor driver.  The only other employees in this position were men, with the exception of one other woman over the age of 40 who was also being "absorbed" into this new position, and who was ultimately terminated.
>
> 55.  Defendant SNL absorbed the male employees into grade 8 positions which meant that they were not downgraded.
>
> 56.  Defendants placed Plaintiff in a position where she was guaranteed not to be able to succeed because of her sex.
>
> 57.  After being changed to a Maintenance Support Technician, Plaintiff was found not to be eligible for the position and was told that SNL could not accommodate her.  She was given the opportunity to apply through SNL for other positions for which she would qualify but never received a call or interview.
>
> 58.  Plaintiff was not offered any other position and was terminated.

Complaint ¶¶ 52-58, at 12-13.

First, the Court concludes that Benavidez has sufficiently pled that she experienced an adverse employment action when she was removed from her position as a Neutron Generator Production Specialist and placed in a new position as a Maintenance Support Technician.  In her new position as a Maintenance Support Technician, "which in essence required her to be a trailer

tractor driver," Complaint ¶¶ 43, 54, at 11, 12, Benavidez "was required to, among other things,

obtain a Commercial Driver's License, obtain a Hazmat Tanker endorsement for fueling, and

pass the OSHA tire and rim safety training, and obtain a forklift certificate," Complaint ¶ 25, at

8. Her new job also included "duties requiring working in strenuous positions with exertions of

physical effort up to 60 pounds." Complaint ¶ 24, at 8. Benavidez sufficiently alleges that she

was subjected to an adverse employment action in that she was subjected to "a significant change

in employment status" or to "reassignment with significantly different responsibilities." Orr v.

City of Albuquerque, 417 F.3d at 1150. Second, Benavidez' allegation that she was "demoted

from a Pay Grade 8 to a Pay Grade 7" and that, after the Metalworkers Union complained,

Sandia Labs reinstated her Pay Grade 8, but "froze her scale so that she could no longer receive

any raises," sufficiently alleges that she was subjected to an adverse employment action in that

she was subjected to "a decision causing a significant change in benefits." Orr v. City of

Albuquerque, 417 F.3d at 1150. Third and finally, Benavidez has sufficiently pled that she

experienced an adverse employment action when she "was not offered any other position and

was terminated," Complaint ¶ 58, at 13, as the Tenth Circuit has made clear that firing

constitutes an adverse employment action, see Orr v. City of Albuquerque, 417 F.3d at 1150

(brackets in original).[7]

Having concluded that Benavidez has pled sufficient background facts to make it

plausible that she had a protected status under the NMHRA -- being over the age of forty and a

woman -- and that the Defendants took an adverse employment action against her, the Court

---

[7]As explained in Section IV of this Memorandum Opinion and Order's Analysis Section, the Court concludes that Benavidez has exhausted her administrative remedies for the conduct alleged in support of her NMHRA discrimination claims that took place after she filed her Charge of Discrimination on September 9, 2014, including her ultimate termination.

must determine whether Benavidez has pled sufficient background to make plausible that "[her] protected] status *was a determinative factor* in the decision [for her reassignment, significant change in employment status, or significant change in benefits]."   Hunt v. Cent. Consol. Sch. Dist., 951 F. Supp. 2d at 1205 (emphasis added).   In other words, the question is whether Benavidez alleges sufficient facts indicating that her age and sex played a role in her treatment. Based on Benavidez' allegations, the Court concludes that Benavidez has pled sufficient facts at the motion-to-dismiss stage.   That Benavidez was placed as a Maintenance Support Technician where the only other employees in the position were men, with the exception of one other woman over the age of forty who was also being "absorbed" into this new position, and who was also ultimately terminated, makes it plausible that Benavidez' protected status was a determinative factor in the Defendants' decision to take an adverse employment action against her.   See Hunt v. Cent. Consol. Sch. Dist., 951 F. Supp. 2d at 1205.   Further, that when Benavidez was placed in her new position the Defendants demoted her from a Pay Grade 8 to a Pay Grade 7, while absorbing male employees into Grade 8 positions and downgrading them, also gives rise to a plausible inference of unlawful discrimination.   While Benavidez' union contested this issue and Sandia Labs gave back Benavidez' Grade 8 pay, it froze her scale so that she could not receive any raises.   Complaint ¶¶ 14-62, at 7-13.   Finally, that "there was no reduction in the work force in Plaintiff's department[, however,] as younger individuals with Trades Degrees, whom Plaintiff had trained, are currently working in her old position" gives rise to a plausible inference of unlawful discrimination."   Complaint ¶ 23, at 8.   In sum, the allegations set forth in the Complaint at this stage sufficiently state a claim for sex and age discrimination under the NMHRA.

III.   **THE COURT DISMISSES THE NMHRA CLAIMS AGAINST THE INDIVIDUAL
       DEFENDANTS -- GARDNER AND TUCKER.**

The Defendants argue that Benavidez has "failed to exhaust her administrative remedies
with respect to her claims against Defendants Gardner and Tucker[.]"  Motion at 8.  In her
Response, Benavidez concedes that she did not exhaust her administrative remedies with respect
to claims against Garner and Tucker, and therefore, withdraws her claims as to them.  See
Response at 12-13.  Benavidez writes:

> Defendants are correct that neither the charge of discrimination nor the Order of
> Non-Determination by the New Mexico Human Rights Bureau issued on April 8,
> 2015, . . . name Defendants Gardner or Tucker.  That being so, Plaintiff agrees
> that these two Defendants cannot be sued under the NMHRA because Plaintiff
> has not exhausted her administrative remedies as to them.  For that reason,
> Plaintiff will withdraw her claims as to them.

Response at 12.  The Court agrees with the parties that Benavidez did not exhaust her
administrative remedies with respect to Gardner and Tucker.

"Although the NMHRA provides for individual, personal liability in discrimination cases,
it also demands that 'a party must exhaust his or her administrative remedies *against a party*
before bringing an action in district court *against that party*."  Muffoletoo v. Christus St. Vincent
Regional Medical Center, 2015 WL 9943427, at *5 (D.N.M. Nov. 19, 2015)(Vazquez,
J.)(quoting Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d at 1193)(emphasis in original).
See Bates v. New Mexico Corrections Dep't., 2010 WL 4339367, at *16 (D.N.M. Sept. 30,
2010)(Browning, J.)(citing Kelley v. City of Albuquerque, 375 F. Supp. 2d at 1214 ("Before a
plaintiff can state a valid claim against an individual defendant under NMHRA, however, the
plaintiff must first exhaust her administrative remedies.")).  In Sonntag v. Shaw, the Supreme
Court of New Mexico stated that, "[u]nder the NMHRA, a plaintiff must exhaust his or her

administrative remedies against a party before bringing an action in district court against that party. . . .” Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d at 1193.  Based on this requirement, the Supreme Court of New Mexico held that, “[i]n neglecting to name [the corporation’s owner] personally, [the plaintiff] failed to exhaust her administrative remedies against him.  The trial court therefore erred in allowing Plaintiff’s discrimination claim to be brought against [the owner] individually.” Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d at 1193.

Similarly, in Luboyeski v. Hill, the Supreme Court of New Mexico addressed a case where the plaintiff “filed a complaint with the Division, naming the School System as respondent and claiming that Kermit Hill, another teacher at the school where [the plaintiff] taught, had touched and made advances toward her in sexually inappropriate ways.” Luboyeski v. Hill, 117-NMSC-380, ¶ 3, 872 P.2d at 354.  Hill was “not named as [a] respondent[] in the proceeding before the Division and w[as] only added as defendants on [the plaintiff’s] appeal to the district court.”  117-NMSC-380, ¶ 7, 872 P.2d at 355.  The Supreme Court of New Mexico found that the plaintiff had not exhausted her administrative remedies against Hill, holding “that parties who have not been parties to an administrative proceeding should not be added on appellate review of that proceeding.”  117-NMSC-380, ¶ 7, 872 P.2d at 355 (internal citations and quotations omitted).

The operative Charge of Discrimination form in this case names only Sandia National Laboratories.  See Charge of Discrimination at 1 (executed September 18, 2014), filed October 21, 2015 (Doc. 7-1)(“Charge of Discrimination”).  Accordingly, Benavidez may not maintain any NMHRA claims against the individual Defendants -- Gardner and Tucker -- in this case.  On

December 8, 2015, the Defendants filed a notice of adverse authority.   See Defendants' Disclosure of Adverse Authority, filed December 8, 2015 (Doc. 20)("Notice of Adverse Authority").  In the Notice of Adverse Authority, the Defendants explain:

> In Defendants' Motion to Dismiss, Defendants argued that Plaintiff's New Mexico Human Rights Act claims against Defendants Gardner and Tucker must be dismissed for failure to exhaust administrative remedies, citing *Luboyeski v. Hill*, 1994-NMSC-032, ¶ 7, 872 P.2d 353, 355.   In her Response, Plaintiff acknowledged that the individual Defendants cannot be sued under the NMHRA, and agreed to withdraw those claims.
>
> Counsel for Defendants has since learned of the New Mexico Supreme Court's decision in *Lobato v. New Mexico Environment Department,* 2012-NMSC-002, 267 P.3d 65.  *Lobato* does not overrule *Luboyeski*, and in fact cites *Luboyeski* for the proposition that individual defendants cannot be named for the first time in court.  1994-NMSC-032, ¶ 10.  However, the New Mexico Supreme Court did find that in the "limited circumstances" of that case, the plaintiff's claims survived his failure exhaust administrative remedies in large part because the Charge of Discrimination form and related administrative procedures did not adequately instruct him to identify individuals.  *Id*. at ¶ 14.  The undersigned counsel believes the *Lobato* case may be directly adverse authority, and accordingly is disclosing it to the Court.

Notice of Adverse Authority at 1-2.

The Court concludes that the Supreme Court of New Mexico's decision Lobato v. New Mexico Environment Department does not undermine the Court's conclusion that Benavidez may not maintain any NMHRA claims against the individual Defendants -- Gardner and Tucker -- in this case.  In Lobato v. New Mexico Environment Department, the Supreme Court of New Mexico reiterated that the "NMHRA creates a cause of action against individuals, which necessarily requires the naming of these individuals in the administrative complaint, and requires administrative exhaustion against these individuals as a prerequisite to judicial remedies." Lobato v. New Mexico Environment Department, 2012-NMSC-002, ¶ 10, 267 P.3d at 68.

It continued, however, that the agency's "official Charge of Discrimination form" provided by the Human Rights Division "creates a trap for unwary claimants to forfeit their statutory rights and judicial remedies." This analysis, coupled with other factors, including the fact that plaintiff had filed his Charge of Discrimination without the advice of counsel, led the New Mexico Supreme Court to conclude that "*in these limited circumstances* the requisite administrative exhaustion of the NMHRA should not be required in order for Plaintiff to pursue his judicial remedies under the statute."

Muffoletoo v. Christus St. Vincent Regional Medical Center, 2015 WL 9943427, at * 5 (citations omitted).

No such circumstances appear to exist here. There is no indication that, by the time Benavidez signed and submitted the Charge of Discrimination form, she had not already consulted with an attorney. Benavidez did not respond to the Defendants' filing of their Notice of Adverse Authority, and she does not argue in her Response that she fits the Supreme Court's description of "unwary plaintiffs." Muffoletoo v. Christus St. Vincent Regional Medical Center, 2015 WL 9943427, at * 5. Moreover, the website for the state agency states that, "[e]ffective March 1, 2010, parties represented by counsel will be expected to prepare their own FORMS for initiating a Human Rights claim. Parties who are not represented by an attorney should contact the Human Rights Bureau for assistance in completing the necessary paperwork to file a complaint." Muffoletoo v. Christus St. Vincent Regional Medical Center, 2015 WL 9943427, at * 5 (quoting *Filing a Complaint of Discrimination*, New Mexico Dep't of Workforce Solutions, http://www.dws.state.nm.us/Labor-Relations/Human-Rights/Filing-a-Complaint-of-Discrimination (last visited June 20, 2016)). If an attorney did not represent Benavidez at the time she submitted her Charge of Discrimination, she should have at the very least consulted with the agency before filing her complaint on the form provided online, as the website directs. See Muffoletoo v. Christus St. Vincent Regional Medical Center, 2015 WL 9943427, at * 5. In

sum, the Court identifies no reason to ignore the ordinary rule that a plaintiff must exhaust her administrative remedies with respect to each individual defendant before bringing a civil action. See Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d at 1193.  Accordingly, the Court will dismiss all NMHRA claims against those individual Defendants not named in the Charge of Discrimination that forms the basis for this suit.  The Court therefore dismisses the NMHRA claims against Gardner and Tucker.

## IV.    BENAVIDEZ HAS EXHAUSTED HER ADMINISTRATIVE REMEDIES FOR THE CONDUCT ALLEGED IN SUPPORT OF HER NMHRA DISCRIMINATION CLAIMS THAT TOOK PLACE AFTER SHE FILED HER CHARGE OF DISCRIMINATION ON SEPTEMBER 9, 2014.

The Defendants argue that Benavidez has "failed to exhaust her administrative remedies . . . with respect to alleged actions after filing her charge of discrimination."  Motion at 8. Benavidez alleges that, "[o]n September 9, 2014, [she] filed a formal charge of discrimination on the bases of sex, age, and equal pay in violation of the New Mexico Human Rights Act, NMSA § 28-1-7 (1978), et seq."  Complaint ¶ 3, at 5-6.  The Defendants note, however that: "The charge itself appears to have been signed on September 18, 2014, and date stamped as received by the U.S. Equal Employment Opportunity Commission's Albuquerque Area Office on September 23, 2014.  These inconsistencies are not germane to Defendants' argument, and need not be resolved at this stage."  Motion at 9 n.1.  The Court agrees with the Defendants that these inconsistencies need not be resolved at this stage given that they are not material to the Defendants' argument. Moreover, the Defendants argue:

> For example, Plaintiff alleges that Defendant Sandia's medical doctor advised her that she was incapable of performing her job duties on September 30, 2014, which then required her to find a new position (Amended Complaint [Doc. 1-2] at ¶¶ 31 and 32) and that she was terminated on April 16, 2015 (id. at ¶ 36).  Plaintiff has failed to exhaust her administrative remedies with respect to any allegedly

> discriminatory adverse employment actions occurring after the charge of
> discrimination was filed, and her discrimination claims as to those actions must be
> dismissed.  *See Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003).

Motion at 9.  Benavidez does not address this argument in her Response.  See Response at 1-17.

The Court disagrees with the Defendants, however, that Benavidez has not exhausted her

administrative remedies for any allegedly adverse employment actions in support of her

NMHRA discrimination claims that took place after she filed her charge of discrimination on

September 9, 2014.

In her Complaint, Benavidez sued Sandia Labs for sex and age discrimination in violation

of the NMHRA.  See Complaint ¶¶ 38-48, at 10-12; id. ¶¶ 49-62, at 12-13.  Much of Benavidez'

Complaint focuses on her reassignment, because of a workforce reduction, from being a Neutron

Generator Production Specialist to being a Maintenance Support Technician -- events that

formed the basis of her September 9, 2014, Charge of Discrimination.  In Benavidez' Complaint,

however, she also alleges, in support of her sex and age discrimination claims, events that took

place after September 9, 2014, including her termination:

> 31.  On September 30, 2014, Dr. Saurman with Defendant SNL advised Plaintiff
> that she was incapable of performing the job duties due to her permanent medical
> restrictions.
>
> 32.  As a result, Plaintiff was placed on a realignment process and was not given
> any reasonable accommodations.  Plaintiff made multiple complaints to SNL
> management and SNL Human Resources, including complaints to Defendant
> Varick Tucker, but instead of being offered help Plaintiff was humiliated and
> degraded.
>
> 34.  Plaintiff was advised to bid/apply for other positions offered through
> Defendant SNL.  Plaintiff bid and applied for several positions for which she was
> capable of performing but was never called back or interviewed.
>
> 35.  Defendant SNL did not offer Plaintiff any accommodations even though there
> were similarly-situated employees given accommodations.

36.  On April 16, 2015 Plaintiff's employment was terminated by Defendant SNL.

Complaint ¶¶ 31-36, at 8-10.  Further, under Count I (age discrimination), Benavidez alleges:

45.  After Defendants moved her to the new position, a position Defendants knew Plaintiff was not physically capable of performing successfully, Defendants thereafter determined that Plaintiff was not physically eligible for the position. Defendants advised Plaintiff to apply for other positions through SNL, but Plaintiff was not interviewed for any of the positions for which she applied.

Complaint ¶ 45, at 11.  Finally, under Count 2 (sex discrimination), Benavidez alleges:

57.  After being changed to a Maintenance Support Technician, Plaintiff was found not to be eligible for the position and was told that SNL could not accommodate her.  She was given the opportunity to apply through SNL for other positions for which she would qualify but never received a call or interview.

58.  Plaintiff was not offered any other position and was terminated.

Complaint ¶¶ 57-58, at 12-13.

"The NMHRA mandates that the plaintiff exhaust administrative remedies as a prerequisite to filing a lawsuit in court."  Rivera v. Smith's Food and Drug Centers, 2006 WL 4891275, at *3 (D.N.M. Feb. 16, 2006)(Brack, J.)(citing Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶¶ 10-14, 980 P.2d at 69).  "The exhaustion requirement aims 'to achieve a satisfactory adjustment of the complaint through persuasion and conciliation.'"  Rivera v. Smith's Food and Drug Centers, 2006 WL 4891275, at *3 (quoting N.M. Stat. Ann. § 28-1-10(C)).  "To exhaust administrative remedies under the NMHRA, a person must: (i) file a complaint with the NMHRA or the EEOC making sufficient allegations to support the complaint; and (ii) receive an order of nondetermination from the NMHRA."  Campos v. Las Cruces Nursing Center, 828 F. Supp. 2d 1256, 1267 (D.N.M. 2011)(Browning, J.)(citing Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶¶ 15-18, 980 P.2d at 70).  "Notably, [however,]

the Supreme Court of New Mexico has stated that receiving an order of nondetermination from the NMHRD after the filing of a district court complaint suffices to exhaust the plaintiff's administrative remedies." Campos v. Las Cruces Nursing Center, 828 F. Supp. 2d at 1273 (citing Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 21, 980 P.2d at 71).

In this case, Benavidez filed her Charge of Discrimination on September 9, 2014, see Charge of Discrimination at 1, and received her Order of Nondetermination from the NMHRD before filing this case on April 8, 2015, see Order of Nondetermination at 1, filed October 21, 2015 (Doc. 7-1 at 2)("Order of Nondetermination").   Benavidez therefore exhausted her administrative remedies with respect to the conduct that took place before September 9, 2014, and the Court has subject-matter jurisdiction over claims stemming from conduct and adverse employment actions that occurred before September 9, 2014.  See Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 20, 980 P.2d at 71 ("[E]xhaustion of administrative remedies is a prerequisite to suit under the NMHRA, and a failure to exhaust administrative remedies may mean that the court lacks subject-matter jurisdiction.").  The Court concludes that Benavidez has also exhausted her administrative remedies with respect to conduct or adverse employment actions that took place after September 9, 2014.  On July 30, 2015, Benavidez submitted a second Charge of Discrimination, which details the conduct and adverse employment actions -- including her termination -- that took place after September 9, 2014.   See Charge of Discrimination at 1, filed November 25, 2015 (Doc. 19-1)("July Charge of Discrimination"). Benavidez has now informed the Court that, on January 27, 2016, she received an Order of Nondetermination with respect to her July Charge of Discrimination from the Human Rights Bureau.  See Motion for Leave to Amend Complaint ¶ 8, at 2-3, filed February 10, 2016 (Doc.

30)("Motion for Leave").  Because "the Supreme Court of New Mexico has stated that receiving an order of nondetermination from the NMHRD after the filing of a district court complaint suffices to exhaust the plaintiff's administrative remedies," the Court concludes that it has subject-matter jurisdiction over Benavidez' NMHRA sex and age discrimination claims to the extent that they are based on conduct or adverse employment actions that took place after September 9, 2014, including Benavidez' termination.  Campos v. Las Cruces Nursing Center, 828 F. Supp. 2d at 1273 (citing Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 21, 980 P.2d at 71).  See Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 20, 980 P.2d at 71 ("[E]xhaustion of administrative remedies is a prerequisite to suit under the NMHRA, and a failure to exhaust administrative remedies may mean that the court lacks subject-matter jurisdiction.")

## V.   THE COURT WILL DISMISS THE PORTION OF BENAVIDEZ' INTENTIONAL-INFLICTION-OF-EMOTIONAL-DISTRESS CLAIM THAT § 301 DOES NOT PREEMPT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Defendants assert that Benavidez' intentional-infliction-of-emotional-distress claim fails as a matter of law.  See Motion at 9-10.  The Defendants contend that Benavidez must establish "extreme and outrageous" conduct to succeed on her intentional infliction of emotional distress claim.  Motion at 9-10.  The Defendants argue that Benavidez' allegations that she was "belittled and berated," "downgraded," and "terminated" do not amount to extreme and outrageous conduct.  Motion at 10.  The Court has already concluded that § 301 forecloses Benavidez from successfully asserting an intentional infliction of emotional distress claim based on the Defendants' downgrading, their failure to help her find a more appropriate position, and her ultimate termination for being unable to perform the new position.  With respect to the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 preempts, the

Court has concluded that it must be dismissed because Benavidez has not demonstrated that she exhausted her remedies under the CBA.  See Allis-Chalmers Corp. v. Lueck, 471 U.S. at 220-21 (concluding that complaint should have been dismissed for failure to make use of the grievance procedure established in a collective-bargaining agreement or dismissed as pre-empted by § 301).  By contrast, the Court has concluded that § 301 does not preempt Benavidez claim of intentional infliction of emotional distress to the extent that it is based on Gardener's "belittl[ing] and berat[ing]" her "for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree."  Complaint ¶ 64, at 13.  The Court concludes, however, that these allegations fail to state a claim for intentional infliction of emotional distress.

The following elements must be proven to establish a claim of intentional infliction of emotional distress: "[i] the conduct in question was extreme and outrageous; [ii] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [iii] the plaintiff's mental distress was extreme and severe; and [iv] there is a causal connection between the defendant's conduct and the claimant's mental distress."  Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 2002-NMSC-004, ¶ 25, 41 P.3d at 342.  For purposes of the tort of intentional infliction of emotional distress, New Mexico law adopts the Restatement's definition of extreme and outrageous conduct.  See Trujillo v. N. Rio Arriba Elec. Coop., Inc., 41 2002-NMSC-004, ¶ 25, P.3d at 342.  According to the Restatement, extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Restatement § 46 cmt. d.  See UJI 13-1628 NMRA ("Extreme and outrageous conduct is that

which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person.").  The Restatement § 46 states:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Restatement § 46 cmt. d.

Under the Restatement, Gardener's "belittl[ing] and berat[ing]" of Benavidez "for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree" is not so extreme and outrageous as to state a claim for intentional infliction of emotional distress.  Complaint ¶ 64, at 13.  "It is true . . . that employer conduct has sometimes been found sufficiently outrageous to warrant an award of damages."  Salazar v. Furr's, Inc., 629 F. Supp. 1403, 1411 (D.N.M. 1986)(Campos, J.).  In cases in which a claim has successfully been stated, the behavior complained of has involved serious racial slurs, see Agarwal v. Johnson, 603 P.2d 58, 67 (Cal. 1979); Alcorn v. Anbro Engineering, Inc., 468 P.2d 216, 218-19 (Cal. 1970), accusations of criminal behavior, see Agis v. Howard Johnson, 355 N.E.2d 315, 319 (Mass. 1976); Beavers v. Johnstone, 145 S.E.2d 776, 777-78 (Ga. Ct. App. 1965); Armano v. Federal Reserve Bank of Boston, 468 F. Supp. 674, 676 (D. Mass. 1979)(Caffrey, J.), sexual harassment, see Nieto v. Kapoor, 182 F. Supp. 2d 1114, 1145-46 (D.N.M. 2000)(Vazquez, J.), or the public allegation that the plaintiff had a rare terminal disease, see Chuy v. Philadelphia Eagles Football Club, 431 F. Supp. 254, 262-65 (E.D. Pa. 1977)(Becker, J.).

In Nieto v. Kapoor,[8] for example, Judge Martha Vazquez of the United States District Court for the District of New Mexico concluded that one of the plaintiffs prevailed on her intentional infliction of emotional distress claim.  See 182 F. Supp. 2d at 1145.  Judge Vazquez explained:

> Dr. Kapoor's treatment of Anna Nieto, while certainly inappropriate, did not rise to the level of intentional infliction of emotional distress.  Dr. Kapoor made two racially offensive comments which Ms. Nieto heard, touched Ms. Nieto's back in a massaging fashion for several seconds, asked to walk her to her car, had a patient ask if she wanted to date Dr. Kapoor, ordered Ms. Nieto to leave the simulation room where she had been called to assist, thereby humiliating Ms. Nieto, and criticized her work.  This conduct was not so atrocious that a person would be unable to cope with the resulting emotional distress.

182 F. Supp. 2d at 1145.

In this case, while Gardener's "belittl[ing] and berat[ing]" of Benavidez "for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree" was surely hurtful and unpleasant, it was not on par with the outrageousness of facts in cases which successfully raised intentional infliction of emotional distress claims.  Accordingly, the Court dismisses the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 does not preempt for failure to state a claim upon which relief can be granted.

## VI.  THE COURT RETAINS SUBJECT-MATTER JURISDICTION OVER THIS LAWSUIT AND WILL NOT REMAND THE CASE TO STATE COURT.

Because the Court has concluded that § 301 does not preempt Benavidez' age and sex discrimination claims brought pursuant to the NMHRA, it is left with two state-law claims.  The Court must "address the potential alternative basis for jurisdiction that arises from the fact that at

---

[8]In Nieto v. Kapoor, Judge Vazquez addressed whether the plaintiffs prevailed on their intentional-infliction-of-emotional-distress claims following a bench trial, rather than at the motion-to-dismiss stage.  The Court nonetheless finds Judge Vazquez' analysis of what constitutes "extreme and outrageous" conduct instructive.

least some of the incidents complained of appear to have taken place within a federal enclave."

Celli v. Shoell, 40 F.3d 324, 328 (10th Cir. 1994).  Indeed, the Defendants' Notice of Removal

alleges that "[t]he allegations in Plaintiff's Complaint concern her employment at Sandia, when

she worked on Kirtland Air Force Base," and that "[a]ll of Plaintiff's allegations of

discrimination and intentional infliction of emotional distress concern alleged actions that took

place during Plaintiff's employment at Sandia."  Notice of Removal at 5.  The Defendants also

allege that "[t]he individual Defendants in this lawsuit, Timothy Gardner and Varick Tucker,

also worked for Sandia on Kirtland Air Force Base during the time that they had any supervisory

or managerial responsibilities with respect to Plaintiff."  Notice of Removal at 5.  According to

the Defendants, "[c]ases that arise from events 'occurring within federal enclaves may be

removed to federal district court as part of federal question jurisdiction.'"  Notice of Removal at

5 (quoting Akin v. Ashland Chem. Co., 156 F.3d 1030, 1034 (10th Cir. 1998)).  The Defendants

further explain:

> The United States Court of Appeals for the Tenth Circuit has confirmed that
> Kirtland Air Force Base is a federal enclave subject to exclusive federal
> jurisdiction: "Kirtland Air Force Base is a federal enclave: it is located on land
> that New Mexico ceded to the federal government in 1952 and 1954.  Since that
> time the federal government has exercised exclusive jurisdiction within the
> boundaries of the Base."  *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234,
> 1236 (10th Cir. 2012).  Under *Akin*, this entire lawsuit may be removed to federal
> court pursuant to federal question jurisdiction.  *Akin*, 156 F.3d at 1034.

Notice of Removal at 5-6.  In their Reply, the Defendants again emphasize that, regardless how it

rules on their preemption arguments, the Court retains federal enclave jurisdiction over this

lawsuit.  See Reply at 7.  The Defendants further state:

> As demonstrated in Defendants' Notice of Removal [Doc. 1], the events in this
> case occurred within a federal enclave.  In footnote 1 of Plaintiff's Response, she
> questions why Defendants did not assert "federal enclave jurisdiction in their

Motion to Dismiss as an alternative basis for federal jurisdiction." The answer is that the purpose of the Motion to Dismiss is to seek dismissal of Plaintiff's claims, not to establish federal jurisdiction. That was accomplished in the Notice of Removal. Plaintiff also suggests that removal was premature. This is clearly wrong. *See* 28 U.S.C. § 1446(b)(1) & (3) (requiring a notice of removal within 30 days from service or the point at which it is apparent the case is removable). Because Plaintiff's Response does not establish that this court lacks subject matter jurisdiction, the case cannot be remanded. *See* 28 U.S.C. § 1447(c).

Reply at 7-8.

The Court agrees with the Defendants that it retains federal enclave jurisdiction over this lawsuit. "Although a plaintiff must allege essential jurisdictional facts in a complaint, federal jurisdiction may be sustained on the basis of a statute not relied on or alleged in the pleadings." Celli v. Shoell, 40 F.3d at 328 (citing May v. Colorado Supreme Court, 508 F.2d 136, 137 (10th Cir. 1974), cert. denied, 422 U.S. 1008 (1975)). "The Constitution grants Congress the power to exercise exclusive jurisdiction over enclaves acquired by the United States with the state's consent for various military purposes." Celli v. Shoell, 955 F. Supp. 1337, 1341 (D. Utah 1998)(Sam, J.)(citing U.S. Const. art. I, § 8, cl. 17). Clause 17 of section eight of Article I of the Constitution of the United States of America states in-full:

> To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;--And

U.S. Const. art. I, § 8, cl. 17. "James Madison proposed the idea of granting Congress exclusive legislative powers over land purchased for the public benefit." Akin v. Big Three Industries, Inc., 851 F. Supp. 819, 822 (E.D. Tex. 1994)(Cobb, J.)(citing Capt. Richard T. Altieri, Federal Enclaves: The Impact of Exclusive Legislative Jurisdiction Upon Civil Litigation, 72 Mil. L.

Rev. 55, 59 (1976)).  "The Constitutional clause prevents state legislative interference with public lands. Similarly, *Mater* [*v. Holley*, 200 F.2d 123 (5th Cir. 1952)]'s conclusion that there should be a federal forum in which to litigate controversies arising on such lands prevents state judicial interference with matters likely to involve substantial federal interests."  Akin v. Big Three Industries, Inc., 851 F. Supp. at 822.

> Whether federal enclave jurisdiction, a form of federal question jurisdiction, exists is a complex question, resting on such factors as whether the federal government exercises exclusive, concurrent or proprietorial jurisdiction over the property, when the property became a federal enclave and what the state law was at the time, whether that law is consistent with federal policy, and whether it has been altered by national legislation.

Celli v. Shoell, 40 F.3d at 328 (citing e.g., Lord v. Local Union No. 2088, Int'l Bhd. Of Elec. Workers, AFL-CIO, 646 F.2d 1057, 1059-60 (5th Cir. 1981), cert. denied, 458 U.S. 1106 (1982); Willis v. Crag, 555 F.2d 724, 726 (9th Cir. 1977); Macomber v. Bose, 401 F.2d 545, 546 (9th Cir. 1968); Stokes v. Adair, 265 F.2d 662, 665 (10th Cir. 1959); Mater v. Holley, 200 F.2d at 124-25)).  As the Defendants correctly note, in Allison v. Boeing Laser Technical Services, the Tenth Circuit held that Kirtland Air Force Base is a federal enclave that was established in 1954.  See 689 F.3d at 1236.  In its Response, Benavidez concedes that Kirtland Air Force Base is a federal enclave.  See Response at 9 n.1 ("Plaintiff submits that . . . KAFB is a federal enclave.").

The question is therefore whether the events giving rise to this lawsuit took place at Kirtland Air Force Base.  In her Complaint, Benavidez does not refer specifically to Kirtland Air Force Base.  See Complaint at 5-18.  She states that the "events or omissions giving rise to the claims occurred in Albuquerque, New Mexico," Complaint ¶ 2, at 5, and that, "at all relevant times to this complaint, [she] was employed by Defendant Sandia National Laboratories[,]" Complaint ¶ 8, at 6.  Benavidez further alleges that Sandia Labs is a New Mexico corporation,

see Complaint ¶ 9, at 6, and that she was "assigned to work at Sandia Nation[al] Laboratories in Albuquerque, New Mexico," Complaint ¶ 14, at 7.   The Court notes that the Sandia National Laboratories website states that "Sandia/New Mexico is located on Kirtland Air Force Base (KAFB) in southeastern Albuquerque."   Visiting Sandia/New Mexico, Sandia National Laboratories, http://www.sandia.gov/locations/visiting_albuquerque/ (last visited June 21, 2016). The Defendants also attach two declarations to their Notice of Removal: (i) the Declaration of Timothy Gardner (executed October 12, 2015), filed October 15, 2015 (Doc. 1-3)("Gardner Decl."); and (ii) the Declaration of Varick Tucker (executed October 12, 2015), filed October 15, 2015 (Doc. 1-5)("Tucker Decl.").   Relevant to federal enclave jurisdiction, the Gardner Decl. states:

> 6.  During the entire time Ms. Benavidez was employed by Sandia, she worked on Kirtland Air Force Base.
>
> 7.  Any actions I took or decisions I made with respect to Ms. Benavidez were made while I was employed at Sandia, working on Kirtland Air Force Base.

Gardner Decl. ¶¶ 6-7, at 2.  The Tucker Decl. similarly states:

> 9.  During the entire time Ms. Benavidez was employed by Sandia, she worked on Kirtland Air Force Base.  After she was transferred to a vacant position in July 2014, Ms. Benavidez work location was in Sandia's Building 876, which is located between G Ave SE and H Ave SE, and between 12th Street SE and 14th Street SE.  Ms. Benavidez's Team Lead and Manager were located in Sandia's Building 875, which is immediately south of Building 876.
>
> 10.  Any actions I took or advice and support I provided with respect to Ms. Benavidez were made while I was employed at Sandia, working on Kirtland Air Force Base.  My work location was in Sandia's Building 800, which is located between G Ave SE and H Ave SE, and between 3rd Street SE and 7th Street SE.

Tucker Decl. ¶¶ 9-10, at 2.  With respect to federal enclave jurisdiction, Benavidez asserts in her Response:

Plaintiff submits that although KAFB is a federal enclave, Plaintiff has not had an opportunity to conduct discovery to uncover facts showing that all the actions complained of occurred at KAFB.  Plaintiff submits, therefore, that any motion to remove this case on the basis of federal enclave jurisdiction is premature, and should not be considered by the Court at this juncture.

Response at 9 n.1.

"If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it *by a preponderance of the evidence*."  Celli v. Shoell, 40 F.3d at 327 (emphasis added).  Here, the Court concludes that the Defendants have demonstrated by a preponderance of the evidence that federal enclave jurisdiction exists by citing to the Complaint, and by attaching the Gardner Decl. and the Tucker Decl.  Benavidez does not dispute that Kirtland Air Force Base is a federal enclave, and she does not introduce any evidence indicating at least some of the injuries she allegedly suffered did not take place on Kirtland Air Force Base.  See Bachman v. Fred Meyer Stores, Inc., 402 F. Supp. 2d 1342, 1347-49 (D. Utah 2005)(Greene, J.)(denying the plaintiffs' motion to remand on the grounds that federal question jurisdiction existed on the basis of a federal enclave, because the defendants had demonstrated by a preponderance of the evidence that at least some of the alleged injuries sustained by the plaintiff's late husband took place on federal enclaves).  The Court therefore denies Benavidez' request that the Court remand this action to state court, because the Court has federal question jurisdiction on the basis that Kirtland Air Force Base is a federal enclave.  If, down the road, some evidence comes up that the actions at issue occurred at Sandia Labs facilities not at Kirtland Air Force Base, such as at the University of New Mexico, the Court can reconsider its jurisdiction, as it always must be mindful that it has jurisdiction to exercise power over the parties and case.

**VII.   THE COURT WILL DISMISS BENAVIDEZ' AGE AND SEX DISCRIMINATION CLAIMS BROUGHT UNDER THE NMHRA AND HER INTENTIONAL-INFLICTION-OF-EMOTIONAL-DISTRESS CLAIM BECAUSE THEY ARE BARRED BY THE FEDERAL ENCLAVE DOCTRINE.**

The Court concludes that the federal enclave doctrine bars Benavidez' age and sex discrimination claims brought under the NMHRA and her intentional-infliction-of-emotional-distress claim.  "Under a body of constitutional law applicable to federal enclaves, U.S. Const. art. I, § 8, cl. 17, state law that is adopted after the creation of the enclave generally does not apply on the enclave."  Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1235.  The central principle of the federal enclave doctrine is that Congress has exclusive authority over these enclaves.  See Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1235.  The Tenth Circuit has explained:

> But in the absence of applicable federal legislation displacing state law, those state laws that existed at the time that the enclave was ceded to the federal government remain in force.  "Since a State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States, only state law existing at the time of the acquisition remains enforceable, not subsequent laws."  *Paul* [*v. U.S.*], 371 U.S. [245,] 268 [(1953)].  Thus, the federal government acquires property subject to state law.
>
> > The Constitution does not command that every vestige of the laws of the former sovereignty must vanish.  On the contrary its language has long been interpreted so as to permit the continuance until abrogated of those rules existing at the time of the surrender of sovereignty which govern the rights of the occupants of the territory transferred.  This assures that no area however small will be left without a developed legal system for private rights.
>
> *James Stewart & Co. v. Sandrakula*, 309 U.S. 94, 99-100 (1940).  And even though state law will not remain static outside the enclave, any changes made to the state law applicable within the enclave must be a matter of federal law. Because "future statutes of the state are not a part of the body of laws in the ceded area," "Congressional action is necessary to keep [state law] current."  *James Stewart*, 309 U.S. at 100.

Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1237.  The law of federal enclaves, however,

allows for three exceptions.  See Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1237.

> The Supreme Court has recognized at least three exceptions to the rule that only state law in effect at the time of cession applies within the federal enclave: 1) where Congress has, by statute, provided a different rule; 2) where the state explicitly retained the right to legislate over specific matters at the time of cession; and 3) where minor regulatory changes modify laws existing at the time of cession.
>
> The first exception recognizes the obvious fact that Congress can legislate on behalf of the enclave and may provide for the application of state laws enacted after the creation of the enclave.  See [U.S. v.] Sharpnack, 355 U.S. [286,] 294-95 [(1958)].  Thus, for example, the first Federal Crimes Act, enacted in 1790, defined a number of federal crimes that applied to federal enclaves, and in 1825 Congress adopted the first Assimilated Crimes Act, which allowed state criminal codes to apply to crimes committed on federal enclaves.  Id. at 288, 290.  State criminal codes now apply to crimes committed on military bases, Indian reservations, federal facilities, and public lands unless other federal statutes bar their application. Congress has also allowed the application of state law to a variety of civil claims in federal enclaves, such as wrongful death, 16 U.S.C. § 457; workers' compensation, 40 U.S.C. § 3172; unemployment compensation, 26 U.S.C. § 3305(d); and fish and game regulation, 10 U.S.C. § 2671.
>
> But no federal statute yet allows the broad application of state employment, tort, and contract law to federal enclaves.  And "it is well established that in order for Congress to subject a federal enclave to state jurisdiction, there must be a specific congressional deferral to state authority over federal property." West River Elec. Ass'n, Inc. v. Black Hills Power and Light Co., 918 F.2d 713, 719 (8th Cir. 1990).
>
> The second exception deals with those powers the states expressly reserved at the time of cession.  In James v. Dravo Contracting Co., 302 U.S. 134 (1937), the Supreme Court upheld the power of states to transfer only partial jurisdiction to the federal government, retaining some authority over the ceded lands.  Common reservations of power include the authority to collect state taxes and the right to serve civil and criminal process within an enclave.  See, e.g., James v. Dravo Contracting Co., 302 U.S. at 149, and Paul, 371 U.S. at 266 (discussing West Virginia and California federal enclave cession consent statutes).  Reservations may also be much broader, preserving a wide range of state powers.  See United States v. Fields, 516 F.3d 923, 929 (10th Cir. 2008)(explaining that an Oklahoma cession statute "indicates that the United States is being ceded full civil and criminal jurisdiction, with a concurrent jurisdiction reserved to the State").

The third exception applies to minor regulatory changes to state programs that existed at the time of cession. In *Paul,* the Supreme Court considered state regulatory schemes that were in place when the state ceded sovereignty but required ongoing maintenance from a regulatory body. The Court found, for example, that changes in milk pricing regulations applicable on a federal enclave might be permissible "provided the basic state law authorizing such control has been in effect since the time[ ] of [cession]." *Paul*, 371 U.S. at 269.

Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1237-38.

The federal enclave at issue in this case -- Kirtland Air Force Base -- was established in 1954. See Allison v. Boeing Laser Tech. Servs., 689 F.3d at 1236. The Court must examine Benavidez' claims to determine whether they would have been available in New Mexico before 1954. First, Benavidez asserts an intentional-infliction-of-emotional-distress claim (Count III).[9] The Defendants contend that New Mexico first recognized the tort of intentional infliction of emotional distress in 1972 in Mantz v. Follingstad, 1972-NMCA-164, 505 P.2d 68, long after Kirtland Air Force Base was established as a federal enclave in 1954. See Tr. at 20:11-14 (Poore). Benavidez maintains, however, that in 1937 in Curry v. Journal Pub. Co., 1937-NMSC-023, 68 P.2d 168, overruled by Ramirez v. Armstrong, 1983-NMSC-104, 673 P.2d 822, the Supreme Court of New Mexico addressed the idea of emotional distress, and acknowledged the ability of a court to provide damages for it. See Tr. at 20:25-21:7 (Higgins). Moreover, Benavidez contends that Curry v. Journal Pub. Co. "is the case that the plaintiff would show to

---

[9]The Court has already concluded that the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 does not preempt must be dismissed for failure to state a claim upon which relief can be granted. Even if the Court, however, found that the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 does not preempt states a claim upon which relief can be granted, the Court would dismiss the intentional infliction of emotional distress claim because, as the Court will subsequently explain, it is barred by the federal enclave doctrine.

the Court to say that it's possible that emotional distress predated the federal enclave of Kirtland Air Force Base."  Tr. at 21:7-10 (Higgins).

The Court agrees with the Defendants that New Mexico first recognized the tort of intentional infliction of emotional distress in Mantz v. Follingstad in 1972.  In that case, with respect to the tort of "intentional infliction of mental suffering," the Court of Appeals of New Mexico explained that "[t]his is a new tort theory in New Mexico."  1972-NMCA-164, ¶ 42, 505 P.2d at 75.  Almost ten years later in Dominguez v. Stone, 1981-NMCA-146, 638 P.2d 423, the Court of Appeals of New Mexico made clear that "[t]his court recognized the tort of intentional infliction of emotional distress, called the law of outrage, by the plaintiff in Mantz v. Follingstad."  1981-NMCA-146, ¶ 16, 638 P.2d at 426 (citation omitted).  Moreover, Benavidez' citation to Curry v. Journal Pub. Co. is unavailing.  There, the Albuquerque Journal mistakenly published a news item which stated that the former Territorial Governor of New Mexico, George Curry, had died.  See 1937-NMSC-023, ¶ 1, 68 P.2d at 168.  Plaintiffs, the Governor's son and daughter-in-law, asserted that reading this false statement caused them great pain and anguish, which resulted in physical injury.  See 1937-NMSC-023, ¶ 1, 68 P.2d at 168.  The Supreme Court of New Mexico in Curry v. Journal Pub. Co., however, did not recognize the tort of intentional infliction of emotional distress, but instead "held that negligently spoken or written words do not constitute a cause of action for emotional distress."  Ramirez v. Armstrong, 1983-NMSC-104, ¶ 6, 673 P.2d at 824.  Because Benavidez' intentional-infliction-of-emotional-distress claim would not have been available until 1972, long after Kirtland Air Force Base became a federal enclave in 1954, the federal enclave doctrine bars it.

Benavidez also asserts claims for: (i) discrimination on the basis of age in violation of the NMHRA, <u>see</u> Complaint ¶¶ 38-48, at 10-12 (Count I); and (ii) discrimination on the basis of sex in violation of the NMHRA, <u>see</u> Complaint ¶¶ 49-62, at 12-13 (Count II).  The NMHRA, which the New Mexico Legislature enacted in 1969, however, did not exist in 1954.  <u>See</u> N.M. Stat. Ann. §§ 28-1-1 to -14; <u>Human Rights Commission of New Mexico v. Bd. of Regents of University of New Mexico College of Nursing</u>, 1981-NMSC-026, ¶ 9, 624 P.2d 518, 519; Tr. at 20:14-15 (Poore)("And of course the New Mexico Human Rights Act was passed in 1969). Accordingly, the federal enclave doctrine bars Benavidez' age and sex discrimination claims brought pursuant to the NMHRA.  In sum, because the federal enclave doctrine bars all three of Benavidez' state-law claims, they must be dismissed.

**IT IS ORDERED** the Defendants' Motion to Dismiss, filed October 21, 2015 (Doc. 7), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Katherine A. Wray
Jane Katherine Girard
Wray & Girard P.C.
Albuquerque, New Mexico

--and--

Rachel Berenson
Berenson & Associates, P.C.
Albuquerque, New Mexico

--and--

Rachel E. Higgins
Rachel E. Higgins Attorney at Law
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Aaron C. Viets
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

--and--

Justin E. Poore
Sandia Corporation
Albuquerque, New Mexico

      *Attorneys for the Defendants*