**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

LINDA BENAVIDEZ,

      Plaintiff,

vs.                                              No. CIV 15-0922 JB/LF

SANDIA NATIONAL LABORATORIES;
VARICK TUCKER, Personally, and
TIMOTHY GARDNER, Personally,

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Plaintiff's First Motion to Compel Production of Documents, filed May 2, 2016 (Doc. 52)("Motion to Compel"). The Court held a hearing on March 16, 2017. The primary issue is whether the Court should compel Defendant Sandia National Laboratories to produce various items of requested discovery to Plaintiff Linda Benavidez. The Court will grant the Motion to Compel in part and deny it in part. Because the Court concludes that Benavidez made a sufficient showing at the hearing that she is entitled to two of the requested items -- and dropped her Motion to Compel as to any other items she had initially requested -- the Court will order the production of a spreadsheet of "copies of job postings or any available job openings within Sandia National Laboratories from 2014 to present," and of ten representative photographs of "vehicles in the Sandia National Laboratories commercial pool." Motion to Compel at 6, 7. The Court will otherwise deny the Motion to Compel. Further, because the Court is granting in part and denying in part the Motion to Compel, it will not award Sandia Labs the attorney's fees and expenses it requests due to Benavidez' filing of the Motion to Compel. The Court also concludes that Benavidez did not

satisfactorily meet-and-confer with Sandia Labs before filing the Motion to Compel as the rules require.  The Court, however, will not impose a sanction on these particular facts.

**<u>FACTUAL BACKGROUND</u>**

The Court takes the following recitation of the relevant facts from the First Amended Complaint for Damages for Violation of the New Mexico Human Rights Act, and for Intentional Infliction of Emotional Distress, filed October 15, 2015 (Doc. 1-2)("First Amended Complaint"), which Benavidez originally filed in the Second Judicial District Court, County of Bernalillo, State of New Mexico.  <u>See</u> First Amended Complaint at 1.[1]

Sandia Labs employed Benavidez, a United States citizen and a resident of Albuquerque, New Mexico.  <u>See</u> First Amended Complaint ¶ 8, at 6.  Defendant Varick Tucker was Benavidez' Human Resource manager, while Defendant Timothy Gardener was Benavidez' manager.  <u>See</u> First Amended Complaint ¶¶ 11-12, at 6.  Sandia Labs had hired Benavidez as a Neutron Generator Production Specialist on June 1, 2001, <u>see</u> First Amended Complaint ¶ 14, at 7, but she eventually "developed some serious medical conditions which resulted in Plaintiff's life activities being affected,"  First Amended Complaint ¶ 16, at 7.  In 2011, the requirements of Benavidez' position changed to include the need for a Trades Degree.  <u>See</u> First Amended Complaint ¶ 17, at 7.  To obtain a Trades Degree, Benavidez would have had to return to school for college-level courses such as physics, trigonometry, and chemistry, which would have required her to take years of preparatory classes to qualify to take the required classes.  <u>See</u> First Amended Complaint ¶ 19, at 7; <u>id.</u> ¶ 42, at 11; <u>id.</u> ¶ 53, at 12.

---

[1]To cite to pages in the First Amended Complaint, the Court will use the CM/ECF's pagination -- <u>i.e.</u>, the blue number in the top right-hand corner of each page -- because the First Amended Complaint does not contain internal pagination.

Benavidez was told that, if she was unable to obtain the Trades Degree, she would be "bumped" into another similar position at Sandia Labs with the same grade level and pay.  First Amended Complaint ¶ 22, at 8.  See id. ¶ 42, at 11; id. ¶ 53, at 12.  "Instead of being 'bumped' into a similar position at Sandia Labs, though, Plaintiff was ultimately placed in a position described as a Maintenance Support Technician," which "included 'duties requiring working strenuous positions with exertions of physical effort up to 60 pounds.'"  First Amended Complaint ¶ 24, at 8.  See id. ¶ 43, at 11; id. ¶ 54, at 12.  "She and her co-workers that were put in this position, essentially as tractor/trailer drivers, were the only females working this job."  First Amended Complaint ¶ 25, at 8.  See id. ¶ 43, at 11; id. ¶ 54, at 12.  "The only other employees in this position were men, with the exception of one other woman over the age of 40 who was also being 'absorbed' into this new position, and who was ultimately terminated."  First Amended Complaint ¶ 54, at 12.

 "On September 9, 2014, Ms. Benavidez filed a formal charge of discrimination on the basis of sex, age, and equal pay in violation of the New Mexico Human Rights Act, NMSA § 28-1-7 (1978), et seq."  First Amended Complaint ¶ 3, at 5-6.  On September 30, 2014, a doctor "with Defendant SNL advised Plaintiff that she was incapable of performing the job duties due to her permanent medical restrictions."  First Amended Complaint ¶ 31, at 9.  See id. ¶ 45, at 11; id. ¶ 57, at 13.  Accordingly, Benavidez "was placed on a realignment process and was not given any reasonable accommodation."  First Amended Complaint ¶ 32, at 9.  See id. ¶ 57, at 13.  On April 16, 2015, Sandia Labs terminated Benavidez' employment.  See First Amended Complaint ¶ 36, at 10; id. ¶ 66, at 13-14.

## PROCEDURAL BACKGROUND

This case has had a lengthy procedural history, and the Court will detail it as it relates to Benavidez' Motion to Compel. This discussion will, to an extent, involve discussing the pleadings, briefing, and Memorandum Opinions and Orders that entail information relevant to the Motion to Compel, with respect to both substance and chronology. One of the case's aspects has been whether the First Amended Complaint was before the Court, and whether Benavidez was going to be the sole plaintiff, in light of Benavidez' various proposed amendments subsequent to filing the First Amended Complaint. As a consequence of the litigation regarding those issues, the Motion to Compel was not heard until March 16, 2017, as the parties and the Court continued to choose to withhold argument on the Motion to Compel until the Court had decided the issues surrounding the First Amended Complaint's amendment.

On August 27, 2015, Benavidez filed suit in the Second Judicial District Court. See First Amended Complaint at 1. Benavidez did not serve the original complaint upon the Defendants, and Benavidez instead served the First Amended Complaint. See Notice of Removal at 1, filed October 15, 2015 (Doc. 1). About a month and a half later, on October 15, 2015, the Defendants removed the case to federal court, asserting federal-question jurisdiction. See Notice of Removal at 1-7. Benavidez asserted three causes of action against all of the Defendants: (i) discrimination on the basis of age in violation of the New Mexico Human Rights Act, N.M. Stat. Ann. §§ 28-1-1 to -14 ("NMHRA"), see First Amended Complaint ¶¶ 38-48, at 10-12 (Count I); (ii) discrimination on the basis of sex in violation of the NMHRA, see First Amended Complaint ¶¶ 49-62, at 12-13 (Count II); and (iii) intentional infliction of emotional distress, see First Amended Complaint ¶¶ 63-73, at 13-14 (Count III). Benavidez asked the Court for judgment against the Defendants "for all actual, compensatory, nominal, and emotional damages she has

suffered . . . [,] punitive damages for Defendants' willful, wanton, and reckless conduct . . . [,] attorneys' and other fees, costs, and pre- and post-judgment interest accrued[,] and for such other relief as the Court finds just and proper."  First Amended Complaint at 14-15.

1.      **The Preemption MOO Dismissing Benavidez' State Claims.**

After Benavidez filed the First Amended Complaint, after a January 20, 2016, hearing,[2] the Court issued the first of the Memorandum Opinions and Orders it has entered in this case. The Amended Memorandum Opinion and Order, filed June 27, 2016 (Doc. 64)("Preemption MOO"), addressed the Defendants' Motion to Dismiss, filed October 21, 2015 (Doc. 7)("Motion to Dismiss"), in which Sandia Labs argued that the Labor Management Relations Act, 29 U.S.C. § 141 ("LMRA") preempted Benavidez' state law claims.  Sandia Labs supported its Motion to Dismiss by citation to the Supreme Court of the United States' holding that LMRA § 301 will completely preempt a state law claim when resolution of the state law claim is substantially dependent upon analysis of the terms of a Collective Bargaining Agreement ("CBA") between the parties.  See Caterpillar Inc. v. Williams, 482 U.S. 386, 395 (1987); Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213 (1962)(stating that preemption analysis turns on whether the action confers rights on employers or employees "independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract"); Cisneros v. ABC Rail Corp., 217 F.3d 1239, 1302 (10th Cir. 2000)(explaining that § 301 "preempts questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, . . . whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort").  Such "[p]reemption arises only when an 'evaluation of the . . . claim is

---

[2]See Transcript of Hearing (taken January 20, 2015)("January Tr.").

inextricably intertwined with consideration of the terms of the labor contract.'"  Mowry v. United Parcel Service, 415 F.3d 1149, 1152 (10th Cir. 2005)(emphasis in original).  Further, "[a]s long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."  Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 410 (1988).  The Court, in its Preemption MOO, ultimately concluded:

> First, the Court concludes that the LMRA's § 301 does not preempt Benavidez' age and sex discrimination claims brought pursuant to the NMHRA. Second, the Court concludes that the LMRA's § 301 partially preempts Benavidez' intentional-infliction-of-emotional-distress claim.  The Court concludes that, to the extent that Benavidez bases her intentional infliction of emotional distress claim on Gardener's "belittl[ing] and berat[ing]" her "for not being able to complete the course work she took in preparation for attempting to obtain a Trades Degree," § 301 does not foreclose Benavidez from asserting an intentional infliction of emotional distress claim.  See Complaint ¶ 64, at 13.  The Court concludes, however, that § 301 preempts Benavidez' intentional-infliction-of-emotional-distress claim to the extent that it is based on: (i) the Defendants' downgrading of Benavidez and putting her in a position for which she was not qualified, either by experience or physical abilities, rather than allowing her to move into another Grade 8 position, see Complaint ¶ 64, at 13; and (ii) the Defendants doing nothing to help her find another, more appropriate position after she complained to management multiple times and asked for help in her new position, and their ultimate termination of Benavidez for being unable to perform the new position, see Complaint ¶ 65, at 13.  The Court nonetheless dismisses the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 preempts, because Benavidez has not demonstrated that she exhausted her remedies under the CBA.[3]  See Allis-Chalmers Corp. v. Lueck, 471 U.S. [202, 220-21 (1985)](concluding that complaint should have been dismissed for failure to make use of the grievance procedure established in a collective-bargaining agreement or dismissed as pre-empted by § 301).  Third, the Court concludes that Benavidez states a claim for sex and age discrimination under the NMHRA. Fourth, the Court will dismiss the claims against the individual defendants -- Gardner and Tucker -- because Benavidez has not exhausted her administrative remedies against them.  The Court concludes, however, that Benavidez has exhausted her administrative remedies for the conduct alleged in support of her

---

[3]Collective Bargaining Agreement, which governs matters such as priority placement for bargaining unit employees unable to perform their job because of physical disability developed while a Sandia Labs employee.  See Preemption MOO, passim.

NMHRA discrimination claims that took place after she filed her Charge of Discrimination on September 9, 2014.  Fifth, with respect to the portion of Benavidez' intentional-infliction-of-emotional-distress claim that § 301 does not preempt, the Court concludes that Benavidez does not state a claim upon which relief can be granted.  In sum, the Court is left with two state-law discrimination claims brought under the NMHRA.  While the Court concludes that it retains federal enclave jurisdiction over this action, and therefore denies Benavidez' request in the Response that the Court remand this action to state court, it must dismiss Benavidez' three claims -- including those brought under the NMHRA -- pursuant to the federal enclave doctrine.

Preemption MOO at 46-48.

### 2.   <u>Motion for Leave to Substitute Second Amended Complaint.</u>

After the January 20, 2016, hearing, which ultimately led to the Court's Preemption MOO, and wherein the Court considered Sandia Labs' Motion to Dismiss -- but before the Court had issued its Preemption MOO -- Benavidez filed the Plaintiff's Motion for Leave to Amend Complaint, filed February 2, 2016 (Doc. 30)("Motion for Leave to Substitute Second Amended Complaint") -- providing as an attachment the Plaintiff's Second Amended Complaint for Damages for Violation of the New Mexico Human Civil Rights Act, Title I and IV of the American with Disabilities Act of 1964, Retaliation and Intentional Infliction of Emotional Distress and the Equal Pay Act of 1963, filed February 2, 2016 (Doc. 31)("Proposed Second Amended Complaint").  <u>See</u> Motion for Leave to Substitute Second Amended Complaint at 1. "The Amended Complaint includes three (3) additional Plaintiffs who have similar claims arising out the same or similar conduct by their former employer, Defendant Sandia Corp. and the additional violation charge of the Equal Pay Act[, 29 U.S.C. § 206(d)]."  Motion for Leave to Substitute Second Amended Complaint at 2.  The three additional Plaintiffs have, according to the Motion for Leave to Substitute Second Amended Complaint, received "Right to Sue letters dated November 24, 2015, November 25, 2015 and November 30, 2015 and have received their

letter of Non Determination from Human Rights Bureau on January 27, 2016."  Motion for Leave to Substitute Second Amended Complaint at 2.  The Motion for Leave to Substitute Second Amended Complaint asserted that the Court and the Defendants were aware that Benavidez was awaiting the additional Plaintiffs' "Right to Sue Letters" before she filed this impending Motion for Leave to Substitute Second Amended Complaint.  Motion for Leave to Substitute Second Amended Complaint at 2-3.  "Plaintiff further request[ed] leave to amend the Complaint such that the caption may be amended to accurately reflect the nature to withdraw [sic] her claims against Defendant Gardner and Defendant Tucker and to add additional exhausted claims and additional Parties."  Motion for Leave to Substitute Second Amended Complaint at 3.

The Proposed Second Amended Complaint, attached to the Motion for Leave to Substitute Second Amended Complaint, however, retained the same claims in the First Amended Complaint that the Court's Preemption MOO dismissed.  See Proposed Second Amended Complaint at 1-24.  Specifically, the Proposed Second Amended Complaint "essentially re-state[d] th[e] [Intentional-Infliction-of-Emotional-Distress] claim, as well as the New Mexico Human Rights Act age and sex discrimination claims that are subject to the [Preemption MOO]." Defendants' Response to Plaintiff's Motion for Leave to Amend Complaint at 2, filed March 7, 2016 (Doc. 38).  More specifically, the Proposed Second Amended Complaint alleged "Count I: Discrimination on the Basis of Serious Medical Condition in Violation of the New Mexico Human Rights Act and Title I of the American Disability Act," Proposed Second Amended Complaint ¶¶ 123-34, at 16-17; "Count II: Discrimination on the Basis of Sex in Violation of the New Mexico Human Rights Act and/or Title VII of the Civil Rights Act Against Defendant Sandia Corporation," Proposed Second Amended Complaint ¶¶ 135-49, at 17-19; "Count III[:]

Retaliation Against Defendant Sandia Corporation," Proposed Second Amended Complaint ¶¶ 150-58, at 19-20; "Count IV: Violation of the Age Discrimination in Employment Act," Proposed Second Amended Complaint ¶¶ 159-69, at 20-21; "Count V: Intentional Infliction of Emotional Distress," Proposed Second Amended Complaint ¶¶ 170-83, at 21-22; and "Count VI: The Equal Pay Act of 1963," Proposed Second Amended Complaint ¶¶ 184-88, at 22-23.  On July 1, 2016 -- following the Court's issuance of the Preemption MOO -- Benavidez also submitted the Plaintiff's Supplemental Briefing on Doc. 30, Motion for Leave to Amend Complaint, filed July 1, 2016 (Doc. 65)("Supplemental Briefing"), making minor changes to the Proposed Second Amended Complaint.  See Supplemental Briefing at 1-2.  The Supplemental Briefing renumbered paragraphs, discussed grievances that the Plaintiffs made before the Metal Trade Council, made more specific allegations, added a punitive damages claim, and changed the anticipated month of filing.  See Supplemental Briefing at 2.  Importantly, the Supplemental Briefing provided that, despite the Preemption MOO, "[i]n order to preserve the record for any appeal and on behalf of the new proposed Plaintiffs, Plaintiff has not removed the state law claims that the Court dismissed in the *Amended Memorandum Opinion and Order* [Doc. 64]." Supplemental Briefing at 2.

    **3.**    **Motion for Leave to Substitute Second Amended Complaint Response**.

Sandia Labs responded to the Motion for Leave to Substitute Second Amended Complaint with the Defendants' Response to Plaintiff's Motion for Leave to Amend Complaint, filed March 7, 2016 (Doc. 38)("Motion for Leave to Substitute Second Amended Complaint Response").  The Motion for Leave to Substitute Second Amended Complaint Response objected to the Motion for Leave to Substitute Second Amended Complaint, because the "Plaintiff's proposed amendment would be futile, cause undue delay, and cause undue prejudice

to Defendant Sandia Corporation."  Motion for Leave to Substitute Second Amended Complaint Response at 1.  Essentially, Sandia Labs requested that the Court not allow Benavidez to amend the First Amended Complaint until after the Court issues its Preemption MOO resolving the issues Sandia Labs raised in its Motion to Dismiss.  See Motion for Leave to Substitute Second Amended Complaint Response at 3.  The Motion for Leave to Substitute Second Amended Complaint Response concluded by stating:

> Plaintiff's proposed amendment is -- at least as to the state law claims -- futile. Furthermore, the filing of a second amended complaint before the Court completes and issues its decision on Defendants' motion to dismiss would moot that motion and effectively nullify the work that has gone into arguing and deciding the motion, causing undue delay and undue prejudice to Sandia. Defendants' respectfully request that the Court deny Plaintiff leave to amend her complaint until after a decision is issued on Defendants' motion to dismiss, and in no event should it be granted with regard to state law claims that Sandia has already identified as defective.

Motion for Leave to Substitute Second Amended Complaint Response at 3.

### 4.     The Motion for Leave to Substitute Second Amended Complaint Reply.

Benavidez replied to the Motion for Leave to Substitute Second Amended Complaint Response with the Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Leave to Amend Complaint, filed March 21, 2016 (Doc. 43)("Motion for Leave to Substitute Second Amended Complaint Reply").  The Motion for Leave to Substitute Second Amended Complaint Reply offered a path forward for the Court, stating initially that the "Plaintiff is attempting to comply with Court's Scheduling Order [Doc. 35] deadline by moving to amend the pleadings and to join additional parties in compliance with Fed. R. Civ. P. 15(a)."  Motion for Leave to Substitute Second Amended Complaint Reply at 1.  Accordingly, the Motion for Leave to Substitute Second Amended Complaint Reply explained that the

Plaintiff's deadline to move to amend the pleadings and to join additional parties

is April 30, 2016. The three (3) proposed joining plaintiffs had a deadline to file an appeal from the Human Rights Department or the Employee Equal Opportunity Commission before February 24, 2016 and February 30, 2016, and therefore it is critical that this Court grant Plaintiff's motion for leave to amend to adjoin these additional three (3) plaintiffs. If the Court does not grant Plaintiff's motion to amend the complaint the three (3) additional Plaintiffs' will be forced to file a new lawsuit and bring Defendant into separate proceedings and waste the Court's valuable time and resources.

Motion for Leave to Substitute Second Amended Complaint Reply at 2. Thus, according to the Motion for Leave to Substitute Second Amended Complaint Reply, Benavidez would, "[u]pon the Court's decision on Defendants' motion to dismiss, . . . again amend their second amended complaint to properly reflect the court's decision if it alters the ability to bring any of the claims." Motion for Leave to Substitute Second Amended Complaint Reply at 2. Benavidez also provided that the "Proposed Joining Plaintiffs request this Court to allow them to pursue their right to adjoin and appeal their decisions of the Employee Equal Opportunity Commission and the Human Rights Department." Motion for Leave to Substitute Second Amended Complaint Reply at 2.

**5.    The Motion to Compel.**

Benavidez filed the Motion to Compel on May 2, 2016. See Motion to Compel at 1. In the Motion to Compel, Benavidez explains the timeline of the discovery requests and responses, see Defendant Sandia National Laboratories Responses to Plaintiff's First Set of Request for Production, filed May 2, 2016 (Doc. 52-1)("Discovery Responses"), regarding the Motion to Compel. See Motion to Compel at 1-2. Benavidez explains that she served the Motion to Compel on Sandia Labs on March 8, 2016, and that Sandia Labs responded on April 11, 2016, and supplemented its response on April 13, 2016. See Motion to Compel at 1. According to Benavidez, on April 29, 2016, she reviewed Sandia Labs' Discovery Responses and "began

good-faith communications to resolve specific disputes."  Motion to Compel at 1.  Apparently the "Plaintiff filed this *Motion* in order to preserve her objections to Defendant's responses pursuant to D.N.M.L.R.-civ 26.6, but the parties continue[d] to discuss in good faith and hope to resolve these matters."  Motion to Compel at 1 (emphasis in original).

Benavidez then addresses her requests to which Sandia Labs had objected before she filed the Motion to Compel.  <u>See</u> Motion to Compel at 2 (explaining that, in its Discovery Responses, Sandia Labs objects to Benavidez' Requests for Production ("RFP") Nos. 2, 7, 9, 11, 12, 19, 23, 24 and 28).  According to Benavidez, RFP No. 2 states: "Please provide a copy of any job evaluations given to Linda Benavidez during her entire duration of employment with Sandia National Laboratories," and Benavidez argues that, although Sandia Labs produced three evaluations, she believes there must be more.  Motion to Compel at 3.  Then turning to RFP Nos. 7, 9, and 24, Benavidez explains that each of those three requests regards "statements relating to the lawsuit or investigations" and that Sandia Labs responded only that it had no such discovery to produce.  Motion to Compel at 3-4 (referencing Discovery Responses at 2).  Benavidez argues such a response is inadequate, because Sandia Labs instead needs to specifically disavow the existence of any investigation regarding Benavidez' case should there really be no investigation. <u>See</u> Motion to Compel at 4.

Benavidez next addresses her RFP No. 11, which requests "all contracts and subcontracts from 2008 through present regarding the work performed at Sandia National Laboratories in the Neutron Generator field," and to which Sandia Labs objects, because such was not relevant and, further, because such was proprietary.  Motion to Compel at 5 (referencing Discovery Responses at 3).  According to Benavidez, however, the content that RFP No. 11 requests is relevant to her claims, because the "National Nuclear Security Administration made significant decisions that

directly impacted Sandia Neutron Generator," and these "decisions and new product families should be reflected in the contracts," meaning that Sandia Labs was also "required to adhere to certain requirements in its government contracts, likely including security clearances and training for employees who would be working on the contracts," which are relevant to Benavidez' claims regarding the change in educational requirements for the job she held.  Motion to Compel at 5. Regarding Sandia Labs' objection as to the requested items' proprietary nature, Benavidez assures the information will remain private.  See Motion to Compel at 5-6.  Next, Benavidez explains that RFP No. 12 requests "all correspondence, notes, memoranda, e-mails, faxes, or records of conversations between Sandia National Laboratories management and employees or doctors regarding Ms. Benavidez between 2011 through present."  Motion to Compel at 11. According to Benavidez, Sandia Labs objects to RFP No. 12, because it is overbroad, and thus Benavidez now uses her Motion to Compel to narrow the request to a specific set of eighteen individuals.  See Motion to Compel at 6.

Benavidez' Motion to Compel then turns to her RFP No. 19, which requests "copies of job postings or any available job openings within Sandia National Laboratories from 2014 to present."  Motion to Compel at 6.  Benavidez explains that Sandia Labs responds to RFP No. 19 by stating:

> Request No. 19 is overly broad, and the burden and expense of producing the requested information far outweighs the likely benefit of the requested information.  Sandia had thousands of posted job openings during the requested time period, a large number of which required advanced degrees or other qualifications that Plaintiff does not possess.  Additionally, Plaintiff had access to all job postings up to the date of her separation, and to the majority of open positions since her separation which were posted on Sandia's external website.

Motion to Compel at 5-6 (citing Discovery Responses at 5).  Benavidez then uses her Motion to compel to argue that she has requested only one year of job postings -- the year which

corresponds to her employment's realignment within Sandia Labs -- which is relevant to her claims regarding Sandia Labs' accommodation of Benavidez and its attempts to secure her different employment in a "suitable position."  Motion to Compel at 7.

Next, Benavidez addresses her RFP No. 23, which requests that Sandia Labs "provide a description, make and model, and photographs of all vehicles in the Sandia National Laboratories commercial pool."  Motion to Compel at 7.  Benavidez argues that, although Sandia Labs objects to this request on the basis of relevance and burden, she was forced to "take a job in maintenance support, in the motor pool," and that RFP No. 23 will yield information that will help her demonstrate that she was not physically capable to perform that job.  Motion to Compel at 7 (referring to Discovery Responses at 6).  Last, Benavidez argues in favor of her RFP No. 28, which requests "[a]ll correspondence between Sandia National Laboratories and the union that relate to the changes made to the job qualifications required of the Neutron Generator position."  Motion to Compel at 7.  According to Benavidez, Sandia Labs' document responding to RFP No. 28 "is missing at least one page, because it is not complete," and the Court should thus order production of the "entire letter."  Motion to Compel at 7.

**6.     The May 16, 2016, Hearing.**

The Court held a hearing on May 16, 2016.  See Transcript of Hearing, taken May 16, 2016 ("May Tr.").[4]  At the May 16, 2016, hearing, the Court had not yet issued its Preemption MOO, and thus the parties determined that it may be premature to hear Benavidez' Motion for Leave to Substitute Second Amended Complaint.  In that respect, the Court instructed Benavidez to "make your own decision whether you want to file separate cases" given the proposed

---

[4]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

addition of new Plaintiffs, and

> if you need to file separate cases, you can.  If I get the opinions out and you want to bring it back here, us pick this up, I'll just hold this for the time being, I won't rule on it, and then you can make a decision.  You'll just have to be the judge of your own time.

May Tr. at 6:7-16 (Court).   The briefing was not complete on the Motion to Compel, so Benavidez also addressed the Court: "Judge, we have actually be[en] conversing regarding some discovery issues and we will be I believe upon consent of the defense contacting you.  We've narrowed down some issues and we're hoping to have your ear in regards to a couple of the foundation of the discovery issues."  May Tr. at 7:7-12 (Wray).

### 7.    The August 25, 2016, Hearing.

The Court thereafter held a hearing on August 25, 2016.  At the hearing the Court addressed, in part, the Motion for Leave to Substitute Second Amended Complaint.   See Transcript of Hearing at 2:4-5, taken August 25, 2016 (Court)("Tr.").  Regarding that motion, the Court reminded the parties:

> We started a hearing and I tried to work out an agreement [where] we could have the motion to dismiss that was pending [--] and I have not been able to get the opinion out [--] [and the opinion] would apply to all the new people, but we weren't able to reach that agreement.  So we adjourned that hearing for motion for leave to amend the complaint.

Tr. at 2:4-11 (Court).  The Court continued: "I finished my work on that opinion, so where are we on the motion for leave to amend?  Do you still want to file this complaint?"  Tr. at 2:11-14 (Court).  Benavidez responded that she wished to argue in favor of the Motion for Leave to Substitute Second Amended Complaint and Supplemental Briefing, and that one reason that the Proposed Second Amended Complaint still contains the state claims that the Court has dismissed is because

- 15 -

> [t]he February amended complaint was designed to become a federal complaint. It was designed to contain the allegations [] necessary not just to bring forth the state claims that are pending, but also to bring those [] federal claims. And the intent has been to include everything in this amended complaint so we're not hiding the ball so we do not have to amend again . . . .

Tr. at 4:4-17 (Girard). Further, with respect to why Benavidez filed the Motion for Leave to Substitute Second Amended Complaint instead of waiting for the Preemption MOO, Benavidez indicated that "we had three additional plaintiffs to add who had been issued their right to sue letters, and they had a statutory deadline to meet." Tr. at 3:14-24 (Girard). The Court was hard pressed, however, to understand "why go through all that motion if I spent a lot of time dealing with the []motion to dismiss, why put them all back in the case[.] I just don't get that." Tr. at 4:18-21 (Court). The Court thus asked Benavidez if she has "a complaint that you can propose to the Court and parties that conforms to the Court's opinion," Tr. at 5:1-3 (Court), to which Benavidez replied that she could "prepare that pretty quickly," Tr. at 5:4-5 (Girard).

Sandia Labs then addressed the Court, arguing that its "primary objections are the same as the courts, which is that they include and in some instances double down on the state law claims which you have already dismissed." Tr. at 7:22-25 (Poore). Benavidez then interjected and explained that "what I would like, at the end of this process, [is] for a ruling that makes clear or a complaint that makes clear that the new plaintiffs are also subject to the Court's prior ruling." Tr. at 10:13-17 (Girard). To achieve this goal, Benavidez explained that what she proposes is

> to file this complaint as written, followed by the order that says that the Court's ruling applies to all plaintiffs, the Court's previous ruling in the motion to dismiss applies to all plaintiffs and claims in this complaint. We thought that that satisfied it and made it easier, but obviously it has not . . . .

Tr. at 10:21-11:5 (Girard). Benavidez then reiterated that she simply wanted a clean slate, with a

- 16 -

federal-court complaint that alleges both her original state claims and the new federal claims; that includes herself and the three additional Plaintiffs; and that in no way did she expect that the Preemption MOO would not to apply to that new complaint or to the additional Plaintiffs. <u>See</u> Tr. at 11:18-25 (Girard).

Accordingly, Benavidez apologized for causing the Court frustration and stated that, because there was not a complaint before the Court at the present time, she further was not prepared to argue her Motion to Compel, which the Court had attempted to have her argue. <u>See</u> Tr. at 13:1-6 (Girard). The Court thus took the Motion to Compel under advisement, without hearing argument, and stated it would "get an opinion out to you and an order denying your motion to amend and then we'll figure out how to go from there." Tr. at 13:7-13 (Court). Upon giving the parties one last chance to address the Court, Sandia Labs provided:

> Your Honor, I do want to make sure we're also being transparent that if the motion to amend is denied, it would be our understanding that at least many of the federal claims on the additional three plaintiffs would be outside the statute of limitations. So when I indicated that we weren't filing a motion to dismiss on the federal claims that was based on this. I don't want to say that that would be our position for a third amended complaint.

Tr. at 13:15-24 (Poore). Benavidez then took the opportunity to reiterate that the statutory deadline which Sandia Labs mentioned was one of the motivating factors in filing the Motion for Leave to Substitute Second Amended Complaint as it did and when it did. <u>See</u> Tr. at 14:1-9 (Girard). The Court then denied the Motion for Leave to Substitute Second Amended Complaint "as to the way it's filed." Tr. at 14:10-11 (Court).

### 8.   <u>The Motion to Compel Response</u>.

Sandia Labs responded to the Motion to Compel with its Response of Defendant Sandia National Laboratories to Plaintiff's First Motion to Compel Production of Documents, filed May

18, 2016 (Doc. 55)("Motion to Compel Response").  Sandia Labs first argues that the Motion to

Compel "should be denied because she did not confer in good faith before filing."  Motion to

Compel Response at 1.  According to Sandia Labs, "[n]o pre-motion good faith conference

occurred in this case because Plaintiff did not allow for it," and,

> [t]he first time Sandia learned that Plaintiff had any concerns about Sandia's
> responses to her first requests for production was on Friday, April 29, 2016, when
> an assistant for one of Plaintiff's lawyers emailed a letter to defense counsel with
> the statement that the attached letter was Plaintiff's good faith attempt to resolve a
> discovery dispute.

Motion to Compel Response at 2 (referencing Email from Debbie Grant to Justin Poore and

Aaron Viets at 1-6 (dated April 29, 2016), filed May 18, 2016 (Doc. 55-1)("Benavidez' April 29,

2016, Email").  According to Sandia Labs, the "email's time stamp is 10:24 a.m.," and indicated

that Benavidez "took issue with nine of Sandia's discovery responses and stated that she would

be moving to compel on Monday, May 2, 2016," citing "Local Rule 26.6, which was nearly

expired."  Motion to Compel Response at 2.

Sandia Labs then provides that "[d]efense counsel responded promptly," and that "at 1:55

p.m. on the afternoon of Friday, April 29, 2016, Sandia . . . offered to extend the Local Rule 26.6

deadline by one week to allow time for the parties to actually confer and then engage the Court

only if necessary after that."  Motion to Compel Response at 2 (citing Email from Mr. Poore to

Mr. Viets, Rachel Berenson, Rachel Higgins, Jane Girard, Katherine Wray, et. al., at 7 (dated

April 29, 2016), filed May 18, 2016 (Doc. 55-1)("Sandia Labs' April 29, 2016, Email")).  As a

result of that colloquy, Sandia Labs provides that the parties held a conference on May 3, 2016,

which was productive with respect to some of Benavidez' discovery requests.  See Motion to

Compel Response at 2-3.  Sandia Labs explains, however, that Benavidez nonetheless "refused

Sandia's offer to extend the motion filing deadline and had gone ahead and filed her [Motion to

Compel]."  Motion to Compel Response at 3.  Sandia Labs also explains that the Motion to Compel "accuses Sandia of failing to explain its objections" in its Discovery Responses, which Sandia Labs argues is "true," but only "because she never gave Sandia a chance to do so before filing her [Motion to Compel]."  Motion to Compel Response at 3.  Sandia Labs argues that Benavidez thus filed her Motion to Compel without her engaging in a meaningful, good-faith conference, and she has "wasted time, energy, and resources of the parties and the Court," because much of the Motion to Compel "is now moot."  Motion to Compel at 3-4.

Sandia Labs, accordingly, next addresses the two RFPs that it argues are still live and that its colloquy with Benavidez has not mooted:  RFP No. 19 and RFP No. 23.  See Motion to Compel Response at 5-9.  RFP No. 19 requests "copies of job postings or any available job openings within Sandia National Laboratories from 2014 to the present."  Motion to Compel Response at 5.  Sandia Labs explains that it objected to this RFP in its Discovery Responses by arguing that such a request is overbroad and burdensome, because "most of the jobs responsive to Request for Production No. 19 required advanced degrees or other qualifications (such as physical abilities) that Plaintiff . . . did not possess."  Motion to Compel Response at 5-6.  Sandia Labs also explains that, in Benavidez' Motion to Compel, she "misstates the scope of her request, saying she only asked for one year's worth of responsive material . . . and she has since offered to narrow the timeframe to 'the time that Plaintiff was being put into the motor pool [and] . . . the time leading up to Plaintiff's termination."  Motion to Compel Response at 6 (quoting Email from Ms. Wray to Mr. Poole and Mr. Viets (dated May 13, 2016), filed May 18, 2016 (Doc. 55-1)("Benavidez' May 13, 2016, Email")(narrowing the scope to July 2, 2014, until April 17, 2015)).  In its Motion to Compel Response, Sandia Labs nonetheless maintains its argument of overbreadth and burden, and adds its objection for relevance, because "the

discovery is addressed to a non-existent issue.  Sandia had no legal obligation to find another job for Plaintiff, which exposes the request for the fishing expedition that it is."  Motion to Compel Response at 6.  Sandia Labs further emphasizes that "[r]etaliatory failure-to-hire cases first begin with a job application or the like from the plaintiff . . . [and] Sandia is aware of no case from this jurisdiction . . . holding that it is retaliation for an employer not to award a current employee a new job that she herself never sought."  Motion to Compel Response at 6-7.

Sandia Labs then explains that these job postings were available to Benavidez while she was at Sandia Labs and that her failure to apply has nothing to do with Sandia Labs' conduct.  See Motion to Compel at 7.  Further, although Sandia Labs maintains an objection as to the relevance of the job postings to which Benavidez applied -- eleven in total -- Sandia Labs explains that it nonetheless produced responsive documents regarding those eleven jobs.  See Motion to Compel Response at 7.  Last, Sandia Labs argues that "the volume of material at issue and the burden of gathering it, even if the time period is narrowed to July 2, 2014 through April 17, 2015," is immense, and "is not simply a matter of typing in a date range then pushing a button or two."  Motion to Compel Response at 7.  Accordingly, Sandia Labs resists RFP No. 19 under rule 26(b)(1) of the Federal Rules of Civil Procedure.

Sandia Labs next addresses RFP No. 23, wherein Benavidez requests "a description, make and model, and photographs of all vehicles in the Sandia National Laboratories Commercial pool."  Motion to Compel Response at 8.  Sandia Labs explains that it objected to RFP No. 23 in its Discovery Responses, because "producing this information [i]s not relevant and [is] burdensome."  Motion to Compel Response at 8.  According to Sandia Labs, "Plaintiff has since offered to narrow the request only to vehicles that Plaintiff was expected to operate."  Motion to Compel at 8 (referencing Benavidez' May 13, 2016, Email).  Sandia Labs states,

however, that the "Plaintiff would be expected to operate all of the approximately 3,000 vehicles and pieces of equipment that Sandia's Fleet Services Department manages," making RFP No. 23 an overly burdensome request.  Motion to Compel Response at 8.  Sandia Labs also contends that RFP No. 23 is, further, irrelevant, because photographs of vehicles will not "demonstrate that she was not physically able to perform" her job.  Motion to Compel Response at 9.

Next, Sandia Labs argues that it "should be awarded its expenses," stating:

> Under Rule 37(a)(5)(B), Sandia asks that the Court award Sandia its expenses incurred in opposing the Motion because so much of the Motion proved to be unjustified and because Plaintiff filed it without first conferring in good faith. Plaintiff's headlong rush to Court is set forth above, as is the lack of justification for two parts of the motion.  Plaintiff's complaints about the other seven requests for production were so obviously unjustified and would almost certainly not have been incorporated into the Motion, if Plaintiff had simply conferred first as was her duty.

Motion to Compel Response at 9.  Sandia Labs then explains how it resolved its objections to the now-moot RFPs, and why a good-faith conference and Benavidez' acceptance of its offer to extend the motion deadline by a week would have negated the necessity of filing the Motion to Compel.  See Motion to Compel Response at 9-11.  Thus, Sandia Labs argues that "[l]arge portions of Plaintiff's Motion could have and should have been resolved before she filed it, and none of it was justified, much less substantially justified," and that, "if a motion to compel is denied, and after the opportunity to be heard, the Court must require the movant or movant's attorney or both to pay the non-movant's reasonable expenses incurred in opposing the motion, including attorney's fees."  Motion to Compel Response at 11 (citing Fed. R. Civ. P. 37(a)(5)(B))(internal quotations omitted).  Sandia Labs notes, however, that "the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust."  Motion to Compel Response at 11 (citing rule 37(a)(5)(B)).

According to Sandia Labs, the United States Court of Appeals for the Sixth Circuit has held that fees and expenses may be awarded in a situation where a motion to compel was filed before the parties conferred, and that a motion to compel was not substantially justified.  See Motion to Compel at 11 (citing Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc., 326 F.3d 687, 700-01 (6th Cir. 2003)).   In conclusion, Sandia Labs reiterates that although Benavidez "may argue that she had to file her Motion to beat the Local Rule 26.6 deadline," Sandia Labs had offered to extend that deadline by a week, and Benavidez declined.  Motion to Compel at 11.

9. **The Motion to Compel Reply.**

Benavidez replied to the Motion to Compel Response with the Plaintiff's Reply to Defendant's Response to Motion to Compel, filed June 6, 2016 (Doc. 61)("Motion to Compel Reply").  The Motion to Compel Reply begins with Benavidez' argument regarding her "attempt to confer in good faith," where she argues that Sandia Labs' "request for monetary sanctions should be denied."  Motion to Compel Reply at 1.  According to Benavidez, she filed the Motion to Compel to "maintain her right to object and in an attempt to resolve the party's discovery disputes," and, before filing, she claims that she suggested to Sandia Labs that "after timely filing her Motion to Compel, the parties attempt to resolve or narrow discovery issues prior to Defendant's response deadline," but that Sandia Labs chose to take a different path.  Motion to Compel Reply at 1-2.  Benavidez further explains that, after the May 2, 2016, conference with Sandia Labs -- wherein many of the items of discovery in the Motion to Compel were resolved -- she told Sandia Labs that she intended to withdraw the Motion to Compel and file a substituted motion, which narrowed the issues for the Court.  See Motion to Compel Reply at 2 (citing Email from K. Wray to J. Poore and A. Viets (dated May 3, 2016), filed June 6, 2016 (Doc. 61-1)("Benavidez' May 3, 2016, Email")).  By email on May 13, 2016, Benavidez then reiterated

this suggestion, and requested that Sandia Labs agree to undergo an informal discovery resolution process with the Court regarding the narrowed issues.  See Motion to Compel Reply at 2 (citing Benavidez' May 13, 2016, Email).  Benavidez argues that, ultimately, at a May 16, 2016, hearing for another matter in this case, she and Sandia Labs agreed at the hearing that they would be "attempting informal resolution," and that Sandia Labs did not maintain its agreement, because it instead filed its Motion to Compel Response.  Motion to Compel Reply at 2. Benavidez thus contends that Sandia Labs -- and not her -- has evaded informal discovery resolution and that the Court therefore should not award fees.  See Motion to Compel Reply at 3.

Benavidez then turns to her RFP No. 19, and argues that

it seeks discovery directly related to Plaintiff's allegations that (1) there were available jobs for which Plaintiff was qualified and could have performed; and, (2) but for Defendant's retaliation and failure to abide by its promise and policy to provide assistance during the realignment process, Plaintiff would have received call backs for those jobs.

Motion to Compel Reply at 5.  Benavidez, accordingly, explains that the Court should order Sandia Labs to produce the information, because it appears to Benavidez that Sandia Labs' objection regards only its difficulty in producing the discovery, meaning it has decided to "withhold important and relevant information."  Motion to Compel Reply at 5.

Last, Benavidez addresses her RFP No. 23, and explains that the "Plaintiff would be willing to have the photographs and the makes and models of the vehicles that are centrally located," thereby further narrowing her initial request.  Motion to Compel Reply at 5.  Benavidez maintains that "[t]his evidence is essential to show what Defendant was attempting to do to Plaintiff by placing her in this position with known medical restrictions operating and maintaining this fleet of vehicles."  Motion to Compel Reply at 5.  Benavidez thus requests that

the Court grant her Motion to Compel as to RFP No. 19 and RFP No. 23, and deny Sandia Labs'
request for costs.

    10.    **The Court's Amendment MOO.**

    On January 17, 2017, the Court issued a Memorandum Opinion and Order, filed January
17, 2016 (Doc. 84)("Amendment MOO"), addressing in part Benavidez' Motion for Leave to
Substitute Second Amended Complaint.  Before the Court had the opportunity to formally deny
the Motion for Leave to Substitute Second Amended Complaint with a Memorandum Opinion
and Order, however, Benavidez filed the Plaintiff's Motion to Withdraw Prior Motion to Amend
and Substituted Motion to Amend Complaint, filed August 31, 2016 (Doc. 71)("Motion to
Withdraw and Amend").  See Motion to Withdraw and Amend at 1.  In the Motion to Withdraw
and Amend, Benavidez essentially sought to amend the Proposed Second Amended Complaint,
because she recognized that the Proposed Second Amended Complaint made claims that the
Court had already dismissed in its Preemption MOO and that the Court was thus inclined to deny
the Motion for Leave to Substitute Second Amended Complaint.  Benavidez relied on rule 15(a)
of the Federal Rules of Civil Procedure, and requested that the Court permit her to file the
Second Amended Complaint for Damages for Violation of Title I and IV of the Americans with
Disabilities Act of 1964, Retaliation and the Equal Pay Act of 1963, filed August 31, 2016 (Doc.
71-1)("Proposed Third Amended Complaint").  See Motion to Withdraw and Amend at 1-4.  The
Proposed Third Amended Complaint sought to amend the Proposed Second Amended Complaint
by eliminating state law claims in accordance with the Court's Preemption MOO.  See Motion to
Withdraw and Amend at 1-2.   The Proposed Third Amended Complaint thus included
Benavidez, as well as three proposed additional Plaintiffs, claiming: "Count I: Discrimination on
the Basis of Serious Medical Condition in Violation of Title I of the American Disability Act,"

Proposed Third Amended Complaint ¶¶ 127-38, at 16-17; "Count II: Discrimination on the Basis of Sex in Violation of the Civil Rights Act Against Defendant Sandia Corporation," Proposed Third Amended Complaint ¶¶ 139-53, at 17-19; "Count III[:] Retaliation Against Defendant Sandia Corporation," Proposed Third Amended Complaint ¶¶ 154-63, at 19-20; "Count IV: Violation of the Age Discrimination in Employment Act," Proposed Third Amended Complaint ¶¶ 164-74; and "Count VI: The Equal Pay Act of 1963," Proposed Third Amended Complaint ¶¶ 189-93, at 21-22.

The Court's Amendment MOO first allowed Benavidez to withdraw her Motion for Leave to Substitute Second Amended Complaint.  See Amendment MOO at 1-3.  The Court further granted leave for Benavidez to file her Proposed Third Amended Complaint with respect to the federal claims she proposed to bring, on her behalf, against Sandia Labs.  See Amendment MOO at 1-3.  The Court did not, however, grant leave for Benavidez to file her claim under the Equal Pay Act, 29 U.S.C. § 206(d).  See Amendment MOO at 1-3.  Regarding the proposed Plaintiffs, the Court denied the Motion to Withdraw and Amend, because the Court concluded that their Equal Pay Act claim similarly failed to state a claim, and because the filing date of their other federal claims did not relate back to a date meeting the statutory limitation for filing such claims, thus rendering them time barred and futile.  See Amendment MOO at 1-3.

### 11.   The March 16, 2017, Hearing.

The Court held a hearing on March 16, 2017.  See Transcript of Hearing, taken March 16, 2017 ("March Tr.").  At this point, the Court had issued its Amendment MOO, and Benavidez had filed a Motion for Partial Reconsideration of this Court's January 17, 2017 *Memorandum Opinion and Order*, filed February 3, 2017 (Doc. 87)("Motion for Reconsideration").  The Court heard argument on the Motion for Reconsideration before it heard argument on the Motion to

Compel.  Turning to the Motion to Compel, the Court suggested the parties take it one RFP at a time.  See March Tr. at 25:1-5 (Court).  Benavidez argued that "before the August hearing the parties had engaged in good faith conference and had narrowed the issues quite drastically," and regarding RFP No. 19,

> we sent defense counsel a letter on April 15[, 2016] after reviewing their affidavit stating how much time and energy and money would take place in producing our request . . .  [Thus] we narrowed the request even further, and . . . stated . . . plaintiff would accept a printout of the spread[sheet] that is represented on the website for the period beginning from plaintiff's removal as a production specialist until her termination.

March Tr. at 25:9-24 (Berenson).  Benavidez then explained that the request for these job openings at Sandia Labs is relevant and proportional to the case's needs, because, "pursuant to their policies and procedures, [Benavidez] was placed in a realignment process . . . [and] we're looking for . . . evidence of retaliation."  March Tr. at 26:9-24 (Berenson).  Benavidez explained further: "What we're looking at is did [Sandia Labs] place the plaintiff in a position where she was bound to fail and looking for jobs, what jobs were available to her, why didn['t] they [place her] in these certain positions, and I believe that is completely proportional to the needs of the case."  March Tr. at 26:12-22 (Berenson).  The Court inquired, however, what Benavidez thought she would find if she had these job postings, and Benavidez argued:

> I believe what we hope to find . . . are available positions that [they] could have placed Ms. Benavidez in but did not.  During, their actual language from their realignment process states that priority placement into a vacant job for which they qualify education and training or separation [is] part of this process.  It was Sandia in their policies and procedures that made reference to them helping the plaintiff into a new position.  We believe that or we're hopeful that we could look at and see whether there were position[s] that . . . she could have been placed into but Sandia chose not to.  Yes, it was [her] duty to look and she did, and she wasn't given not a single call back from the I believe 11 positions that she applied for.  Also evidence of retaliation, Judge.

March Tr. at 27:9-24 (Berenson).  Benavidez also agreed with the Court that the request should be limited to only those jobs for which Benavidez was qualified, as her education and experience disqualifies her from many of the jobs Sandia Labs would have had posted.  See March Tr. at 28:14-22 (Berenson).

Sandia Labs then argued that, even regarding Benavidez' more limited request, the request was still not relevant, because a retaliatory failure-to-hire claim begins with an application, and not a job posting.  See March Tr. at 30:6-23 (Viets).  Regarding the realignment process, which Benavidez had explained entailed the help of Sandia Labs in finding suitable alternative employment, Sandia Labs stated:

> [I]t's a collaborative effort between the employee and Sandia to identify jobs . . . that might be appropriate for the person who is undergoing the process. . . .  [is] not a promise that Sandia will let you sit back and cool your heels and we'll just deliver a job you know into your lap.  It's important to understand that these 11 were positions that the plaintiff herself participated in selecting.

March Tr. at 31:10-18 (Viets).  Sandia Labs thus contended that it is not "consistent with the law on failure to hire cases for the plaintiff to argue that there is some job that she didn't pursue herself that she could have gotten. . . .  I think [she is trying to] punish Sandia for engaging in a good deed saying we'll help you."  March Tr. at 32:20-33:2 (Viets).

At this point, Sandia Labs focused on the "fact that we're even having this discussion right now points up a problem that sort of precedes all of this.  This is the kind of discussion that should have taken place before the [m]otion to compel was ever filed."  March Tr. at 33:8-12 (Viets).  Sandia Labs thus reiterated that Benavidez' response to its Discovery Responses came very near Benavidez' deadline to file her Motion to Compel and that, although Sandia Labs offered to extend that deadline, Benavidez nonetheless filed the Motion to Compel before the parties had a chance to meaningfully confer to resolve the discovery disputes.  See March Tr. at

33:14-35:10 (Viets).  In addition, Sandia Labs argued that Benavidez' procedural tactic would support the Court's award of fees for Sandia Labs' work concerning the Motion to Compel.  See March Tr. at 33:14-35:10 (Viets).  Sandia Labs then told the Court that it would not "take more than a few hours" to generate the spreadsheet of job postings in the more-limited time frame that the parties had discussed.  See March Tr. at 35:24-25 (Poore).  Sandia Labs nonetheless reiterated its objection to relevance in light of the law surrounding failure-to-hire claims and of the large number of postings for which Benavidez would not have been qualified.  See March Tr. at 36:17-37:7 (Viets).

Benavidez responded that her letter objecting to Sandia Labs' Discovery Responses was, albeit late, still within the statutory deadline for making such objections.  See March Tr. at 37:15-20 (Berenson).  Further, while Benavidez concedes that "it didn't give them enough time to adequately respond . . . we did meet and confer," after filing the Motion to Compel, because, she argued, there must be a court order to extend the deadline to file such a Motion to Compel. March Tr. at 37:20-38:16 (Berenson).  Benavidez then reiterated the relevance and importance of her request, because Sandia Labs -- in the collaborative realignment process -- ultimately helped Benavidez get a job as a "heavy mechanic operator," and she needed to see the universe of options that were available to her.  March Tr. at 38:16-25 (Berenson).

The Court then granted "the more narrow request to produce the spreadsheet," because "it looks like [it is] not unduly burdensome or expensive to produce."  March Tr. at 39:2-5 (Court).[5] Further, the Court did not consider that the production would definitely not produce any relevant information, because the production might regard Sandia Labs' good effort in helping

---

[5]At the hearing, again, Sandia Labs conceded that the more narrow production "should not be particularly difficult.  It shouldn't take more than a few hours."  March Tr. at 35:24-25 (Poore).

- 28 -

Benavidez.  See March Tr. at 39:8-16 (Court).  The Court also indicated that it was not going to order any specific postings' production at this time and instead likely order only those postings in the relevant time frame for which Benavidez was qualified.  See March Tr. at 39:17-40:13 (Court).

Benavidez then argued in favor of her RFP No. 23, and indicated to the Court that she had narrowed the request, from all of the vehicles which Benavidez was required to drive and maintain, to "the vehicles that she was required to maintain and to drive, to change tires, that are centrally located."  March Tr. at 40:14-41:2 (Berenson).  The Court then suggested that, "at least as a starting point, what if I told Sandia to get 10 pictures of vehicles that this job would have required her to drive, and make it representative."  March Tr. at 42:20-43:14 (Court).  Benavidez agreed that this limited production would be a "great starting point."  March Tr. at 43:15-21 (Berenson).

Sandia Labs argued, however, that it could instead "go back to the office and Google" pictures of road graders and other large vehicles.  March Tr. at 44:8-15 (Viets).  The Court then explained to Sandia Labs that it was inclined to think that the actual photographs which were representative of her job and duties at Sandia Labs would be more convincing to a jury.  See March Tr. at 44:16-45:2 (Court).  Sandia Labs then complied and agreed it would provide ten representative photographs of the vehicles at Sandia Labs with which Benavidez' position would have necessitated her interaction.  See March Tr. at 44:16-45:2 (Viets); id. at 47:4-6 (Viets).  Accordingly, the Court explained:

> All right so you'll get 10 pictures of some equipment that the position required a male fully qualified with a . . . license would be expected to drive in that position, and then Sandia can designate them, count them one to 10 and can tell you that a smaller number . . . are the ones that they actually expected Ms. Benavidez [to use] and you can argue otherwise but you'll get 10 pictures there, and if you're

> not, if you, after you show the 10 pictures to Ms. Benavidez and she doesn't think
> that's representative, [you can] come back and talk to us about it, but I have a
> feeling you'll get what you want and what you need to put in front of the jury.

March Tr. at 48:6-20 (Court).  The Court then confirmed that the parties had resolved the rest of

the issues in the Motion to Compel that were not argued, and concluded the hearing upon

ensuring they were resolved.  <u>See</u> March Tr. at 49:8-15 (Court, Berenson).

## **RELEVANT LAW REGARDING DISCOVERY**

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for tangible

objects.  <u>See</u> Fed. R. Civ. P. 34.  Rule 34(a) states:

> A party may serve on any other party a request within the scope of Rule 26(b):
>
> **(1)**  to produce and permit the requesting party or its representative to
> inspect, copy, test, or sample the following items in the responding
> party's possession, custody, or control:
>
> > **(A)**  any designated documents or electronically stored
> > information -- including writings, drawings, graphs,
> > charts, photographs, sound recordings, images, and
> > other data or data compilations -- stored in any
> > medium from which information can be obtained
> > either directly or, if necessary, after translation by
> > the responding party into a reasonably usable form;
> > or
> >
> > **(B)**  any designated tangible things; or
>
> **(2)**  to permit entry onto designated land or other property possessed or
> controlled by the responding party, so that the requesting party
> may inspect, measure, survey, photograph, test, or sample the
> property or any designated object or operation on it.

Fed. R. Civ. P. 34(a).  Rule 26(b)(1) explains that the proper scope of discovery is "any

nonprivileged matter that is relevant to any party's claim or defense and proportional to the

needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).  The factors that bear upon proportionality are:

"the importance of the issues at stake in the action, the amount in controversy, the parties'

relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26 (b)(1).

Federal courts have held that the scope of discovery under rule 26 is broad. See Gomez v. Martin Marrietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information."). The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." Hickman v. Taylor, 329 U.S. 495, 507 (1947). A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished).[6] "'Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, 2012 WL 3860744, at *1 (D.N.M. 2012)(Browning, J.)(quoting Tottenham v. Trans

---

[6]McGee v. Hayes is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that McGee v. Hayes has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

World Gaming Corp., 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)).  See Hardrick v.
Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(Burnett, M.J.)(noting that courts do and
should remain concerned about "fishing expeditions, discovery abuse and inordinate expense
involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted).
"[B]road discovery is not without limits and the trial court is given wide discretion in balancing
the needs and rights of both plaintiff and defendant."  Gomez v. Martin Marietta Corp., 50 F.3d
at 1520 (internal quotation marks omitted).

The 2000 amendments to rule 26(b)(1) began narrowing the substantive scope of
discovery and injected courts deeper into the discovery process.  See Simon v. Taylor, 2015 WL
2225653, at *23 (D.N.M. April 30, 2015)(Browning, J.).  Before the 2000 amendments, rule
26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is
> relevant to the subject matter involved in the pending actions, whether it relates to
> the claim or defense of the party seeking discovery or to the claim or defense of
> any other party, including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things and the identity
> and location of persons having knowledge of any discoverable matter.  The
> information sought need not be admissible at the trial if the information sought
> appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here
in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is
> relevant to ~~the subject matter involved in the pending actions, whether it relates to~~
> the claim or defense of ~~the party seeking discovery or to the claim or defense of~~
> any ~~other~~ party, including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things and the identity
> and location of persons having knowledge of any discoverable matter.  For good
> cause, the court may order discovery of any matter relevant to the subject matter
> involved in the action.  Relevant ~~The~~ information ~~sought~~ need not be admissible
> at the trial if discovery the ~~information sought~~ appears reasonably calculated to
> lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the changes to the last sentence -- which the advisory

committee's notes make clear was a housekeeping amendment to clarify that inadmissible

evidence must still be relevant to be discoverable -- the 2000 amendments have two effects:

(i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts

into the process in the entirely new second sentence.

> In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions.  [Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D. Miletich, Discovery and Disclosure Practice, Problems, and Proposals for Change] 44-45 (1997).  The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

> The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party.  The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause.  The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery.  The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery.   Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center.  See Discovery and Disclosure Practice, supra, at 44.  Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or

defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action.  The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.  The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision.  A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard.   Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information.  Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable.  In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.  In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention.  When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence.  As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible.  The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery.   Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence.  As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii).  These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1).  The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated.  See 8 Federal Practice & Procedure § 2008.1 at 121.  This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery.  Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998) (quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing.  The amendments sent a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  They directed district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter," to "claim or defense," added teeth to the relevance standard more than it substantively narrowed discovery.  It is not surprising that the Supreme Court and Congress would want to increase judicial presence: "relevance" is a liberal concept in the context of trial.  Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Of course, regardless of this individual court's philosophical thoughts about the new rules, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188.  The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action."  This good-cause standard is intended to be flexible.  When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be.  "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

- 36 -

The 2015 amendments to rule 26(b)(1) continued this process of narrowing the discovery's substantive scope and injecting courts further into the discovery process.  The 2015 amendment made notable deletions and additions, both of which aimed to emphasize the need to make discovery proportional to the needs of the case.  See Fed. R. Civ. P. 26(b)(1).  Rule 26(b)(1), with the deletions and additions, provides:

> *(1) Scope in General.*  Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ~~including the existence, description, nature, custody, condition and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).~~ [and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.]

Fed. R. Civ. P. 26(b)(1)(alterations added).

The first deletion removes the statement that discovery is available for any matter relevant to any party's claim or defense, "including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."  Fed. R. Civ. P. 26(b)(1) (pre-December 2015 version).  The Committee Notes express that this deletion does not make a substantive change.  Rather, the deletion was made because "[d]iscovery of such matters is so deeply entrenched" in standard discovery that including it would be "clutter."  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.[7]

---

[7]The Court regrets this deletion.  Moving things out of the statute's text often creates mischief, especially for courts that rely heavily on the text's plain language.  The drafters might

Regarding the second deletion, the Committee Notes explain that the former provision for discovery of relevant but inadmissible information that appears "reasonably calculated to lead to the discovery of admissible evidence" is also deleted.[8]   Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

> The phrase has been used by some, incorrectly, to define the scope of discovery. As the Committee Note to the 2000 amendments observed, use of the "reasonably calculated" phrase to define the scope of discovery "might swallow any other limitation on the scope of discovery."  The 2000 amendments sought to prevent such misuse by adding the word "Relevant" at the beginning of the sentence, making clear that "'relevant' means within the scope of discovery as defined in this subdivision . . . ."  The "reasonably calculated" phrase has continued to create problems, however, and is removed by these amendments.  It is replaced by the direct statement that "Information within this scope of discovery need not be admissible in evidence to be discoverable."   Discovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise within the scope of discovery.

Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.  The deletion, therefore, did not necessarily change the discovery's scope, but clarified it.  Accordingly, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense."  State Farm Mutual Auto. Ins. Co.

---

be astonished how often the Court sees objections to interrogatories and requests that seek basic information about documents.  The rule is well-established because the deleted language was in the rule; now that the language is not in the rule, the rule may be eroded or, more likely, ignored or overlooked by those who do not spend time in the weeds of the advisory notes.  What the advisory comments describe as "clutter" is a simple instruction to practitioners who do not practice in federal court every day for every case.  This deletion might incrementally increase unnecessary litigation rather than shorten it.  Some of the amendments seem more designed to help the nation's large corporations, represented by some of the nation's most expensive law firms, cut down expenses than they are to help courts and practitioners in more routine cases.

[8]Arguably, older lawyers will have to learn a new vocabulary and ignore the one they have used for decades.  If the changes were not made to change the scope of discovery, it is unclear what the benefit of all this really is.

v. Fayda, 2015 WL 7871037, at *2 (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

The most notable addition to rule 26(b) is the proportionality concept. Rule 26(b)(2)(C)(iii) has always limited overly burdensome discovery and required proportionality. See Fed. R. Civ. P. 26(b)(2)(C)(iii)(pre-2015 version). The proportionality requirement was relocated to 26(b)(1) to address the "explosion" of information that "has been exacerbated by the advent of e-discovery."[9] Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment. Describing how e-discovery is the driving factor in the 2015 amendment, the Notes state:

> The burden or expense of proposed discovery should be determined in a realistic way. This includes the burden or expense of producing electronically stored information. Computer-based methods of searching such information continue to develop, particularly for cases involving large volumes of electronically stored information. Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

---

[9] This relocation -- rather than substantive change -- is one reason that the Court is skeptical that the 2015 amendments will make a considerable difference in limiting discovery or cutting discovery costs. Courts have been bringing common sense and proportionality to their discovery decisions long before the 2015 amendments. See Aguayo v. AMCO Ins. Co., 59 F. Supp. 3d 1225, 1275 (D.N.M. 2014)(Browning, J.)("[T]he Court expects that discovery and motion practice bear some proportionality to the case's worth."); Cabot v. Wal-Mart Stores, Inc., 2012 WL 592874, at *11-12 (limiting the scope of discovery because it was unduly burdensome in relation to the relevance and need). The real import of the rule is that it will likely lead to more "proportionality" objections and more disputes that the district courts will have to resolve, which is what the drafters apparently intended. It is unclear how more judicial involvement in discovery can be squared with a federal court docket that is at a breaking point already. It is also unclear what was wrong with the old goal of discovery of being largely self-executing. The new rules also require attorneys to learn the new vocabulary of "proportionality," delete their old stock legal sections from their briefs, and rewrite these new sections to use the correct language. Older lawyers must be particularly alert to read and learn the new rules, read the comments, and understand the thrust of the drafting. Finally, given that "proportionality" is a very subjective standard, it will be hard for any court to sanction any attorney for raising this objection. In sum, the rules are just as likely to increase the costs of discovery as to decrease it.

Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

Chief Justice Roberts' 2015 Year-End Report on the Federal Judiciary indicates that the addition of proportionality to rule 26(b) "crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality."[10]  Chief

---

[10]The Rules Enabling Act, 28 U.S.C. §§ 2071-2077, empowers the federal courts to prescribe rules for the conduct of their business.  See 28 U.S.C. § 2071.  The Judicial Conference -- the policy making body of the federal judiciary -- has overall responsibility for formulating those rules.  See Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx ("2015 Year-End Report").  The Chief Justice leads the Judicial Conference.  The Judicial Conference's Committee on Rules of Practice and Procedure, known as the Standing Committee, enlists guidance from advisory committees and conferences to draft proposed rules and amendments for the Judicial Conference's consideration.  See 2015 Year-End Report.  Chief Justice Roberts, a former clerk for Chief Justice William Rehnquist, appointed the Honorable David Campbell, United States District Judge for the District of Arizona, also a former Rehnquist clerk and President George W. Bush appointee, to chair the Civil Rules Advisory Committee.  Campbell and David Levi, Dean of the Duke University School of Law, a former clerk to Justice Lewis Powell, and former chief judge of the United States District Court for the Eastern District of California, appointed as United States Attorney by President Ronald Reagan and appointed to the Eastern District of California by President George W. Bush, led the effort to increase proportionality and hands-on judicial case management in the 2015 amendments.  See Report to the Standing Committee at 4, Advisory Committee on Civil Rules (May 8, 2013), available at http://www.uscourts.gov/rules-policies/archives/committee-reports/advisory-committee-rules-civil-procedure-may-2013.  After the Judicial Conference concurred on the 2015 amendments, it sent the proposed rules and amendments to the Supreme Court, which approved them.  Chief Justice Roberts submitted the proposed rules to Congress for its examination.  See 2015 Year-End Report at 6.  Because Congress did not intervene by December 1, the new rules took effect.  Some scholars have noted that the rules reflect the conservative nature of those who have participated in drafting the amendments.  See Edward A. Purcell, Jr., From the Particular to the General: Three Federal Rules and the Jurisprudence of the Rehnquist and Roberts Courts, 162 U. Pa. L. Rev. 1731 (2014); Corey Ciocchetti, The Constitution, The Roberts Court, and Business: The Significant Business Impact of the 2011-2012 Supreme Court Term, 4 Wm. & Mary Bus. L. Rev. 385 (2013).  In particular, the New Mexico Trial Lawyer published an article asserting that the amendments favored corporate defendants, which was partially the result of Chief Justice Roberts' appointment of "corporate-minded judges to the Rules Advisory Committee that drafted the amendments."  Ned Miltenberg & Stuart Ollanik, The Chief Umpire is Changing the Strike Zone at 1, The New Mexico Trial Lawyer (Jan./Feb. 2016).  The Court shares some of the concerns with the new amendments being pro-business and giving corporations new tools to limit plaintiffs' discovery.

Justice John Roberts, <u>2015 Year-End Report on the Federal Judiciary</u> at 6, Supreme Court of the United States, <u>available at</u> http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx ("2015 Year-End Report").  He states that the proportionality concept seeks to "eliminate unnecessary or wasteful discovery," and to impose "careful and realistic assessment of actual need."  2015 Year-End Report at 7.  This assessment may, as a practical matter, require "judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information."  <u>State Farm Mutual Auto. Ins. Co. v. Fayda</u>, 2015 WL 7871037, at *2 (S.D.N.Y. 2015)(Francis IV, M.J.)(internal quotation marks omitted).  The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations."  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  <u>See</u> <u>Dao v. Liberty Life Assurance Co. of Boston</u>, 2016 WL 796095, at *3 (N.D. Cal. 2016)(LaPorte, M.J.)(observing that the 2015 amendment "reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses or objections"); <u>Williams v. U.S. Envt'l Servs., LLC</u>, 2016 WL 617447, at *1 n.2.  In general, "the parties' responsibilities [] remain the same" as they were under the rule's earlier iteration so that the party resisting discovery has the burden of showing undue burden or expense.  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  <u>See</u> <u>Dao v. Liberty Life Assurance Co. of Boston</u>, 2016 WL 796095, at *3 (noting that, "while the language of the Rule has changed, the amended rule does not actually place a greater burden on the parties with respect to their discovery obligations").

Like with the 2000 amendments, it is unsurprising that the drafters are unable to articulate precise language narrowing the discovery's substantive scope.  Instead of being

Aristotelian and trying to draft rules, the drafters largely opted to make federal judges Plato's enlightened guardians.  They have decided that no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, and other factors.  They have dropped all discovery disputes into judges' laps.  The drafters have decided that this determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers want when they: (i) encourage district judges to take a firmer grasp on the discovery's scope; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

## LAW REGARDING MOTIONS TO COMPEL

Rule 37 provides enforcement mechanisms for rule 34.  According to rule 37, if a party does not respond to an interrogatory or to a request for production, the party requesting the discovery may move the Court to compel the opposing party to respond.  See Fed. R. Civ. P. 37(a)(2)(B).   "[A]n evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4).  See Lewis v. Goldberry, 2012 WL 681800, at *4 (D.N.M. 2012)(Browning, J.).  Rule 37(a) provides:

> On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery.  The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

Fed. R. Civ. P. 37(a).  If a party refuses to produce documents through proper discovery, a defendant should move to compel production pursuant to rule 37.  See Lane v. Page, 727 F. Supp. 2d 1214, 1236 n.15 (D.N.M. 2010)(Browning, J.).[11]

Rule 37 prescribes sanctions for parties who fail to comply with discovery until after a motion to compel is filed against them.  With some exceptions, when a party is compelled to provide discovery, or provides the discovery only after a motion to compel has been filed against it, rule 37(a)(5) requires the court to order the responding party to pay the movant's reasonable expenses incurred in filing the motion.  Rule 37(a)(5) provides:

> **(5) Payment of Expenses; Protective Orders.**
>
> > **(A)** *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).*  If the motion is granted -- or if the disclosure or requested discovery is provided after the motion was filed -- the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.  But the court must not order this payment if:
> >
> > > **(i)** the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
> > >
> > > **(ii)** the opposing party's nondisclosure, response, or objection was substantially justified; or
> > >
> > > **(iii)** other circumstances make an award of expenses unjust.
> >
> > **(B)** *If the Motion Is Denied.*  If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent

---

[11]See also D.N.M.L.R. Civ. 7.1(a)("Movant must determine whether a motion is opposed, and a motion that omits recitation of a good-faith request for concurrence may be summarily denied." (emphasis added)).

who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees.  But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

(C) *If the Motion Is Granted in Part and Denied in Part.*  If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion.

Fed. R. Civ. P. 37(a)(5).  Where parties have taken legitimate positions, and the Court grants in part and denies in part a motion to compel discovery responses, courts generally conclude that justice requires that each party be responsible for their own fees and costs.  See Pulsecard, Inc. v. Discover Card Servs., 168 F.R.D. 295, 310-11 (D. Kan. 1996)(Rushfelt, M.J.); Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 138 F.R.D. 530, 539 (C.D. Ill. 1991)(Mills, J.).

## LAW REGARDING RULE 16 SCHEDULING

Rule 16(b) of the Federal Rules of Civil Procedure provides: "Except in categories of actions exempted by local rule, the district judge . . . must issue a scheduling order after receiving the parties' report under Rule 26(f) . . . The scheduling order must limit the time to join other parties, amend the pleadings, complete discovery, and file motions."  Fed. R. Civ. P. 16(b). While rule 15 of the Federal Rules of Civil Procedure governs amendments to pleadings generally, rule 16 governs amendments to scheduling orders.  See Bylin v. Billings, 568 F.3d 1224, 1230 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)).  Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  The Advisory Committee Notes to rule 16 explain: "[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension.  Since the scheduling order is entered early in the litigation, this standard seems

more appropriate than a 'manifest injustice' or 'substantial hardship' test."  Fed. R. Civ. P. 16 advisory committee's notes to 1983 Amendment) "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment."  Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 2007 U.S. Dist. LEXIS 56492, at *3 (D.N.M. June 5, 2007)(Browning, J.).  "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 2007 U.S. Dist. LEXIS 56492, at *3.

The Tenth Circuit has noted that the "good cause" standard of rule 16 is "an arguably more stringent standard than the standards for amending a pleading under [r]ule 15."  Bylin v. Billings, 568 F.3d at 1230.  The Tenth Circuit has also noted, however, that there is a "rough similarity" between the "good cause" standard in rule 16 and the "undue delay" standard in rule 15.  Minter v. Prime Equip. Co., 451 F.3d 1196, 1205 n.4 (10th Cir. 2006).  Cf. Martinez v. Target, Corp., 384 Fed. Appx. 840, 846 (10th Cir. 2010).  The Tenth Circuit has stated: "[I]t appears unlikely that applying [r]ule 16 would lead to a different outcome [than rule 15], much less prevent a 'manifest injustice.'"  Bylin v. Billings, 568 F.3d at 1232.  The Tenth Circuit quoted other appellate courts that have applied rule 16 and have "afforded wide discretion to district courts' application of that rule."  Bylin v. Billings, 568 F3d. at 1231 (citing United States v. Dang, 488 F.3d 1135, 1143 (9th Cir. 2007)("[T]he district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order . . . will not be disturbed unless they evidence a clear abuse of discretion."); Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F3d. 669, 684 (3d Cir. 2003)("Rule 16 was not intended to function as an inflexible straightjacket on the conduct of litigation.")).

## LAW REGARDING PROTECTIVE ORDERS

Federal district courts have broad discretion over discovery.  See Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995).  "The trial court has discretion to grant a protective order pursuant to rule 26(c) of the Federal Rules of Civil Procedure."  Morales v. E.D. Etnyre & Co., 228 F.R.D. at 696 (citing Thomas v. Int'l Bus. Machines, 48 F.3d 478, 482 (10th Cir. 1995)).  Rule 26(c) provides that, upon a showing of good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which order may include forbidding disclosure or discovery.  Fed. R. Civ. P. 26(c)(1)(A).  See Miller v. Regents of the Univ. of Colo., 188 F.3d 518, 1999 WL 506520, at *12 (10th Cir. 1999)(unpublished table decision)(reasoning that "[t]he district court is in the best position to weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties").  "Federal Rule of Civil Procedure 26(c) expressly limits who may move for a protective order to parties or the person from whom discovery is sought."  SEC v. Dowdell, 144 F. App'x 716, 722-23 (10th Cir. 2005)(unpublished)(noting that a third party may not move for a rule 26(c) protective order if it is not a party to the underlying action, has not intervened, or has not been served a subpoena seeking discovery).

"It is the party seeking the protective order who has the burden to show good cause for a protective order."  Velasquez v. Frontier Med. Inc., 229 F.R.D. 197, 200 (D.N.M. 2005)(Browning, J.).  See Murphy v. Gorman, 271 F.R.D. 296, 303 (D.N.M. 2010)(Browning, J.).  The party seeking the protective order must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."  Gulf Oil Co. v. Bernard,

452 U.S. 89, 102 n.16 (1981)(internal quotation marks omitted).  Although rule 26(c) is silent

regarding the time within which the movant must file for a protective order, the United States

Court of Appeals for the Tenth Circuit has held that "a motion under [rule] 26(c) for

protection . . . is timely filed if made before the date set for production."  In re Coordinated

Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 669 F.2d 620, 622 n.2 (10th Cir.

1982)(quoting In re Halkin, 598 F.2d 176, 193 (D.C. Cir. 1979), overruled on other grounds by

Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 (1984)).

## ANALYSIS

The Court will grant in part and deny in part the Motion to Compel.  The Court concludes

that the concessions and the compromises that it solicited at the hearing are an adequate

resolution for Benavidez' RFP No. 19 and RFP No. 23.  Sandia Labs will, for the time frame of

July 2, 2014, until April 17, 2015, produce a spreadsheet of its internal job postings for which

Benavidez would have qualified.  Sandia Labs will also produce ten photographs of Sandia Labs

vehicles that are representative of the range of vehicles that Benavidez would have been required

to drive and maintain during her employment.  The Court, because it is granting in part and

denying in part the Motion to Compel, will not award Sandia Labs attorney's fees and expenses.

## I.      THE PARTIES DID NOT MEET AND CONFER BEFORE BENAVIDEZ FILED THE MOTION TO COMPEL, BUT THE COURT WILL STILL ENTERTAIN THE MOTION TO COMPEL.

Sandia Labs, at the outset, suggests that Benavidez filed the Motion to Compel without

[u]nder Rule 37(a)(5)(B) . . . first conferring in good faith.  Plaintiff's headlong rush to Court is set forth above, as is the lack of justification for two parts of the motion.  Plaintiff's complaints about the other seven requests for production were so obviously unjustified and would almost certainly not have been incorporated into the Motion, if Plaintiff had simply conferred first as was her duty.

Motion to Compel Response at 9.  Sandia Labs cites to <u>Gabaldon v. Stock</u>, No. CIV 12-0586

LH/KBM, Order Denying Motions to Compel at 2-3, filed February 8, 2013 (Doc. 48), for

precedent that, when a plaintiff sends a meet and confer letter to the defendant just before the

deadline to file a motion to compel, and the defendant does not have a meaningful opportunity to

respond before the deadline -- and even offers to extend the deadline -- but the plaintiff files a

motion to compel anyway, such conduct violates the "spirit of discovery," and the Court should

deny the motion.  Motion to Compel Response at 3 (quoting <u>Gabaldon v. Stock</u> at 3).  The Court,

however, takes a different view of the meet and confer requirement.

In <u>New Mexico ex rel Balderas v. Valley Meat Co., LLC</u>, 2015 WL 3544288, at *19

(D.N.M. 2015)(Browning, J.), the Court discussed D.N.M. LR-Civ. 7.1(a), which sets forth a

meet-and-confer requirement in fairly bare-bones terms:

> A motion must be in writing and state with particularity the grounds and the relief
> sought.  A party may adopt by reference another party's motion or other paper by
> making specific reference to the filing date and docket number of such motion or
> other paper.  Movant must determine whether a motion is opposed, and a motion
> that omits recitation of a good-faith request for concurrence may be summarily
> denied. . . .

The Court explained:

> The local rule states that a "[m]ovant must determine whether a motion is
> opposed," but it leaves two important dimensions of this requirement unspecified.
> First, the local rule does not specify how much time the movant must give the
> opposing party before the movant proceeds to file its motion without a response.
> The logical course of action for a non-movant who plans to oppose a motion is
> simply to fail to reply to the movant's request for consent; after all, once the non-
> movant notifies the movant of its opposition to the motion, the movant is in the
> clear to file the motion.  If, on the other hand, the non-movant simply maintains
> radio silence, he or she can get a jump on responding to the motion by using
> whatever time the movant gives him or her before filing -- effectively lengthening
> the time to respond.  Second, the local rule gives no indication how specific the
> movant must be in describing the motion to which it is requesting consent.  On
> one end of the spectrum, the movant can attach a completed and ready-to-file
> copy of the motion; on the other end, it can describe only the relief sought, i.e.,

dismissal of Counts II and IV.  Intermediate steps on the spectrum include giving a short rationale for the relief sought -- e.g., "the motion will seek to dismiss Count II on limitations grounds and Count IV for failure to exhaust administrative remedies" -- or attaching an unfinished draft or truncated version of the motion.  The local rules' only input on these two issues is that the request for consent be in "good faith."

2015 WL 3544288, at *19 (quoting D.N.M. LR-Civ. 7.1(a)).  The Court concluded:

In the context of discovery and other non-dispositive motions, local rule 7.1's meet-and-confer requirement is not meant to be perfunctorily satisfied.  It is designed to encourage parties to contact each other -- preferably in-person or by telephone, rather than via letter or electronic-mail transmission -- and work out mutually agreeable solutions to kinks that arise in the flow of discovery, extensions to prearranged schedules, and pragmatic compromises on scope-of-discovery disputes.  The District encourages such solutions for essentially the same reasons that it encourages settlement of cases: they conserve judicial resources, vest the decisionmaking in the hands of the people with the most familiarity with the dispute, and result in outcomes that are, by definition, agreeable to all parties concerned.  If an agreed-upon solution can be reached, then doing so is generally preferable to having the same dispute resolved by judicial fiat.

2015 WL 3544288, at *19.

Rule 37(a)(1) of the Federal Rules of Civil Procedure, regarding motions to compel discovery, parallels D.N.M. LR-Civ. 7.1(a)'s open ended language, in requiring simply that: "The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."  Fed. R. Civ. P. 37(a)(1).  The Tenth Circuit has stated that: "Rule 37 is the means by which the courts enforce compliance with the discovery scheme in the Rules.  It affords a broad choice of remedies and penalties for failure to comply."  Robison v. Transamerica Ins. Co., 368 F.2d 37, 39 (10th Cir. 1966).  Further, according to the Tenth Circuit, "the administration of the rules lies necessarily within the province of the trial court with power to fashion such orders an[d] may be deemed proper to vouchsafe full discovery for the just,

speedy and inexpensive determination of the lawsuit."  <u>Robison v. Transamerica Ins. Co.</u>, 368 F.2d at 39.

This trial court discretion is not to say, however, that parties make a good-faith effort to meet and confer by exchanging cursory and perfunctory emails or letters which simply restate each other's positions on the items of discovery.  The Court considers rule 37(a)'s requirement to require a more sincere effort to see if the dispute can be resolved before a party files a motion to compel.  Such a good-faith effort might be established by telephonic conference, contemporaneous email communication, or the now-rare personal meeting amongst parties. Whether the parties engaged in a good-faith conference will involve a case-by-case consideration of the facts, and that consideration might differ from docket to docket, but the Court concludes that rule 37(a) generally demands something more than a one-sided, perfunctory letter sent the day before a motion to compel is filed.  In the case of a violation, the Court may then summarily deny a motion to compel in the event the Court concludes that the movant failed to confer with opposing counsel in good faith.

Confer, as lawyers use it, has obsolete meaning.  <u>See</u> The American Heritage Dictionary of the English Language at 278 (New College Edition 1976)("Dictionary").  It means to compare, i.e., to compare views.  <u>See</u> Dictionary at 278-79.  Comparing views means to hold a conference.  <u>See</u> Dictionary at 278.  It also means to consult together.  <u>See</u> Dictionary at 279. The English word comes from the Latin <u>conferre</u>, which means to bring together and contribute. <u>See</u> Dictionary at 279.  <u>Con</u> means together, and <u>ferre</u> to bring or bear.  <u>See</u> Dictionary at 279.  It is hard to square the idea of a conference where parties are bringing and comparing views with an exchange of letters separated by days.

Thus, the Court concludes that, for there to be a good-faith meet and confer, there must be a conference where the parties come together to compare their views. A conference has an element of concurrence, simultaneous occurrence, and contemporaneousness. In other words, confer means to exchange views at the same time. The rules give the lawyers some freedom how to exchange views at the same time, but a conference cannot lose all resemblance to a conference. While neither the Federal Rules of Civil Procedure or the D.N.M. LR-Civ use the word "meet and confer," in the hierarchy of how to confer, that remains the judiciary's preferred method of conferring. Older lawyers still remember with fondness how conferring was accomplished over lunch or even drinks in the evening. In the twenty-first century, videoconferencing is common and often reduces travel cost and time. Sometimes, all that can be done is talking on a speaker telephone. Finally, the Court will also honor lawyers who sit at a computer and have a simultaneous exchange of emails. All of the above will satisfy the form of conferring. Some things will not satisfy the requirement of "conferred." Bare-bones letters alone -- which are typically separated by days if sent by mail or even fax machine -- will likely not satisfy the "confer" request. Letters may be a good start or part of the process, but ultimately, there must be some simultaneous, or sufficiently detailed, comparison of views. Emails separated by more than a few minutes likely will not -- alone -- satisfy the "confer" requirement. At some point, the parties must come together. But conferring is not all that rule 37(a) requires. Rule 37(a) requires "good faith" conferring. Two things will not be considered good faith. First, there is a temporal requirement. The Court recognizes that good lawyers are very busy. But when discovery responses are received, the clock starts ticking; it is imperative that even the busiest lawyers immediately or at least as soon as possible look at these responses. Waiting until the nineteenth or twentieth day of D.N.M. LR-Civ.'s deadline is not good faith,

especially where it precludes a simultaneous exchange of views.  Hence, good faith means at least enough time to have a conference that might resolve the matter.

Second, if one party is willing to extend the deadline to facilitate conferring, it is not good faith to turn down such an offer if informal resolution is a possibility.  Obviously the parties cannot just keep getting continuances, but one or two is not going to bring a case to a halt. The Court does not recall ever turning down an unopposed motion to extend the D.N.M. LR-Civ 26.6 deadline, and as a practicing lawyer in a court, the Court does not recall ever seeing or hearing of a Magistrate Judge or District Judge denying a motion to extend that deadline.  Thus, any fear that an order extending the deadline is not in place or may not be forthcoming is unfounded and not a good-faith excuse to not confer when the motion is unopposed.[12]

Using these rules for defining what it means to in good faith confer, it is evident that Benavidez did no conferring, in good faith or otherwise.  She waited too long in the deadline period to start her contact with Sandia Labs.  Then she sent only a letter.  There is no evidence of a simultaneous exchange -- oral or written -- about the discovery disputes.  And then she turned down Sandia Labs' offer of an extension of the D.N.M. LR-Civ 26.6 deadline.  Hence, the Court agrees that Benavidez did not confer or attempt to confer in good faith, and that, under the Federal Rules of Civil Procedure, the Court could deny her motion and then shift costs.  The Court also interprets the local rules as allowing it to deny the motion summarily.

---

[12]Starting as a practicing lawyer, and now as a judge for fourteen years, the Court has always questioned the utility and purpose of D.N.M. LR-Civ 26.6.  The Court is not sure why it is in anybody's interest to rush people to file these motions.  True, it would be unfortunate if the case was about to go to trial and the parties waited until the last minute to start filing discovery motions.  On the other hand, only approximately one-percent of federal cases go to trial.  See http://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2015-tables.  It seems unwise to rush the ninety-nine percent for fear of what might happen to the one-percent of cases.  It seems that the rule may make work that otherwise the parties and the Court might otherwise never need to do.

In appropriate circumstances, however, the Court may still choose to hear the motion despite the failure to confer as the Court has described that word, and the Court concludes that the facts of this case turn in Benavidez' favor.  In this case, Benavidez requested twenty-nine items of discovery from Sandia Labs.  See Discovery Responses at 1-9.  Sandia Labs timely responded and objected to Benavidez' requests, and then Benavidez -- although late in the window of time with respect to her local rule 26.6[13] deadline to file a motion to compel in response to Sandia Labs' Discovery Responses -- contacted Sandia Labs with her objections to its objections.  See Benavidez' April 29, 2016, Email.  Benavidez' April 29, 2016, Email selects nine discovery requests to which Sandia Labs had objected and explains why she thinks those objections are misplaced.  See Benavidez' April 29, 2016, Email.  The Benavidez' April 29, 2016, Email also indicates that Benavidez intended to file the Motion to Compel by May 2, 2016, in accordance with her deadline.  See Benavidez' April 29, 2016, Email.  Benavidez then filed the Motion to Compel, but indicated within her Motion to Compel that: "The parties are continuing to engage in conversations to resolve the above-outlined disputes and are hopeful that the issues can be at least partially resolved.  For those matters that cannot be negotiated, Plaintiff requests an order from this Court compelling Defendant to produce the documents."  Motion to Compel at 7-8.

Benavidez and Sandia Labs then held a more comprehensive discovery conference on May 2, 2016, during which they resolved seven of the nine discovery requests to which Sandia Labs had objected.  See Motion to Compel Reply at 1-3.  In Benavidez' May 3, 2016, Email, Benavidez indicated willingness to withdraw the Motion to Compel and file an amended motion

---

[13]Local rule 26.6 requires a party to proceed with a motion to compel "within twenty-one (21) days of service of an objection."  D.N.M. LR-Civ. 26.6.

to compel narrowing the issues to which Sandia Labs need respond, and also requested that Sandia Labs engage in further informal discovery resolution processes.  See Benavidez' May 3, 2016 Email.  Obviously, Benavidez did not withdraw her Motion to Compel, as the Motion to Compel Response addresses all nine discovery requests.  See Motion to Compel Response at 1.

The Court reiterates this procedural history, because, it appears to the Court that Benavidez made some attempt to confer with Sandia Labs, albeit unsuccessful and misguided. The Court reaches this conclusion, because Benavidez stated in Benavidez' April 29, 2016, Email that she would be filing her Motion to Compel to comport with her deadline to file that motion -- she was not removing herself from the informal discovery resolution process at that time.  Indeed, the Motion to Compel stated that negotiations were ongoing, thus indicating that she was not filing the Motion to Compel for nefarious reasons or to otherwise indicate to the Court that the parties had given up on resolving their disputes outside of the courtroom.  The Court notes that, obviously, had Benavidez conferred with Sandia Labs sooner before her deadline, the Motion to Compel would have likely been reduced in scope, because the parties had, by the time of the hearing, winnowed the discovery dispute down to two requests out of twenty-nine.  But Benavidez' mere filing of the Motion to Compel did not cost Sandia Labs any money.  It did not cost the Court any expenses or money either, because the Court did not look at it until before the August 25, 2016, hearing.  The Motion to Compel was just one more step in the meet-and-confer process, and it was the filing of the Motion to Compel Response that cost Sandia Labs money and time.   And, by that point, the two real discovery disputes had crystallized.  The Court would have preferred a different procedural history in this case, but the Court cannot say that, although the requirement to meet and confer in good faith was not met before filing the Motion to Compel, the sanction which Sandia Labs requests -- denial of the

Motion to Compel -- is appropriate in this case.  See New Mexico ex rel Balderas v. Valley Meat Co., LLC, 2015 WL 3544288, at *19 ("In the context of discovery and other non-dispositive motions, local rule 7.1's meet-and-confer requirement is not meant to be perfunctorily satisfied. . . .  If an agreed-upon solution can be reached, then doing so is generally preferable to having the same dispute resolved by judicial fiat.").  The Court thus concludes that Benavidez did not meet the requirement to meet and confer under rule 37(a), but also that the harsh sanction of summary denial is not appropriate on these facts, because an effort to confer was, indeed, made -- albeit tardy -- and because the Motion to Compel raises real discovery disputes that the Court will have to resolve, because the parties have been unable to.  These issues have to be resolved somehow, so there is no use in denying the Motion to Compel and starting the process over again.  The Court now proceeds to consider Benavidez' remaining discovery requests.

## II.   THE COURT WILL GRANT IN PART AND DENY IN PART THE MOTION TO COMPEL REGARDING RFP NO. 19.

Benavidez' Motion to Compel first, in relevant part, addresses her RFP No. 19, which requests "copies of job postings or any available job openings within Sandia National Laboratories from 2014 to present."  Motion to Compel at 6.  According to Benavidez, Sandia Labs responded to RFP No. 19 by stating:

> Request No. 19 is overly broad, and the burden and expense of producing the requested information far outweighs the likely benefit of the requested information.  Sandia had thousands of posted job openings during the requested time period, a large number of which required advanced degrees or other qualifications that Plaintiff does not possess.  Additionally, Plaintiff had access to all job postings up to the date of her separation, and to the majority of open positions since her separation which were posted on Sandia's external website Available positions that Plaintiff expressed interest in are produced in response to Request No. 20.

Motion to Compel at 5-6 (citing Discovery Responses at 5).   Benavidez then concedes her original requests' overbreadth, and, in the Motion to Compel, seeks production of only approximately one year of job postings -- the year which corresponds to her employment's realignment within Sandia Labs, from July 2, 2014, until April 17, 2015 -- which she argues is relevant to her claims regarding Sandia Labs' accommodation of Benavidez and its attempts to secure her different employment in a "suitable position."   Motion to Compel at 7.   Benavidez further argues that RFP No. 19

> seeks discovery directly related to Plaintiff's allegations that (1) there were available jobs for which Plaintiff was qualified and could have performed; and, (2) but for Defendant's retaliation and failure to abide by its promise and policy to provide assistance during the realignment process, Plaintiff would have received call backs for those jobs.

Motion to Compel Reply at 5.   Sandia Labs argues, however, that Benavidez' request is still overbroad and burdensome, because "most of the jobs responsive to Request for Production No. 19 required advanced degrees or other qualifications (such as physical abilities) that Plaintiff . . . did not possess."   Motion to Compel Response at 5-6.   Sandia Labs also explains that "the discovery is addressed to a non-existent issue.   Sandia had no legal obligation to find another job for Plaintiff, which exposes the request for the fishing expedition that it is."   Motion to Compel Response at 6.   According to Sandia Labs, "[r]etaliatory failure-to-hire cases first begin with a job application or the like from the plaintiff . . . [and] Sandia is aware of no case from this jurisdiction . . . holding that it is retaliation for an employer not to award a current employee a new job that she herself never sought."   Motion to Compel Response at 6-7.

Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

(1)    to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

    (A)    any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

    (B)    any designated tangible things; or

(2)    to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a). Rule 26(b)(1) explains that the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). The factors that bear upon proportionality are: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26 (b)(1). Federal courts have held that the scope of discovery under rule 26 is broad. See Gomez v. Martin Marrietta Corp., 50 F.3d at 1520; Sanchez v. Matta, 229 F.R.D. at 654 ("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information.").

At the hearing, the Court agreed with Sandia Labs that jobs for which Benavidez was not qualified were not relevant or proportional, but agreed with Benavidez that some of the postings

might be relevant and proportional.  In arguing that Sandia Labs acted in bad faith to her, she

may want to show that there were other jobs that she was qualified to do other than the one she

got.  Sandia Labs is probably going to pursue with pride to its re-assignment efforts for its

employees to avoid layoffs.  Benavidez no doubt wants to show that Sandia Labs did not act in

good faith, that it had a lot of jobs she could do, and steered her to a job that she could not do, so

that it would run her off.  Hence, not only are these jobs postings likely to lead to admissible

evidence they may be important evidence.  Accordingly, the Court will grant a "more narrow

request to produce the spreadsheet" that regards jobs for which Benavidez was qualified and falls

within the time frame during which she was searching -- July 2, 2014, until April 17, 2015 --

because "it looks like [it is] not unduly burdensome or expensive to produce."  March Tr. at

39:2-5 (Court).  See March Tr. at 39:17-40:13 (Court).  Producing all of the postings would be

burdensome.  See Motion to Compel Response at 7 (explaining that the production "is not simply

a matter of typing in a date range then pushing a button or two").  On the other hand, Sandia

Labs told the Court at the hearing that it would not "take more than a few hours" to generate the

spreadsheet of job postings in the more-limited time frame that the parties had discussed.  See

March Tr. at 35:24-25 (Poore).  Benavidez can then pick the ones for which she wants the actual

posting.  Benavidez should be judicious in her requests, asking only for actual postings that are

likely to be ones for which she was qualified.  The Court asks Sandia Labs to be generous and

liberal with Benavidez' requests for the actual postings.  If there are disputes, the Court is

available to resolve any remaining disputes.

       The Court concludes that the produced spreadsheet might potentially yield relevant

information, because the information could illuminate the extent of Sandia Labs' good-faith

effort to help Benavidez' employment realignment.  See March Tr. at 39:8-16 (Court).  The

Court thus orders Sandia Labs to produce a spreadsheet of the relevant internal job postings from July 2, 2014, until April 17, 2015.  Benavidez can then select the postings she wants to see, keeping in mind that she probably was not qualified for a lot of jobs at Sandia Labs.

## III.   THE COURT WILL GRANT IN PART AND DENY IN PART THE MOTION TO COMPEL REGARDING RFP NO. 23.

Benavidez' Motion to Compel next, in relevant part, addresses her RFP No. 23, which requests that Sandia Labs "provide a description, make and model, and photographs of all vehicles in the Sandia National Laboratories commercial pool."  Motion to Compel at 7. Benavidez explains that Sandia Labs objected to this request on the basis of relevance and burden, and, accordingly, Benavidez now argues that, because she was forced to "take a job in maintenance support, in the motor pool," RFP No. 23 will yield information that will help her demonstrate that she was not physically capable to perform that job.  Motion to Compel at 7 (referring to Discovery Responses at 6). According to Sandia Labs, however, Benavidez has "offered to narrow the request only to vehicles that Plaintiff was expected to operate."  Motion to Compel at 8 (referencing Benavidez' May 13, 2016, Email).  Sandia Labs nonetheless objects, however, because Benavidez was "expected to operate all of the approximately 3,000 vehicles and pieces of equipment that Sandia's Fleet Services Department manages," making RFP No. 23 an overly burdensome request.  Motion to Compel Response at 8.  Sandia Labs also contends that RFP No. 23 is, further, irrelevant, because photographs of vehicles will not "demonstrate that she was not physically able to perform" her job.  Motion to Compel Response at 9.  In her Motion to Compel Reply, Benavidez once again narrowed her request, indicating that she "would be willing to have the photographs and the makes and models of the vehicles that are centrally located," thereby further narrowing her initial request.  Motion to Compel Reply at 5.

Benavidez maintains that "[t]his evidence is essential to show what Defendant was attempting to do to Plaintiff by placing her in this position with known medical restrictions operating and maintaining this fleet of vehicles."  Motion to Compel Reply at 5.

At the hearing, the Court asked Benavidez, to lessen Sandia Labs' burden, if, "at least as a starting point, what if I told Sandia to get 10 pictures of vehicles that this job would have required her to drive, and make it representative."  March Tr. at 42:20-43:14 (Court).  Benavidez agreed that this production would be a "great starting point," March Tr. at 43:15-21 (Berenson), and although Sandia Labs was initially hesitant to concede that such production would be relevant and proportional, Sandia Labs ultimately agreed to provide ten representative photographs of the vehicles at Sandia Labs with which Benavidez' position would have necessitated her interaction.   See March Tr. at 44:16-45:2 (Viets); id. at 47:4-6 (Viets).  Accordingly, the Court held:

> All right so you'll get 10 pictures of some equipment that the position required a male fully qualified with a . . . license would be expected to drive in that position, and then Sandia can designate them, count them one to 10 and can tell you that a smaller number . . . are the ones that they actually expected Ms. Benavidez [to use] and you can argue otherwise but you'll get 10 pictures there, and if you're not, if you, after you show the 10 pictures to Ms. Benavidez and she doesn't think that's representative, [you can] come back and talk to us about it, but I have a feeling you'll get what you want and what you need to put in front of the jury.

March Tr. at 48:6-20 (Court).  The Court concludes that the production of these ten representative vehicles' photographs will not be unduly burdensome, and is further relevant and proportional to Benavidez' claims regarding her inability to operate the specific machinery used at Sandia Labs.  The Court thus orders the production of the photographs.

The Court and the parties need to be realistic and frank about what this dispute involves. Benavidez -- a woman -- wants some pictures of big, heavy machinery to waive before the jury

so they can say: "Look at what Sandia Labs made me work on."  Benavidez does not really care

if they are pictures of actual Sandia Labs vehicles as long as they are big and heavy.  From her

trial strategy standpoint, the bigger and heavier, the better.  They can come off the internet, a

Caterpillar tractor catalog, or even Little Hardhats: Road Construction Ahead,[14] so long as

Sandia Labs does not dispute that those were the vehicles on which it assigned Benavidez to

work.  Hence, Sandia Labs' attorneys -- as officers of the Court -- know what Benavidez wants it

to do, and must put their feet in Benavidez' shoes and give her the best pictures they can -- the

ones any man would have been expected to drive in that position.  Sandia Labs remains free to

argue that she would not have been expected to drive the same equipment as men, but Sandia

Labs needs to produce pictures of vehicles men would drive.  Sandia Labs has a lot of leeway

here to produce the pictures, but it must make a good-faith effort to give Benavidez what she

wants.  If Benavidez is unhappy with what Sandia Labs gives her, and cannot work out the

dispute informally, she can return to the Court for relief.

## IV.   THE COURT WILL REQUIRE EACH PARTY BEAR ITS OWN EXPENSES REGARDING THE MOTION TO COMPEL.

Sandia Labs argues that it "should be awarded its expenses," stating:

Under Rule 37(a)(5)(B), Sandia asks that the Court award Sandia its expenses
incurred in opposing the Motion because so much of the Motion proved to be
unjustified and because Plaintiff filed it without first conferring in good faith.
Plaintiff's headlong rush to Court is set forth above, as is the lack of justification
for two parts of the motion.  Plaintiff's complaints about the other seven requests
for production were so obviously unjustified and would almost certainly not have
been incorporated into the Motion, if Plaintiff had simply conferred first as was
her duty.

---

[14]Wherein "[a] friendly host named George, entertains and educates kids as they watch
real construction workers, the heavy machinery, blasting equipment and the tools used in every
step of a road-building project."   Little Hardhats, Road Construction Ahead, available at
http://www.littlehardhats.com/road-construction-ahead-dvd.html.

Motion to Compel Response at 9.  Benavidez does not explicitly ask for costs.

Rule 37(a)(5) governs expense awards in conjunction with the disposition of motions to compel discovery production.  See Fed. R. Civ. P. 37(a)(5).  Rule 37(a)(5) provides:

**(5) Payment of Expenses; Protective Orders.**

**(A)** *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).*  If the motion is granted -- or if the disclosure or requested discovery is provided after the motion was filed -- the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.   But the court must not order this payment if:

**(i)** the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

**(ii)** the opposing party's nondisclosure, response, or objection was substantially justified; or

**(iii)** other circumstances make an award of expenses unjust.

**(B)** *If the Motion Is Denied.*  If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees.  But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

**(C)** *If the Motion Is Granted in Part and Denied in Part.*  If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion.

Fed. R. Civ. P. 37(a)(5).  Sandia Labs' position has a lot of force.  Benavidez did not comply with the rules when she filed her Motion to Compel.  She should not have waited so late in her

time period to negotiate the discovery dispute, see D.N.M. LR - Civ. 26.6, and then wait until the last minute to bring the issue to a head.  At a minimum, Benavidez should have taken up Sandia Labs on the offer to extend the time for her to file the Motion to Compel.  Benavidez' argument that the time would pass without an order is unfounded; the Court does not really ever deny an unopposed motion to extend the local rule 26.6 deadline.  Benavidez should not have filed her Motion to Compel -- she should have filed the motion to extend the deadline.

On the other hand, there appears to have been a real discovery dispute.  That some disputes were resolved does not mean that they were not real.  As to the seven disputes that were resolved, the Court does not have anything in this record that explains whether, objectively, Benavidez "won" that argument or Sandia Labs "produced" on this issue.  The Court thinks that it is improper to try to shift any fees on the basis of these seven requests without a more detailed examination of these seven requests, a task which would defeat the purpose of informal resolution of discovery disputes.

In this case, the Court has "granted in part and denied in part" the two remaining issues in the Motion to Compel, meaning that rule 37(a)(5)(C) is the applicable provision, and not, as Sandia Labs argues, rule 37(a)(5)(B).  Fed. R. Civ. P. 37(a)(5)(C).  The Court has considerably more discretion to award reasonable expenses in such an occasion and concludes that an award of expenses to Sandia Labs is not warranted at this time.  Compare Fed. R. Civ. P. 37(a)(5)(C) (stating that "the court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion"), with Fed. R. Civ. P. 37(a)(5)(B) (stating that "[i]f the motion is granted -- or if the disclosure or requested discovery is provided after the motion was filed -- the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's

reasonable expenses incurred in making the motion, including attorney's fees.").  The Court

notes that the parties likely could not have avoided the Court's rulings on RFP No. 19 or RFP

No. 20, as each side made arguments in support and in opposition to their substance.  Despite

efforts, they could not informally resolve their disputes with these two RFPs, and they needed

judicial involvement for resolution.  The Court's consideration of the Motion to Compel was

thus not a waste of the parties', or the Court's, time and expense.  The Court, accordingly, will

require each party to bear its own expense, and not order an award under rule 37(a)(5).

**IT IS ORDERED** that Plaintiff's First Motion to Compel Production of Documents,

filed May 2, 2016 (Doc. 52), is granted in part and denied in part.  Defendant Sandia Labs will,

for the time frame of July 2, 2014, until April 17, 2015, produce a spreadsheet of its internal job

postings for which Plaintiff Linda Benavidez would have qualified; she may then select actual

postings off that spreadsheet for which she concludes she was qualified.  Sandia Labs will also

produce ten photographs of Sandia Labs vehicles that are representative of the range of vehicles

that Benavidez would have been required to drive and maintain during her employment.  Sandia

Labs' production of all ordered materials satisfies all Plaintiff Linda Benavidez' remaining

discovery requests, and the Motion to Compel is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Rachel E. Higgins
Rachel E. Higgins Attorney at Law
Albuquerque, New Mexico

-- and --

Rachel Berenson
Berenson & Associates, P.C.
Albuquerque, New Mexico

-- and --

Katherine A. Wray
Jane Katherine Girard
Wray & Girard P.C.
Albuquerque, New Mexico

　　*Attorneys for the Plaintiff Linda Benavidez*

Justin E. Poore
Sandia Corporation
Albuquerque, New Mexico

-- and --

Aaron C. Viets
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

　　*Attorneys for the Defendants*